1   Frederick Douglas
    (Admitted Pro Hac Vice)
2   FEDERAL EXPRESS CORPORATION
    3620 Hacks Cross Road
3   Building B, 3rd Floor
    Memphis, Tennessee, 38125
4   Telephone: (901) 434-8519
    Facsimile: (901) 434-9271
5
    SEYFARTH SHAW LLP
6   Gilmore F. Diekmann, Jr. (SBN: 050400)
    Francis J. Ortman, III (SBN: 213202)
7   560 Mission Street, Suite 3100
    San Francisco, California 94105
8   Telephone: (415) 397-2823
    Facsimile: (415) 397-8549
9
    Evelyn L. Becker (CA SBN: 170903)
10  O'MELVENY & MYERS LLP
    1625 Eye Street, NW
11  Washington, DC 20006
    Telephone: (202) 383-5300
12  Facsimile: (202) 383-5414

13  Attorneys for Defendant
    FEDERAL EXPRESS CORPORATION

14

15              **UNITED STATES DISTRICT COURT**

16            **NORTHERN DISTRICT OF CALIFORNIA**

17  DERRICK SATCHELL, KALINI          Case Nos. C03-02659 SI; C03-02878 SI
    BOYKIN, VALERIE BROWN, RICK
18  GONZALES, CYNTHIA GUERRERO,        **DEFENDANT'S MOTION IN LIMINE NO. 9**
    RACHEL HUTCHINS, DANIEL            **(PRECLUDE PLAINTIFFS' EXPERT DR.**
19  SHERMAN, KELVIN SMITH, SR., and    **WILLIAM T. BIELBY'S EVIDENCE**
    KEN STEVENSON, on behalf of        **REGARDING BIAS IN THE FEDEX**
20  themselves and all others similarly situated,  **PERSONNEL SYSTEM)**

21              Plaintiff,

22          v.                         Hearing Date:    March 2, 2007
                                       Hearing Time:    9 a.m.
23  FEDEX EXPRESS, a Delaware
    corporation,

24

25              Defendant.

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ................................................................................................... 1

MOTION AND MEMORANDUM OF LAW..................................................................... 1

INTRODUCTION.......................................................................................................... 1

BACKGROUND........................................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.      DR. BIELBY'S PURPORTED EVIDENCE THAT FEDEX'S
        PERSONNEL SYSTEM IS "VULNERABLE TO BIAS" DOES NOT
        ASSIST THE TRIER OF FACT AND SHOULD THEREFORE BE
        EXCLUDED ........................................................................................ 3

        A.      Because Dr. Bielby Addresses Subjects Within The Understanding
                Of The Average Person, His Testimony Regarding Those Subjects
                Should Be Excluded ................................................................... 4

                1.      Dr. Bielby's Assertion That FedEx's Personnel System Is
                        "Uniform" And "Standardized" Is Not An Appropriate Subject
                        For Expert Testimony ........................................................ 4

                2.      Dr. Bielby's Assertion That Discretionary Features In A
                        Personnel System "Can Be Vulnerable To Bias," And That
                        Such Vulnerability "Can Result In Substantial Barriers" To
                        Minority Employees Unless Minimized Through Adequate
                        Monitoring And Accountability Is Not An Appropriate
                        Subjects For Expert Testimony.......................................... 4

                3.      Dr. Bielby's Assertion That "Not All Bias Is Subtle At FedEx"
                        Is Not An Appropriate Subject For Expert Testimony .............. 5

        B.      Dr. Bielby's Evidence Regarding Potential Bias In Discretionary
                Features Of FedEx's Personnel System Is Not Relevant To This Case
                And Should Therefore Be Excluded ............................................. 6

        C.      Rule 403 Further Mandates Exclusion Of Dr. Bielby's Evidence
                Regarding Potential Bias In FedEx's Personnel System ..................... 9

                1.      Dr. Bielby's Assertion That Discretionary Features In A
                        Personnel System "Can Be Vulnerable to Bias," And That
                        Such Vulnerability "Can Result In Substantial Barriers" To
                        Minority Employees Unless Minimized Through Adequate
                        Monitoring And Accountability Is Unfairly Prejudicial.............. 10

                2.      Dr. Bielby's Assertion That Statistical Analysis Conducted By
                        Plaintiffs' Expert, Dr. Richard Drogin, Demonstrates Adverse
                        Impact Is Unnecessary And Cumulative ............................ 11

# TABLE OF CONTENTS
## (continued)

Page

II.  DR. BIELBY IS NOT QUALIFIED TO PROVIDE EXPERT EVIDENCE
REGARDING FEDEX'S PERSONNEL PRACTICES AND POLICIES,
AND THIS EVIDENCE MUST THEREFORE BE EXCLUDED. ...................... 11

CONCLUSION .............................................................................................. 13

1                **TABLE OF AUTHORITIES**

2

                                                       **Page**

3                        **CASES**

4 *Bogosian v. Mercedes-Benz of N.A., Inc.,*
    104 F.3d 472 (1st Cir. 1996) ................................................................. 11

5 *Casillas v. U.S. Navy,*
    735 F.2d 338 (9th Cir. 1984) ................................................................ 10

6

*Daubert v. Merrell Dow Pharm.,*
7     509 U.S. 579 (1993) ......................................................................... 9, 10

8 *Daubert v. Merrell Dow Pharm.,*
    43 F.3d 1311 (9th Cir. 1995) ............................................................. 6, 10

9 *Eagleston v. Guido,*
    41 F.3d 865 (2d Cir. 1994) .................................................................. 12

10
*Green v. Kinney Shoe Corp.,*
11     715 F.Supp. 1122 (D.D.C. 1989) ....................................................... 5, 10

12 *In re Rezulin Prods. Liab. Litig.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................ passim

13 *Int'l Bhd. of Teamsters v. United States,*
    431 U.S. 324 (1977) ............................................................................. 7

14 *Little Oil Co. v. Atlantic Richfield Co.,*
    852 F.2d 441 (9th Cir. 1988) ................................................................ 3
15
*McDonnell Douglas Corp. v. Green,*
16     411 U.S. 792 (1973) ............................................................................ 3

17 *Salem v. U. S. Lines Co.,*
    370 U.S. 31 (1962) .............................................................................. 3

18 *Sittig v. Louisville Ladder Group LLC,*
    136 F. Supp. 2d 610 (W.D. La. 2001) ................................................. 11

19 *U.S. Smelting Co. v. Parry,*
    166 F. 407, 411 (1909) ........................................................................ 3
20
*United States v. Fuentes-Cariaga,*
21     209 F.3d 1140 (9th Cir) ....................................................................... 3

22 *United States v. Gwaltney,*
    790 F.2d 1378 (9th Cir. 1986) .............................................................. 3

23 *United States v. Rahm,*
    993 F.2d 1405 (9th Cir. 1993) .............................................................. 3

24 *Wilkinson v. Rosenthal & Co.,*
    712 F. Supp. 474 (E.D. Pa. 1989) ...................................................... 12
25
*Wilson v. Muckala,*
26     303 F.3d 1207 (10th Cir. 2002) ......................................................... 3, 4

27                          **RULES**

FED. R. EVID. 403 ................................................................................. 9, 10

28

Defendant's Motion in Limine No. 9
Case Nos. C 03-02659 SI; C 03-02878 SI

1

## TABLE OF AUTHORITIES

2

**Page**

3    FED R. EVID. 702 ............................................................................. passim

4

## ARTICLES

5    Greenwald & Krieger, *Implicit Bias: Scientific Foundations*, 94 Cal. L. Rev. 945 (2006)............................................................................................. 8

6    Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991) ......................................... 10

7

## BOOKS

8    1 Lindemann & Grossman, Employment Discrimination Law (3d ed. 1997)................... 7

9    4 Weinstein & Berger, Weinstein's Federal Evidence (4th ed. 2006) ................................ 6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

Please take notice that on March 2, 2007, at 9 a.m., before the Honorable Susan Illston, in Courtroom 10, on the 19th floor of the United States District Courthouse for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Federal Express Corporation ("FedEx") will move to preclude plaintiffs' expert Dr. William T. Bielby's evidence regarding bias in FedEx's personnel system.

**MOTION AND MEMORANDUM OF LAW**

**INTRODUCTION**

Despite the heft of his expert report, plaintiffs' expert, William T. Bielby, Ph.D., manages to say nothing much at all. His findings that discretionary features in FedEx's personnel system are "vulnerable" to bias address subject matters that do not require expert testimony and provide evidence that lacks any logical connection to this litigation. Moreover, Dr. Bielby lacks the expertise to opine on the adequacy and validity of FedEx's personnel policies and procedures, particularly on its monitoring and accountability practices. Dr. Bielby's proffered evidence thus fails to meet the standards for expert testimony set forth under Federal Rule of Evidence ("Fed. R. Evid") 702. Rather, his engagement by plaintiffs appears intended "more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004). Dr. Bielby's evidence regarding bias at FedEx should therefore be precluded.

**BACKGROUND**

William T. Bielby, Ph.D., plaintiffs' expert in the field of social science, was asked by plaintiffs to assess whether FedEx's personnel policies and practices create barriers to the career advancement of minority employees at FedEx. (Expert Report of William T. Bielby, Ph.D., dated

June 30, 2006 at 1, ¶ 1 (attached as Ex. A to Becker Decl.) ("Bielby Report").)  Dr. Bielby

ultimately concludes that discretionary features in FedEx's personnel system are "vulnerable" to

bias and FedEx's monitoring and accountability practices are inadequate to minimize this

supposed vulnerability.  (*Id.* at 5, ¶ 9.) In so concluding, Dr. Bielby's makes five principal

findings:

- First, he provides an overview of his view of the FedEx personnel system, concluding that FedEx's personnel system is "uniform, centralized, and in many ways highly formalized and standardized." (Bielby Report at 5, 6-8, ¶¶ 9, 10-14.)

- Second, Dr. Bielby summarizes social science literature that he claims supports the finding that (a) discretionary features in a personnel system "***can*** be vulnerable to bias," and (b) such vulnerability "***can*** result in substantial barriers" to minority employees unless minimized through adequate monitoring and accountability.  (*Id.* at 5, 9-20, ¶¶ 9, 15-27 (emphasis added).)

- Third, he analyzes FedEx's personnel system and finds that it is "deficient" in both monitoring and accountability.  (*Id.* at 5, 20-30, ¶¶ 9, 28-42.)

- Fourth, Dr. Bielby describes the statistical analyses conducted by Dr. Richard Drogin, plaintiffs' statistical expert, and concludes that Dr. Drogin's statistics demonstrate the discretionary features of FedEx's personnel system have "an adverse impact on minorities." (*Id.* at 5, 30-32, ¶¶ 9, 43-47.)

- Fifth and finally, Dr. Bielby discusses the deposition testimony of two individuals, whom he claims provided anecdotal evidence of explicit bias at FedEx, which leads him to conclude that "not all racial bias at FedEx is subtle." (*Id.* at 32-35,¶¶ 48-51.)

The first, second, fourth and fifth findings do not assist the trier of fact because such findings (A)

address subjects that are not so complicated as to require expert testimony, (B) are irrelevant to

the facts of this case, and (C) mislead the jury and needlessly present cumulative evidence.  The

third finding addresses subject matter beyond the realm of Dr. Bielby's expertise, and he is

therefore not qualified to provide such expert evidence.  For these reasons, each and every finding

reached by Dr. Bielby should be excluded.

1

**ARGUMENT**

2

**I.      Dr. Bielby's Purported Evidence That FedEx's Personnel System Is "Vulnerable To Bias" Does Not Assist The Trier Of Fact And Should Therefore Be Excluded**

3

4

One of the "fundamental requirements" of Fed. R. of Evid. 702 is that proposed expert's

5

evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue."

6

*In re Rezulin*, 309 F. Supp. 2d at 539; *see also* FED. R. EVID. 702.  In evaluating the helpfulness

7

requirement, the Ninth Circuit has emphasized that "the test for admissibility is whether the jury

8

will receive '*appreciable help*'" from the expert's evidence. *Little Oil Co., v. Atlantic Richfield*

9

*Co.*,852 F.2d 441, 446 (9th Cir. 1988) (quoting *United States v. Gwaltney*, 790 F.2d 1378, 1381

10

(9th Cir. 1986), *cert. denied*, 479 U.S. 1104 (1987)) (emphasis added).

11

12

**A.      Because Dr. Bielby Addresses Subjects Within The Understanding Of The Average Person, His Testimony Regarding Those Subjects Should Be Excluded.**

13

14

Expert testimony is properly excluded if it concerns matters within the understanding of

15

the average person. *Salem v. U.S. Lines Co.,* 370 U.S. 31, 35 (1962) (expert evidence may be

16

properly excluded if "men of common understanding, are as capable of comprehending the

17

primary facts and of drawing correct conclusions from them" as are the expert witnesses)

18

(quoting *U.S. Smelting Co. v. Parry*, 166 F. 407, 411, 415 (1909)); *see also United States v.*

19

*Fuentes-Cariaga*, 209 F.3d 1140, 1142 n. 3 (9th Cir. 2000) ("Where an expert offers general

20

testimony about an issue within the ken of the jury's knowledge, it is not an abuse of discretion to

21

22

exclude such testimony under Rule 702") (citing *United States v. Rahm,* 993 F.2d 1405, 1413 (9th

23

Cir. 1993).  When the subject matter on which the witness seeks to testify is not "so complicated

24

as to *require* the testimony of an expert witness," the trier of fact can properly draw conclusions

25

based upon normal experiences and common-sense, and the expert testimony therefore is not

26

27

helpful to the fact finder. *Wilson v. Muckala*, 303 F.3d 1207, 1218 (10th Cir. 2002).  Because

28

Defendant's Motion in Limine No. 9
Case Nos. C 03-02659 SI; C 03-02878 SI

Dr. Bielby addresses subjects which are not so complicated as to require expert testimony, his testimony regarding those subjects should be excluded.

### 1. Dr. Bielby's Assertion That FedEx's Personnel System Is "Uniform" And "Standardized" Is Not An Appropriate Subject For Expert Testimony.

Dr. Bielby's assertion that FedEx's personnel system "is uniform, centralized, and in many ways highly formalized and standardized" is no more than his subjective interpretation of Deposition testimony that the jury is equally capable of understanding and interpreting, and should therefore be excluded. (*See* Bielby Report at 6-9, ¶¶ 10-14.) In reviewing FedEx's personnel system, Dr. Bielby merely repeats facts provided by other potential witnesses and makes conclusory arguments based upon those facts, arguments which counsel may make at trial without expert assistance. *See In re Rezulin*, 309 F. Supp. 2d at 541 ("[E]xperts should not be permitted to 'supplant the role of counsel in making argument at trial, and the role of jury in interpreting the evidence.'"). Moreover, the conclusion that FedEx's personnel system is (or is not) "uniform" and "standardized" is one that the trier of fact can properly form based upon normal experiences and common-sense. *See Wilson*, 303 F.3d at 1219. Dr. Bielby's assertions regarding the FedEx personnel system are, quite simply, "no more than 'arguments and conclusory statements about questions of fact masquerading behind a veneer of technical language'" and should therefore be excluded. *In re Rezulin*, 309 F. Supp. 2d at 554.

### 2. Dr. Bielby's Assertion That Discretionary Features In A Personnel System "Can Be Vulnerable To Bias," And That Such Vulnerability "Can Result In Substantial Barriers" To Minority Employees Unless Minimized Through Adequate Monitoring And Accountability Is Not An Appropriate Subject For Expert Testimony.

Dr. Bielby's assertion that discretionary features in a personnel system "*can* be vulnerable to bias" is a matter of commonsense within the knowledge of the average person and should therefore be excluded. Despite the heft of social science literature to which Dr. Bielby cites in his

Defendant's Motion in Limine No. 9
Case Nos. C 03-02659 SI; C 03-02878 SI

expert report, his summary of relevant research boils down to the somewhat unremarkable contention that discretion in personnel decisions *could*[1] permit a manager to discriminate, particularly where the manager is not monitored or held accountable for his or her decisions. It should, however, "be clear to any reasonable person that a subjective [personnel] process *could enable* an employer to hide discriminatory intent. Indeed, this kind of argument may be made, based on the evidence, by lawyers in closing argument. The finders of fact do not need expert testimony on this point." *Green v. Kinney Shoe Corp.*, 715 F. Supp. 1122, 1123-24 (D.D.C. 1989) (emphasis added) (excluding proffered expert testimony regarding the use of subjective criteria in promotion decisions); *see also In re Rezulin,* 309 F. Supp. 2d at 541.

### 3. Dr. Bielby's Assertion That "Not All Bias Is Subtle At FedEx" Is Not An Appropriate Subject For Expert Testimony.

Dr. Bielby's assertion, based solely on allegations contained in the Deposition transcripts of two fact witnesses, that "blatant racism has not disappeared" and that such "[o]vert prejudice among managers undermines equal opportunity" is utterly self-evident and should be excluded. (Bielby Report at 35, ¶ 51.) Moreover, to support his conclusion, Dr. Biebly merely reiterates allegations stated by potential fact witnesses, evidence which may be independently provided to the jury, thus further counseling exclusion of Dr. Bielby's findings on explicit bias at FedEx. *See*

---

[1]    Noticeably, Dr. Biebly has not - and, according to him, cannot - opine on whether (and if so, how often) decision-makers actually abuse this "vulnerability to bias" by discriminating against minorities - a topic for which expert testimony may have been helpful.

Q. Having determined that a system is "vulnerable" to bias, is there any measure that one can come up with in your social framework analysis that tells us how probable discrimination is? In other words, for example, what percent of employment decisions are likely to be affected by bias?

A. *No, there isn't.*

(Deposition of William T. Bielby, Ph.D. at 288:23-289:5 (attached as Ex. B to Becker Decl.) ("Bielby Dep.).)

1   *In re Rezulin*, 309 F. Supp. 2d at 546 (excluding testimony as improper where the expert "merely

2   repeated facts or opinions stated by other potential witnesses").

3       **B.    Dr. Bielby's Evidence Regarding Potential Bias In Discretionary Features Of
4               FedEx's Personnel System Is Not Relevant To This Case And Should
                Therefore Be Excluded.**
5

6           Even if the subject matter of proposed expert testimony is so complicated as to require an

7   expert, the testimony is admissible only if it "is 'relevant to the task at hand,' i.e., that it logically

8   advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm.*,

9   43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). This requirement has commonly been

10  described as one of "fit" and is similar to "'the relevance requirement of Rule 401, which is

11  applicable to all proffered evidence[,] [but] . . . goes beyond mere relevance . . . because it also

12  requires expert testimony to have a valid connection to the pertinent inquiry." *In re Rezulin*

13  *Prods. Liab. Litig.*, 309 F. Supp. 2d at 540 (citations omitted); *see also* 4 Weinstein & Berger,

14  Weinstein's Federal Evidence § 7.02.03[1] (4th ed. 2006) (stating that Rule 702 "goes beyond

15  mere relevance [and i]t is a more stringent standard of admissibility"). Federal courts must

16  therefore "exclude proffered scientific evidence under Rules 702 and 403 unless they are

17  convinced it speaks clearly and directly to an issue in dispute in the case." *Daubert II*, 43 F.3d at

18  1321, n. 17.

19

20          Dr. Bielby summarizes social science literature that he claims supports his findings that

21  (a) discretionary features in a personnel system "***can be*** vulnerable to bias," and (b) such

22  vulnerability "***can*** result in substantial barriers" to minority employees unless minimized through

23  adequate monitoring and accountability. (Bielby Report at 5, 9-20, ¶¶ 9, 15-27) (emphasis

24  added).) As discussed above, these findings are not so complicated as to require expert

25  testimony. However, even if this Court were to find to the contrary, the evidence must also be

26

27

28

Defendant's Motion in Limine No. 9
Case Nos. C 03-02659 SI; C 03-02878 SI

1   excluded because Dr. Bielby has not shown that FedEx managers actually exercised

2   discriminatory intent in making employment decisions.

3        Plaintiffs have alleged racial discrimination in certain aspects of FedEx's employment

4   practices based upon two distinct theories – disparate treatment and adverse impact.  (See

5   Plaintiffs' Third Consolidated Amended Complaint, Dkt. No. 491, Ex. A)  The theory of disparate

6   treatment requires a showing of intentional discrimination, while a claim of adverse impact, by

7   contrast, may be proved absent a showing of discriminatory intent.  See, e.g., Int'l Bhd. of

8   Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977) (finding that in claims of disparate

9   treatment, "[p]roof of discriminatory motive is critical") (emphasis omitted);  see also 1

10   Lindemann & Grossman, Employment Discrimination Law 80 (3d ed. 1997).  Dr. Bielby fails to

11   provide any evidence of discriminatory intent.  As such, his testimony is not helpful either to

12   show disparate treatment, which requires proof of such intent, or adverse impact, for which his

13   expertise in social science is not necessary.

14        Dr. Bielby fails to provide testimony helpful to the trier of fact regarding either of

15   plaintiffs' theories.  First, Dr. Bielby's testimony regarding vulnerability to bias is wholly

16   unrelated to a disparate treatment theory because it does not support a finding of discriminatory

17   intent.  He constructs his entire premise – that discretionary features in a personnel system are

18   vulnerable to bias – on the unproven assumption that decision-makers are biased.  Dr. Bielby,

19   however, has made no independent assessment of whether FedEx managers suffer from bias and

20   stereotyping, much less whether they actually discriminate in making personnel decisions.[2]  Dr.

---

[2]   Dr. Bielby, in fact, did not test **any** FedEx employee for bias or stereotypical views. (Bielby Dep. at 167:7-9.)  Indeed, in preparing his expert report, Dr. Bielby did not talk to any FedEx employees or managers, nor did he visit any FedEx site.  (Id. at 78:20-79:11.)  He admitted that the only effort he made to learn how FedEx's operations work in a typical day was through reading deposition transcripts.  (Id.)  Dr. Bielby's review of the deposition transcripts was, however, deficient at best.  Although provided over 80 depositions in total, he was forced to admit that he "knows" of only **four** which he "read beginning to end" and an additional eight he

Bielby must therefore be assuming that **all** decision-makers – including FedEx managers - suffer from bias and stereotyping. This is, in essence, the theory of implicit bias - the theory that all individuals have implicit biases, which are defined as "forms of social knowledge that operate largely (but not exclusively or necessarily) outside of conscious awareness, yet are significant in determining judgment and behavior in relation to stigmatized and disadvantaged groups." (Dr. Greenwald's Expert Report, dated September 3, 2006, at 26, ¶ 32.) Dr. Bielby, however, has explicitly stated that the theories of implicit racial bias are **not** the "foundation for [his] conclusion" that unmonitored discretion creates a vulnerability to bias in personnel decision-making.[3] (*See, e.g.,* Bielby Dep. at 373:12-374:9.)[4] By distancing himself from this theory (and

---

"thinks or believes" he may have read in their entirety. (*See id.* 77:18-24; 78:1-4.) Providing Dr. Bielby the benefit of the doubt, he therefore read in their entirety only 12 of more than 80 transcripts.

[3]    Even if Dr. Bielby had attempted to reach conclusions founded upon the theory of implicit bias, such conclusions would be inherently unreliable. Implicit bias is nothing more than "junk science" – a "new" and "evolving" science that runs counter to mainstream anti-Freudian theories (*see, e.g.,* Greenwald & Krieger, *Implicit Bias: Scientific Foundations*, 94 Cal. L. Rev. 945, 946 (2006) ("the new science of unconscious mental process . . . is being constructed from an evolving, accumulating body of . . . research")). Moreover, **no one** – including Dr. Bielby or anyone else - has ever scientifically tested whether (and if so, how often) a manager will in fact rely on stereotypes and implicit bias in making personnel decisions in an employment setting with similar accountability and monitoring protections. (*See, e.g.,* Bielby Dep. at 175:25-176:8 ("there are no studies that I'm aware of that . . . [are] designed to get at unconscious bias and their consequences for behavior outside of laboratory settings").); *see also id.* at 175:5-177:13 (stating that he cannot identify any studies showing that unconscious stereotypes, in fact, biased hiring and promotion decisions where various accountability conditions similar to those in place at FedEx, are used.)

[4]    (Bielby Dep. at 373:12-374:9 (emphasis added).) Testimony regarding implicit bias is therefore neither relevant nor reliable as required under *Daubert* and Fed. R. Evid. 702.

> Q. . . . Are the various theories about implicit racial bias the foundation of your opinions and conclusions regarding unmonitored discretion being the source of discriminatory decision-making?
>
> . . .
>
> A. I don't -- I don't think so . . . My insights have certainly been informed by them. **But in terms of foundation for my conclusion, no.** I would have come to

Defendant's Motion in Limine No. 9
Case Nos. C 03-02659 SI; C 03-02878 SI

providing no substitute explanation), Dr. Bielby has utterly failed to provide *any* evidence – reliable or otherwise – connecting his assertion that "personnel systems *can* be vulnerable to bias" to any conclusion that *actual discrimination* has occurred at FedEx. Thus, not only has he failed to independently test FedEx managers for the presence of bias, but he sets forth no general theory to demonstrate the presence of bias in all decision-makers, including those at FedEx.

Second, Dr. Bielby, a sociologist, is unnecessary to plaintiffs' showing regarding their adverse impact theory. Rather, Dr. Bielby merely asserts that discretionary features in a personnel system *can be* vulnerable to bias and then, relying solely upon Dr. Drogin's statistical analyses, concludes that "discretion is exercised in the FedEx personnel system [and] . . . it has an adverse impact on minority employees." (Bielby Report at 35, ¶ 52.) Plaintiffs have already presented the testimony of Dr. Drogin, a statistician, who purports to support a disparate impact theory of discrimination – there is no need for a sociologist to opine on the meaning of Dr. Drogin's statistical evidence. Because Dr. Bielby's theories and findings do nothing to advance or support an adverse impact theory, and because his testimony also is unrelated to plaintiffs' disparate treatment theory, his testimony is not helpful to the trier of fact and must be excluded.

**C.     Rule 403 Further Mandates Exclusion Of Dr. Bielby's Evidence Regarding Potential Bias In FedEx's Personnel System.**

The Supreme Court has observed, "a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of . . . [Rule 403]." *Daubert v. Merrell Pharm.*, 509 U.S. 579, 595 (1993). Fed. R. Evid. 403 provides that relevant evidence may be excluded "if

---

much the same conclusion 15 years ago, 10 years ago, before actual implicit-association test and that sort of thing existed.

(*See also* Dr. Bielby's Rebuttal Expert Report, dated September 1, 2006, at 8, ¶ 15 (stating that the "'implicit association test' . . . is not work I cite in my report"); *see also* Plaintiffs' Expert Dr. Anthony Greenwald's Expert Report, dated September 3, 2006, at 23, ¶ 26 (stating that FedEx's expert Professor Tetlock's assertion "that Professor Bielby's argument is based on appeal to concepts of implicit bias . . . is inaccurate").)

Defendant's Motion in Limine No. 9
Case Nos. C 03-02659 SI; C 03-02878 SI

its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. This principle is of particular import in determining the admissibility of expert evidence given that "'[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" *Daubert*, 509 U.S. at 595 (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)); *see also Daubert II*, 43 F.3d at 1321, n.17.

> 1. **Dr. Bielby's Assertion That Discretionary Features In A Personnel System "Can Be Vulnerable to Bias," And That Such Vulnerability "Can Result In Substantial Barriers" To Minority Employees Unless Minimized Through Adequate Monitoring And Accountability Is Unfairly Prejudicial.**

Not only is Dr. Bielby's evidence regarding vulnerability to bias not relevant, but it is affirmatively harmful in its potential to mislead the jury regarding the burden of proof in employment discrimination cases. Essentially, Dr. Bielby concludes that a discretionary personnel system is biased against minority employees unless adequate monitoring and accountability measures are in place. He therefore asks the fact finder to begin with the expectation of bias and to place the burden on FedEx to prove it took adequate efforts to minimize such bias. This contradicts the established burden of proof in employment discrimination cases. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Moreover, this testimony may lead the trier of fact to believe that discretion in a personnel system – or more specifically, the use of subjective criteria – is inherently suspect under discrimination law, when in fact it is perfectly lawful. *See Kinney Shoe Corp.*, 715 F. Supp. at 1124-25; *see also Casillas v. U.S. Navy*, 735 F.2d 338, 345 (9th Cir. 1984).

Defendant's Motion in Limine No. 9
Case Nos. C 03-02659 SI; C 03-02878 SI

1

2. **Dr. Bielby's Assertion That Statistical Analyses Conducted By Plaintiffs' Expert, Dr. Richard Drogin, Demonstrates Adverse Impact Is Unnecessary And Cumulative.**

2

3

Dr. Bielby's contention that statistical analyses by Dr. Drogin demonstrates adverse

4

impact on FedEx's minority employees is merely a summary of Dr. Drogin's independent

5

analysis and, as such, should be excluded "by considerations of undue delay, waste of time, [and]

6

needless presentation of cumulative evidence." Because Dr. Bielby – who is not a statistician –

7

8

fails to show discriminatory intent, as discussed above, he adds nothing to Dr. Drogin's statistical

9

analysis. Rather, he simply repeats the evidence in a perfunctory manner, leading not only to the

10

needless presentation of cumulative evidence and the attendant delay but to a risk the jury will

11

view Dr. Bielby's testimony as an independent endorsement of the reliability and validity of the

12

statistical evidence. *See, e.g., In re Rezulin*, 309 F. Supp. 2d at 550 (excluding expert opinions as

13

14

"cumulative and certain to waste time" because the opinions "merely recite facts, or endorse

15

opinions" expressed by another expert). This evidence must therefore be excluded.

16

**II.    Dr. Bielby Is Not Qualified to Provide Expert Evidence Regarding FedEx's Personnel Practices and Policies, And His Testimony Regarding Them Must Therefore Be Excluded.**

17

18

When faced with a proffer of expert testimony, a court must determine whether a proposed

19

witness is qualified as an expert by knowledge, skill, experience, training or education *in the*

20

*relevant field. See, e.g., Bogosian v. Mercedes-Benz of N.A., Inc.*, 104 F.3d 472, 476-78 (1st Cir.

21

22

1996) (affirming exclusion of expert evidence where witness' expertise did not extend to relevant

23

field); *see also Sittig v. Louisville Ladder Group LLC*, 136 F. Supp. 2d 610, 616 (W.D. La. 2001)

24

("Although an expert need not have specialization in every area in which he will be called to testify,

25

Rule 702 nonetheless requires that the expert be qualified in the relevant field."). Designation as an

26

expert does not give the witness license to provide expert evidence in any and all scientific,

27

technical or other specialized matters. Rather, when a witness who may be qualified as an expert in

28

Defendant's Motion in Limine No. 9
Case Nos. C 03-02659 SI; C 03-02878 SI

one field provides testimony addressing a subject beyond the realm of his known expertise, the court must exclude such evidence unless the expert can show he or she is qualified in that field as well. *See, e.g., Eagleston v. Guido,* 41 F.3d 865, 874 (2d Cir. 1994) (finding that witness with experience in sociology had failed to establish sufficient expertise in specific fields of criminology or domestic violence); *see also Wilkinson v. Rosenthal & Co.,* 712 F. Supp. 474, 477-78 (E.D. Pa. 1989).

Dr. Bielby is not qualified to provide expert opinions as to the adequacy or validity of FedEx's personnel practices and policies. Although he may be qualified to provide an expert opinion that social science literature supports his finding that discretion in decision-making can make personnel systems vulnerable to bias – assuming this were even helpful to the fact finder or relevant to the facts of the case – he lacks sufficient knowledge, skill, experience, training and education to provide an expert opinion regarding FedEx's actual personnel practices and policies. Dr. Bielby's findings that FedEx' personnel system, although "standardized" and "formalized," has "discretionary features" and suffers from "inadequate" monitoring and accountability must therefore be excluded.

By his own admission, Dr. Bielby lacks the expertise possessed by individuals, such as FedEx's expert Jan Duffy and plaintiffs' expert Nita French, who are qualified to opine on the adequacy and validity of human resource policies and practices. For example, Dr. Bielby – unlike Ms. Duffy – has no experience designing and implementing human resource and diversity policies and practices. (Bielby Dep. at 32:16-33:7.) Nor has he himself designed a performance evaluation system. (*Id.* at 242:19-21.) Nor does he have any experience in analyzing policies and procedures regarding performance evaluation systems (including specifically any attendant monitoring systems). (*Id.* at 41:16-42:5; 242:22-25.) Moreover, any limited knowledge Dr. Bielby may possess regarding personnel practices and policies is selectively gathered through his

experience providing expert testimony in litigation. In his own words, Dr. Bielby is "not a person that goes out and does analyses of specific companies *apart from a litigation context*." (*Id.* at 48:7-16; *see also id.* at 39:10-40:11 ("I don't get access to a representative sample of companies in order to make comparisons . . . So I don't really have a good basis for saying -- you know, or making judgments on the extent to which other companies that are as labor-intensive as FedEx and as big as FedEx are or are not more sophisticated").) His unfamiliarity with personnel practices and policies was made quite clear by his repeated inability to name any specific companies with better policies or practices than FedEx. (*See, e.g., id.* at 41:7-13 ("Q. . . . [C]an you identify any specific companies that have better employee evaluation procedures than FedEx? A. . . . *I think that people who design those things for a living are better able to make that judgment than I am*.") (emphasis added); *see also id.* at 48:7-16, 51:15-18.) Assuming such limited experience were sufficient to provide Dr. Bielby with a minimal understanding of personnel practices and policies, "[a] basic understanding of a subject does not necessarily imply qualification as an expert on the precise issue for jury determination." *Wilkinson*, 712 F. Supp. at 478.[5] Dr. Bielby's testimony on FedEx's personnel practice and policies should therefore be excluded.

### CONCLUSION

For the reasons set forth above, FedEx respectfully requests that the Court preclude Dr.

---

[5]     That Dr. Bielby lacks the expertise to capably opine on the adequacy of FedEx's monitoring and accountability and the discretionary character of the personnel system is further illustrated by his inability to offer anything but conclusions "so vague as to be unhelpful to a fact-finder." *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (excluding expert testimony on ordinary practices of a profession or trade that failed to articulate any objective, clear standard). Indeed, at his deposition, Dr. Bielby was repeatedly unable to identify *any* objective metric or standard by which to measure the degree of discretion or accountability and monitoring at FedEx. (*See, e.g.*, Bielby Dep. at 68:25-69:7; 70:11-19; 72:16-22; 181:5-183:3; 286:15-288:22; 375:8-19; and 378:12-21.) Rather, Dr. Biebly asks this Court to take it on his word (based upon virtually no knowledge, skill, experience, training or education) that FedEx's personnel system is "deficient."

Defendant's Motion in Limine No. 9
Case Nos. C 03-02659 SI; C 03-02878 SI

1   Bielby's evidence regarding bias at FedEx in its entirety.

2

3

4       Dated: January 19, 2007                **FEDERAL EXPRESS CORPORATION**

5

6                                              By:   /s/ Frederick Douglas

7                                                    Frederick Douglas
                                                     FEDERAL EXPRESS CORPORATION
8                                                    3620 Hacks Cross Road
                                                     Building B, 3rd Floor
9                                                    Memphis, Tennessee, 38125

10                                                   Gilmore F. Diekmann, Jr.
                                                     Seyfarth Shaw LLP
11                                                   560 Mission Street, Suite 3100
                                                     San Francisco, California 94105
12
                                                     Evelyn L. Becker
13                                                   O'Melveny & Myers LLP
                                                     1625 Eye Street, NW
14                                                   Washington, DC  20006

15                                                   Attorneys for Defendant Federal Express
                                                     Corporation
16

17

18

19

20

21

22

23

24

25

26

27

28

1   Frederick Douglas
    (Admitted Pro Hac Vice)
2   FEDERAL EXPRESS CORPORATION
    3620 Hacks Cross Road
3   Building B, 3rd Floor
    Memphis, Tennessee, 38125
4   Telephone: (901) 434-8519
    Facsimile: (901) 434-9271
5
    SEYFARTH SHAW LLP
6   Gilmore F. Diekmann, Jr. (SBN: 050400)
    Francis J. Ortman, III (SBN: 213202)
7   560 Mission Street, Suite 3100
    San Francisco, California 94105
8   Telephone: (415) 397-2823
    Facsimile: (415) 397-8549
9
    Evelyn L. Becker (CA SBN: 170903)
10  O'MELVENY & MYERS LLP
    1625 Eye Street, NW
11  Washington, DC  20006
    Telephone:  (202) 383-5300
12  Facsimile: (202) 383-5414

13  Attorneys for Defendant
    FEDERAL EXPRESS CORPORATION

14

15              UNITED STATES DISTRICT COURT

16           NORTHERN DISTRICT OF CALIFORNIA

17  DERRICK SATCHELL, KALINI          Case Nos. C03-02659 SI; C03-02878 SI
    BOYKIN, VALERIE BROWN, RICK
18  GONZALES, CYNTHIA GUERRERO,        DECLARATION OF EVELYN L. BECKER IN
    RACHEL HUTCHINS, DANIEL            SUPPORT OF DEFENDANT'S MOTION IN
19  SHERMAN, KELVIN SMITH, SR., and   LIMINE NO. 9 (PRECLUDE PLAINTIFFS'
    KEN STEVENSON, on behalf of       EXPERT DR. WILLIAM T. BIELBY'S
20  themselves and all others similarly situated,  EVIDENCE REGARDING BIAS IN THE
                                      FEDEX PERSONNEL SYSTEM)
21            Plaintiff,
                                      Hearing Date:    March 2, 2007
22       v.                           Hearing Time:    9:00 a.m.

23  FEDEX EXPRESS, a Delaware
    corporation,
24
25            Defendant.

26

27

28

                                      Becker Declaration ISO Defendant's Motion in Limine No. 9
                                           Case Nos. C 03-02659 SI; C 03-02878 SI

1      I, Evelyn L. Becker, hereby declare as follows:

2      1.  I am a member in good standing of the State Bar of California. I am a partner in

3  the law firm of O'Melveny & Myers LLP, and one of the counsel for the Defendant Federal

4  Express Corporation, in this case. I make this declaration in support of Defendant's Motion in

5  Limine No. 9 (Preclude Plaintiffs' Expert Dr. William T. Bielby's Evidence Regarding Bias In

6  The FedEx Personnel System).

7      2.  Attached to this Declaration as Exhibit A are relevant portions of the Expert

8  Report of William T. Bielby, Ph.D., dated June 30, 2006.

9      3.  Attached to this Declaration as Exhibit B are relevant portions of the Expert

10  Rebuttal Report of William T. Bielby, Ph.D., dated September 1, 2006.

11      4.  Attached to this Declaration as Exhibit C are relevant portions of the deposition of

12  William T. Bielby, Ph.D., taken on October 16, 2006 and November 13, 2006.

13      5.  Attached to this Declaration as Exhibit D are relevant portions of the Expert

14  Report of Anthony G. Greenwald, Ph.D., dated September 3, 2006.

15      I declare under penalty of perjury under the laws of the United States that the foregoing is

16  true and correct.

17      Executed this 19th day of January, 2007.

18

19            /s/ Evelyn L. Becker
                Evelyn. L. Becker

20

21

22

23

24

25

26

27

28

Becker Declaration ISO Defendant's Motion in Limine No. 9
Case Nos. C 03-02659 SI; C 03-02878 SI

Exhibit A

1    James M. Finberg (SBN 114850)
     Bill Lann Lee (SBN 108452)
2    Eve H. Cervantez (SBN 164709)
     Chimène I. Keitner (SBN 226948)
3    LIEFF, CABRASER, HEIMANN &
       BERNSTEIN, LLP
4    275 Battery Street, 30th Floor
     San Francisco, CA 94111-3339
5    Telephone: (415) 956-1000
     Facsimile: (415) 956-1008
6

7    Todd M. Schneider (SBN 158253)
     Guy B. Wallace (SBN 176151)
     Joshua Konecky (SBN 182897)
8    SCHNEIDER & WALLACE
     180 Montgomery Street, Suite 2000
9    San Francisco, CA 94104
     Telephone: (415) 421-7100
10   Facsimile: (415) 421-7105

11   JOHN BURRIS (SBN 69888)
     7677 Oakport Bldg., Suite 1120
12   Oakland, CA 94612
     Telephone: (510) 839-5210
13   Facsimile: (510) 839-3882

14

15   *Class Counsel*

     MICHAEL S. DAVIS (SBN 160045)
     345 Hill Street
     San Francisco, CA 94109
     Telephone: (415) 282-4315
     Facsimile: (415) 358-5576

     KAY MCKENZIE PARKER (SBN 143140)
     225 Bush Street, 16th Floor
     San Francisco, CA 94104
     Telephone: (415) 227-9622
     Facsimile: (415) 227-4522

     WAUKEEN Q. MCCOY (SBN 168228)
     703 Market Street, Suite 1407
     San Francisco, CA 94103
     Telephone: (415) 675-7705
     Facsimile: (415) 675-2530

16

17              UNITED STATES DISTRICT COURT

18           NORTHERN DISTRICT OF CALIFORNIA

19   DERRICK SATCHELL, KALINI
     BOYKIN, VALERIE BROWN, RICK
20   GONZALES, CYNTHIA GUERRERO,
     RACHEL HUTCHINS, TYRONE
21   MERRITT, KELVIN SMITH, SR., and
     KEN STEVENSON, on behalf of
22   themselves and all others similarly situated,

23            Plaintiffs,

24   v.

25   FEDEX EXPRESS, a Delaware
     corporation,

26

27            Defendant.

28

Case No. C 03-2659 SI; C 03-2878 SI

**EXPERT REPORT OF**
**WILLIAM T. BIELBY, PH.D.**

547860.1

# EXPERT REPORT OF WILLIAM T. BIELBY

*Derrick Satchell, et al. v. FedEx Express*

William T. Bielby, Ph.D.

June 2006

William T. Bielby

June 22 2006

William T. Bielby
16152 First Ln, Box 536
Union Pier, MI 49129-0536
312-497-9184
bielby@sas.upenn.edu

EXPERT REPORT OF WILLIAM T. BIELBY

*Derrick Satchell, et al. v. FedEx Express*

June 2006

## ASSIGNMENT, QUALIFICATIONS, AND MATERIALS REVIEWED

1.  I have been retained by the law firm of Lieff, Cabraser, Heimann & Bernstein, counsel for plaintiffs in *Derrick Satchell, et al. v. FedEx Express*.  I have been asked to review testimony and materials describing the personnel policies and practices at the Western Region of FedEx Express ("FedEx") pertaining to compensation, promotion, performance reviews, discipline, and equal employment opportunity (EEO), and to assess whether they create barriers to career advancement and fair compensation for the company's African American and Hispanic hourly employees and African American Operations Managers employed in Domestic Ground Operations ("DGO") and Air Ground Freight Services ("AGFS").  Unless noted otherwise, when I use the term "FedEx" below, I am referring to DGO and AGFS functional divisions within the company's Western Region.

2.  I have testified as an expert witness in both California Superior Court and federal court on cases involving workplace discrimination.  A list of cases in which I have been identified as an expert or have given expert testimony since 2001 is attached as Exhibit A.

3.  I received a Ph.D. in Sociology from the University of Wisconsin--Madison in 1976.  I also have a B.S. in Electrical Engineering and a M.A. in Social Sciences from the

University of Illinois. I am Professor of Sociology at the University of Pennsylvania,

where I am also affiliated with the Population Studies Center. Prior to that, I served for

twenty-seven years as a faculty member in the Department of Sociology at the University

of California, Santa Barbara (UCSB), where I chaired my department from 1992 to 1998.

At UCSB I was also affiliated with UCSB's Department of Statistics and Applied

Probability. I am a past President of the American Sociological Association.

    4. I have taught courses on employment discrimination at both the undergraduate

and graduate levels at UCSB, at the University of California Washington Center in the

District of Columbia, and at Northwestern University. Among my former positions are

Visiting Professor of Management at UCLA, Fellow at the Center for Advanced Study in

the Behavioral Sciences at Stanford, Visiting Distinguished John D. Macarthur Professor

of Sociology at Northwestern University, and Visiting Scholar at the American Bar

Foundation. Since joining the faculty of the University of Pennsylvania I have taught

graduate level courses on statistics and research methods in the social sciences. In

addition to courses on discrimination, research methods, and statistics, I have taught

graduate and undergraduate courses on organizational behavior, labor markets, and social

inequality. I also specialize in research in each of these areas. Over the past twenty years,

much of my research has focused on issues of workplace discrimination and on

organizational policies and practices more generally. My research on these topics has

been supported by four grants from the National Science Foundation, and it has been

published in leading peer-reviewed social science research journals. My Curriculum Vitae

is attached as Exhibit B.

5. I have received national awards from three different professional associations for my research on gender, labor markets, social psychological aspects of work, and organizational personnel practices. I have served on numerous panels, advisory committees, and professional workshops on topics relating to workplace discrimination, organizational personnel policies and practices, and research methodology. I have served as an advisor, consultant, or reviewer for the following organizations and agencies: the U.S. Bureau of the Census, the U.S. Department of Justice, the U.S. Department of Labor, the Equal Employment Opportunity Commission, the National Science Foundation, the National Institute of Mental Health, the National Academy of Sciences, the University of Michigan's Institute for Social Research, Stanford University, the Writers' Guild of America, West and the Bar Association of San Francisco. I have also served on the editorial boards of leading social science journals, and I regularly review manuscripts for scientific journals on topics relating to organizational behavior, employment discrimination, and research methodology. I have been elected to several offices in the American Sociological Association. I served for three years on the ASA Council, the organization's governing body in addition to serving as the Association's President in 2003.

6. I have reviewed the 30(b)(6) deposition testimony of FedEx executives and managers designated by the company to testify about personnel policies and practices as well as the exhibits that accompany the deposition transcripts. The exhibits include written policies, manuals, forms, reports, and correspondence pertaining to the company's human resources system. I was also supplied with a copy of the company's People Manual, dated October 2003, the "People Best Practices" manuals for DGO and AGFS,

and documents, forms, validation studies, and related memos, correspondence, and reports related to the company's policy and practice for conducting performance reviews. A list of documents that were supplied to me by plaintiffs' counsel, apart from those that were marked as deposition exhibits, appears in Exhibit C.

 7.  I also reviewed the deposition testimony of "fact" witnesses who have testified about the company's policies and practices regarding compensation, promotion, performance reviews, discipline, and equal employment opportunity.  A complete list of depositions I have received is listed in Exhibit D.  The list includes the deposition testimony given by two individuals in *Jerome Rogers, et al. v. FedEx Express*, et al.: Heather McKnight, Human Resources Manager; and Darrell Kato, Managing Director in the Coastal Region, DGO.  It also includes the deposition testimony given by Michael Snyder, former Managing Director, for the Southern California District of DGO and former Vice President for Eastern United States, now retired, as well as excerpts from the deposition testimony he gave in *Pettaway-Vint v. Federal Express*.  I also reviewed the statistical reports submitted in 2004 by Dr. Richard Drogin for plaintiffs and by Dr. Mary Baker for FedEx as well as the report submitted by Dr. Drogin this month.

 8.  I have also relied upon academic articles, chapters, and books written by social scientists and management scholars, and they are cited in the footnotes to this report. Social science research conducted across many decades has generated considerable knowledge about what generates and sustains workplace inequalities.  That same research, either directly or by implication, points to the kinds of workplace policies and practices that are likely to minimize bias.  The relevant research has applied multiple methodologies in a variety of contexts, including experiments in controlled laboratory settings;

ethnographies and case studies in "real world" organizations both large and small, public and private, and in a range of industries; surveys done with representative samples of workers and employers; and historical studies based on archival materials from the United States and abroad. Thus, the scientific evidence about bias, discrimination, and the structure and dynamics of race in organizations that I rely upon has substantial external validity and provides a sound basis for analyzing FedEx's policies and practices. My method is to look at distinctive features of the organization's policies and practices and to evaluate them against what social science research shows to be factors that create and sustain bias and those that minimize bias. In litigation contexts, this method of analysis is known as "social framework analysis."[1]

## SUMMARY OF FINDINGS

9. I have concluded that the personnel system at FedEx is uniform, centralized, and in many ways highly formalized and standardized. It also has discretionary features, and due to inadequate monitoring and accountability, these features are vulnerable to bias against African American and Hispanic employees. Statistical analyses of how discretion is exercised in the FedEx personnel system demonstrate that it has an adverse impact on minority employees, consistent with a large body of research by social scientists and management scholars on the sources of workplace racial bias. The basis for these conclusions is explained below.

---

[1] See E. Borgida, C. Hunt, and A. Kim, "Research in Sex Discrimination Litigation," *Journal of Law and Policy,* Vol. 13, 2005, p. 613-628; D. L. Faigman and J. Monahan, "Psychological Evidence at the Dawn of the Law's Scientific Age," *Annual Review of Psychology,* Vol. 56, 2005, p. 631-659; J. Monahan

## OVERVIEW OF THE FEDEX PERSONNEL SYSTEM

10. As in many large, centralized organizations, the FedEx personnel system is in many ways highly formalized and standardized.[2] Centrally developed human resources policies, specified in the People Manual, "best practices" manuals, and other documents apply uniformly throughout the Western Region.[3] Regional, District, and local managers are not authorized to modify the companywide human resources policies.[4] Human Resources policies are coordinated centrally by a corporate Human Resources Division that functions as a service organization to all other divisions.[5]

11. Selection into permanent hourly positions is governed by the FedEx-wide, computerized Job Change Application Tracking System (JCATS). Openings are posted on JCATS, and the system is used both by employees to apply for openings and by hiring managers to make their selections.[6] For first-level management jobs, the ASPIRE system is administered throughout FedEx by the Human Resources Development Department.[7]

12. A centralized compensation function within Human Resources sets pay ranges for each pay grade for both salaried and hourly employees. The compensation of

---

and L. Walker, *Social Science in Law: Cases and Materials,* Fourth Edition, Foundation Press, 1998, Chapter Five, "Social Science Used to Provide Context."

[2] A. L. Kalleberg, D. Knoke, P. V. Marsden, and J. L. Spaeth, *Organizations in America: Analyzing Their Structures and Human Resource Practices,* Sage Publications, 1996.

[3] McQueen depo., p. 91-92.

[4] McQueen depo., p. 29-61, 75-93, 109-114; Davis depo., p. 43; Powell depo., p. 57-58; Rhea depo., p. 19-28; Speroff depo., Vol. I, p. 235-6, Vol. II, p. 28-29, 45-101; Fifer depo., p. 11-14.

[5] McQueen depo., p. 40.

[6] Williamson depo., p. 11-53; Speroff depo., Vol. I, p. 53-61.

nearly all hourly employees is governed by the uniform "merit hourly" pay plan.[8]

Uniform policies also govern the two components of salaried employees' pay: market

level differentials based on geographical differences in prevailing pay rates; and annual

performance-based merit increases.[9] Uniform policies also govern the pay raises

associated with promotions within hourly and salaried ranks and with promotions from

hourly to salaried ranks.[10]

     13. A central Human Resource Analysis department within Human Resources is

responsible for developing the performance assessment instruments used for the annual

evaluations of permanent hourly and salaried employees.[11] Performance reviews have a

substantial impact on both promotion and compensation. For example, a rating of at least

5 (on a 7-point scale) is required in order to be eligible to apply for an open hourly

position in the JCATS system. In addition, internal applicants for promotion into hourly

jobs are ranked into two "priority" categories, with first-priority consideration going to

employees within the job classification group, and second-priority consideration going to

those outside the job classification group. Within priority categories, applicants are

ranked by "credit equivalency value" (CEV), which is computed as months of continuous

service (discounted 50% for part-time employees) multiplied by the total of the last two

---

[7]Speroff depo., Vol. I, p. 176-177; Brooks depo., p. 11-26.

[8]Rhea depo., p. 101-102; Powell depo., p. 21-56, 94-99. The exception is the pay category of aircraft maintenance employees whose compensation is governed by the "step progression" policy. They are not part of the certified class in this litigation.

[9]Davis depo., p. 18-19, 34-36, 43-46, 49-50.

[10]Davis depo., p. 19-42, 45-48; Powell depo., p. 44-46.

performance ratings. CEV is considered the main factor governing selection within priority groups, so among equally experienced candidates, performance ratings will often be the determining factor in selections.[12] Similarly, an applicant for promotion into management under the ASPIRE policy is required to have a score of at least 2.5 (on a 4-point scale) on his or her most recent performance rating, and performance ratings are one factor in the "matrix grid" rankings that are used to select which individuals are to be interviewed for a salaried position.[13]

14. Performance reviews affect compensation both indirectly and directly. First, as noted above, performance ratings have a strong impact on the chances of being considered and selected for a promotion, and a move into a higher pay grade increases and employee's compensation.[14] Second, annual merit increases are linked directly to performance review scores for both salaried and hourly employees.[15]

[11]Hayward depo., p. 56, 73-74. Merit hourly employees are reviewed every six months for the first year they are in a new job (Hayward depo., p. 128).

[12]Williamson depo., p. 52; Hesser depo., p. 60-66; Speroff depo., Vol. I, p. 53-61; Hayward depo., p. 85-86; 2003 People Manual, Section 4-5 (BATES PM1003P179-180). Mr. Speroff testified (Vol. I, p. 53): "At the closing of the process, the computer generates a mathematical computation, and they come up with CEVs, and people are ranked by CEVs, and the top person is the one that is offered the position."

[13]Speroff depo., Vol. I, p. 193-195.

[14]Moreover, policy for promotions of merit hourly employees is to award a 2% per pay grade *percentage increase* over pay in the previous job (up to a 6% limit, subject to other restrictions; Powell depo., p. 99-100). Accordingly, a low performance rating in any given merit cycle lowers the base for percentage increases associated with future promotions.

[15]Davis depo., p. 39, 46-47; Powell depo., p. 56, 75, 83, 94-95; Hayward depo., p. 81-2.

**VULNERABILITY TO BIAS IN THE PERFORMANCE REVIEW PROCESS**

**CAN RESULT IN SUBSTANTIAL BARRIERS TO CAREER ADVANCEMENT**

**FOR AFRICAN AMERICAN AND HISPANIC EMPLOYEES**

15. Because the FedEx personnel system creates such a strong link between performance review ratings and both promotion an compensation, any racial bias in those ratings will have a significant impact on the career trajectories of minority employees. Social scientists describe these kinds of reward systems as systems of *cumulative advantage.* In a cumulative advantage system, factors that result in even small disparities between individuals early in their careers have a cumulative impact and generate growing disparities over time.[16] The materials I have reviewed indicate that discretionary aspects of the performance review system make it vulnerable to bias, and that the company's policies and practices for monitoring the implementation of its policies regarding performance review, promotion, and compensation are inadequate for minimizing racial bias. Below, I first summarize research literature that explains why performance review systems can be vulnerable to bias, and then I explain why FedEx's policy and practice is inadequate for minimizing that vulnerability and is likely to lead to cumulative disadvantage faced by African American and Hispanic employees over the course of their careers.

---

[16]The first cumulative advantage models were developed to explain differences in the career trajectories of scientists, including gender disparities in scientists' careers. See, for example, P. D. Allison, J. S. Long, and T. K. Krauze, "Cumulative Advantage and Inequality in Science," *American Sociological Review*, Vol. 47, 1982, p. 596-606; S. M. Clark, and M. Corcoran, " Perspectives in the Professional Socialization of Women Faculty: A Case of Accumulative Disadvantage?" *Journal of Higher Education*, Vol. 57, 1986, p. 20-43; R. K. Merton, "The Matthew Effect in Science, II: Cumulative Advantage and the Symbolism of Intellectual Property," *Isis* Vol. 79, 1988, p. 606-623; and W. T. Bielby, "Sex Differences in Careers: Is Science a Special Case?" p. 171-187 in *The Outer Circle: Women in the Scientific Community*, edited by H. Zuckerman, J. R. Cole, and J. T. Bruer, Norton, 1991. For its application more broadly, see A.

16.  There is ample reason to closely scrutinize any performance review system for potential racial bias.  A large body of social science research, including many studies conducted in organizational settings, show that African Americans tend to receive lower performance evaluations than do whites.  For example, a 1985 article by Kraiger and Ford performed a meta-analysis of 84 studies with a total of over 20,000 ratees, including 64 field studies and 10 experimental studies of white raters rating a total of 17,159 African American and white ratees.[17]  Meta-analysis is a method for quantitatively aggregating results across studies in order to obtain a more precise estimate of the size and reliability of effects than can be obtained from any single study.[18]  In addition, a meta-analysis of studies conducted across a variety of settings contributes to establishing the external validity of the research.  Kraiger and Ford's meta-analysis found that African Americans, on average, received significantly lower evaluations than did whites.  They also found evidence suggesting that white raters give significantly higher ratings to whites than to African Americans; and (2) that African American raters give significantly higher ratings to African Americans than do whites.[19]

17.  A subsequent meta-analysis published by Martocchio and Whitener in *Human Relations* in 1992 replicates Ford *et al.*'s finding regarding racial differences in

M. O'Rand, "The Cumulative Stratification of the Life Course," p. 188-207 in *Handbook of Aging and the Social Sciences* (4th ed.), edited by R. H. Binstock, L. K. George, et al. Academic Press, 1996.

[17] K. Kraiger and J. K. Ford, "A Meta-Analysis of Race Effects in Performance Ratings," *Journal of Applied Psychology*, Vol. 70, 1985, p. 56-65.

[18] J. E. Hunter and F. L. Schmidt, *Methods of Meta-analysis:  Correcting Error and Bias in Research Findings*, Sage Publications, 1990.

[19] The research on in-group favoritism in performance ratings as it applies to minorities is limited because most datasets contain relatively few instances of minority raters completing ratings of both minority and white ratees and minority ratees being rated by both minority and white raters.

performance measures.[20] The Martocchio and Whitener meta-analysis focused specifically on field studies of performance assessment conducted in private sector firms.[21] The results of their analysis of ten field studies also indicated that race effects were larger on subjective than on objective measures of performance.[22] In an article published in 2003, Roth *et al.* replicated Kraiger and Ford's research on a larger sample of studies, and they found that overall, racial differences in performance ratings between African Americans and whites were comparable to those in the 1985 meta-analysis. However, unlike earlier studies, they found that racial disparities on objective assessments could be as large or larger than those for subjective assessments.[23] The Roth et al. research is also the first large-scale meta-analysis of disparities between whites and Hispanics, and they found that Hispanics tend to be rated lower than whites, although the disparities are generally not as large as those between African Americans and whites.

18. Numerous other studies conducted in organizational settings and published in leading refereed journals report similar findings or racial disparities in performance ratings. For example, Jeffrey Greenhaus and colleagues studied the career experiences of a matched sample of 373 African American and 455 white managers in three companies

---

[20]J. J. Martocchio and E. M. Whitener, "Fairness in Personnel Selection: A Meta-Analysis and Policy Implications," *Human Relations*, Vol. 45, 1992, p. 489-506.

[21]Martocchio and Whitener, *op cit.*, p. 494.

[22]Martocchio and Whitener, *op cit.*, p. 500.

[23]P. L. Roth, A. I. Huffcutt, and P. Bobko, "Ethnic Group Differences in Measures of Job Performance: A New Meta-Analysis," *Journal of Applied Psychology*, Vol. 88, p. 694-706.

in the communications, banking, and electronics industry.[24]  The African American and white managers included in their study were similar in age, organizational tenure, job function, and organizational level.[25]  Their 1991 article in the *Academy of Management Journal* reports that supervisors rate the performance and promotion potential of African American managers significantly lower than whites, findings the authors describe as "remarkably consistent with the results of Kraiger and Ford's (1985) meta analysis."[26] Compared to white managers, African American managers scored lower on a scale of "corporate fit," expressing higher levels of isolation and lower levels of acceptance within the organization.  African American managers reported lower career satisfaction and were more likely to report that there careers had reached a plateau, compared to white managers with similar performance evaluations.  A second article published in 1993 in *Organizational Behavior and Human Decision Processes* explored the attributions supervisors made about the reasons for the successful performance of African American and white managers.  Their findings were consistent with laboratory studies on this topic: compared to white managers, successful performance by African American managers

[24]J. H. Greenhaus, S. Parasuraman, and W. W. Wormley, "Effects of Race on Organizational Experiences, Job Performance Evaluations, and Career Outcomes," *Academy of Management Journal*, Vol. 33, 1990, p. 64-86; J. H. Greenhaus and S. Parasuraman, "Job Performance Attributions and Career Advancement Prospects:  An Examination of Gender and Race Effects," *Organizational Behavior and Human Decision Processes*, Vol. 55, 1991, p. 273-297.

[25]Greenhaus *et al., op cit.,* p. 81; Greenhaus and Parasuraman, *op cit.,* p. 280-281.

[26]Greenhaus *et al., op cit.,* p. 79.

was less likely to be attributed to ability or effort and more likely to be attributed to help from others.[27]

19. The findings of Greenhaus *et al.* regarding race differences in assessment of promotion potential were replicated in a study by Jacqueline Landau of 682 managerial and professional employees of a Fortune 500 company who had been rated at least "above average" in performance.[28] The study, published in 1995 in the *Journal of Organizational Behavior,* examined the impact of race on supervisors' assessments of promotion potential as recorded in company records from the annual performance appraisal process.[29] Landau found that African American managers and professionals were rated lower in promotion potential than whites of comparable age, education, organizational tenure, salary grade, job type, and satisfaction with career support.[30]

20. Other studies and reviews suggest that in many organizational settings, performance reviews by supervisors are not subject to racial bias. For example, in a 1994 review article in the *Annual Review of Psychology,* Landy, Shankster, and Kohler state (p. 282-3) that "the field has been moving inexorably toward the final conclusion that *well-developed rating procedures accompanied by training of the raters* will produce ratings that are minimally biased by demographic characteristics of raters or ratees" (emphasis

---

[27]Greenhaus and Parasuraman, *op cit.*, p. 285-288. For experimental evidence of race bias in attributions of the causes of successful performance, *see* K. L. Yarkin, J. P. Town, and B. S. Wallston, "Blacks and Women Must Try Harder: Stimulus Persons' Race and Sex Attributions of Causality," *Personality and Social Psychology Bulletin,* Vol. 8, 1982, p. 21-24.

[28]Jacqueline Landau, "The Relationship of Race and Gender to Managers' Ratings of Promotion Potential," *Journal of Organizational Behavior,* Vol. 16, 1995, p. 391-400.

[29]Landau, *op cit.*, p. 394.

[30]Landau, *op cit.*, p. 395-396.

added).[31]  In a book published that same year, Latham and Wexley (p. 152) assert that

"*when the appraiser uses behaviorally based appraisal scales*, ratee characteristics, such

as age, race, and sex, have a negligible effect on the resulting performance appraisal"

(emphasis added).[32]  The conclusions of Landy et al. and of Latham and Wexley are not

inconsistent with the research cited above.  It is indeed the case that appropriately

designed performance appraisal systems, carefully implemented and monitored, can be

free of bias.

   21.  A large body of social science research shows that personnel decisions such

as decisions about promotion selections and performance assessment are vulnerable to

stereotyping and bias when they are based on the arbitrary or discretionary use of

subjective criteria.  Moreover, assessments based on objective factors can be influenced

by stereotypes when decision-makers have substantial discretion in deciding how to

weigh those factors. A stereotype is a set of beliefs that links personal traits of individuals

to specific social groups.[33]  The association of such traits as "assertive" and "rational"

[31]F. J. Landy, L. J. Shankster, and S. S. Kohler, "Personnel Selection and Placement," *Annual Review of Psychology*, Vol. 45, 1994, p. 261-296.

[32]G. P. Latham and K. N. Wexley, *Increasing Productivity Through Performance Appraisal*, Addison Wesley, 1994.

[33]S. T. Fiske, A. J. C. Cuddy, P. Glick, and J. Xu, "A Model of (Often Mixed) Stereotype Content: Competence and Warmth Respectively Follow from Perceived Status and Competition," *Journal of Personality and Social Psychology*, Vol. 82, 2002, p. 878-902; N. E. Evans, and R. B. Tyler, "Racial Stereotypes:  The Contents of Their Cognitive Representations," *Journal of Experimental Social Psychology*, Vol. 22, 1986, p. 22-37; P. G. Devine and A. J. Elliot, "Are Racial Stereotypes Really Fading? The Princeton Trilogy Revisited," *Personality and Social Psychology Bulletin*, "Vol. 21, 1995, p. 1139-1150; J. F. Dovidio, J. C. Bringham, B. T. Johnson, and S. L. Gaertner, "Stereotyping, Prejudice, and Discrimination:  Another Look," p. 276-319 in *Stereotypes and Stereotyping*, edited by C. N. MacRae, C. Stangor, and M. Hewstone, Guilford Press, 1996; D. F. Mackie, D. L. Hamilton, J. Susskind, and F. Roselli, "Social Psychological Foundations of Stereotype Formation," p. 41-78 in *Stereotypes and Stereotyping*, edited by C. N. MacRae, C. Stangor, and M. Hewstone, Guilford Press, 1996; K. H. Karim, "The Historical Resilience of Primary Stereotypes:  Core Images of the Muslim Other," p. 153-182 in *The Language and Politics of Exclusion:  Others in Discourse*, edited by S. H. Riggins, Sage Publications, 1997.

with the category male, "nurturing" and "emotional" with the category female, "violent"

and "hostile" with the category African American, and "gang-banger" and "macho" with

Latino, are examples of stereotypes.  When stereotypes such as these are allowed to

influence social judgments, decisions about members of minority groups will be based on

general beliefs about the behaviors, traits, and qualities associated with their gender or

race/ethnicity instead of the actual traits of the individuals being judged.[34]

    22.  Research studies show that the effects of stereotypes, in-group favoritism and

out-group bias on evaluative judgments such as those involved in hiring, job assignment,

promotion, assessments of skills and qualifications, and compensation can be minimized

when decision-makers know that they will be held accountable for the criteria used to

make decisions, for the accuracy of the information upon which the decisions are based,

and for the consequences their actions have for equal employment opportunity.  For

example, research studies show that the effects of stereotypes and outgroup bias on

---

[34]C. O. Word, M. P. Zanna, and J. Cooper, "The Nonverbal Mediation of Self-Fulfilling
Prophecies in Interracial Interaction," *Journal of Experimental Social Psychology*, Vol. 10, 1974, p. 109-
120; Devine and Elliot, *op cit.*; P. G. Devine, "Stereotypes and Prejudice:  Their Automatic and Controlled
Components," *Journal of Personality and Social Psychology*, Vol. 56, 1989; J. F. Dovidio and S. L.
Gaertner, "Stereotypes and Evaluative Intergroup Bias," p. 167-193 in *Affect, Cognition, and Stereotyping*,
edited by D. M. Mackie and D. L. Hamilton, Academic Press, 1993.  For articles and chapters providing
reviews of relevant research, see American Psychological Association, "In the Supreme Court of the United
States:  Price Waterhouse v. Ann B. Hopkins:  Amicus Curiae Brief for The American Psychological
Association," *American Psychologist*, Vol. 46, 1991, p. 1061-1070.  Also see D. M. Messick and D.
Mackie, "Intergroup Relations," *Annual Review of Psychology*, Vol. 40, 1989, p. 49-50; V. F. Nieva and B.
A. Gutek, "Sex Effects on Evaluation," *Academy of Management Review*, Vol. 5, 1980, p. 267-275
(especially pages 270-274); D. N. Bersoff, "In the Supreme Court of the United States:  Clara Watson v.
Fort Worth Bank & Trust, Amicus Curiae Brief for the American Psychological Association" (reprinted in
*American Psychologist*, Vol. 43, 1988, p. 1019-1028); S. T. Fiske and S. E. Taylor, *Social Cognition*,
Addison-Wesley, 1984 (especially Chapter 9, "Social Inference"); L. H. Krieger, "The Contents of our
Categories:  A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity," *Stanford
Law Review*, Vol. 47, 1995, p. 1161-248; B. F. Reskin, *The Realities of Affirmative Action in Employment*,
American Sociological Association, 1998; M. B. Brewer and R. J. Brown, "Intergroup Relations," p. 554-
594 in *Handbook of Social Psychology, Vol. 2 (4th ed.)*, edited by D. T. Gilbert, S. T. Fiske, and G.
Lindzey, Oxford, 1998; W. T. Bielby, "Minimizing Workplace Gender and Racial Bias," *Contemporary
Sociology*, Vol. 29, 2000, p. 120-129.

selection decisions can be minimized when decision-makers know that they will be held accountable for the criteria used to make decisions, for the accuracy of the information upon which the decisions are based, and for the consequences their actions have for equal opportunity.[35]

23. Conversely, social science research demonstrates that substantial discretion in assessing and weighing evaluative criteria invites bias. In a highly discretionary system with limited monitoring, even objective factors can be evaluated in a way that leads towards favoritism to the majority group and discrimination against minorities. For example, social psychologists Samuel Gaertner and John Dovidio have conducted research showing that when white evaluators have discretion in how to weigh evaluative criteria, they tend to do so selectively, in a way that biases outcomes in favor of white ratees. In one part of their study, participants were told they were assisting a university in making admission decisions, and they were given information on factors such as test

---

[35]S. T. Fiske, M. Lin, and S. L. Neuberg, "The Continuum Model: Ten Years Later," p. 231-54 in *Dual Process Theories in Social Psychology*, edited by S. Chaiken and Y. Trope, Guilford Press, 1999; T. E. Nelson, M. Acker and M. Manis, "Irrepressible Stereotypes," *Journal of Experimental Social Psychology*, Vol. 32, 1996, p. 13-38; J. L. Eberhardt and S. T. Fiske, "Motivating Individuals to Change: What Is a Target to Do?" p. 369-415 in *Stereotypes and Stereotyping*, edited by C. N. MacRae, C. Stangor, and M. Hewstone, Guilford Press, 1996; A. M. Konrad and F. Linnehan, "Formalized HRM Structures: Coordinating Equal Employment Opportunity or Concealing Organizational Practices?" *Academy of Management Journal*, Vol. 38, 1995, p. 787-829; T. F. Pettigrew and J. Martin, "Shaping the Organizational Context for Black American Inclusion," *Journal of Social Issues*, Vol. 43, 1987, p. 41-78; G. R. Salancik and J. Pfeffer, "Uncertainty, Secrecy, and the Choice of Similar Others," *Social Psychology*, Vol. 41, 1978, p. 246-55; C. T. Schreiber, K. F. Price, and A. Morrison, "Workforce Diversity and the Glass Ceiling: Practices, Barriers, Possibilities," *Human Resource Planning*, Vol. 16, 1993, p. 51-69; P. E. Tetlock, "Accountability: The Neglected Social Context of Judgment and Choice," p. 297-332 in *Research in Organizational Behavior*, Vol. 7, edited by L. L. Cummings and B. M. Staw, Jai Press, 1985; P. E. Tetlock and J. I. Kim, "Accountability and Judgment Processes in a Personality Prediction Task," *Journal of Personality and Social Psychology*, Vol. 52, 1987, p. 700-709; P. E. Tetlock, "The Impact of Accountability on Judgment and Choice: Toward a Social Contingency Model," *Advances in Experimental Social Psychology*, Vol. 25, 1992, p. 331-376. To see how human resource professionals apply these principles in the design of personnel systems, see R. D. Gatewood and H. S. Field, *Human Resource Selection*, Fifth Edition, Dryden Press, 2001; and H. G. Heneman, III, R. L. Heneman, and T. A. Judge *Staffing Organizations*, Third Edition, Mendota House and Richard D. Irwin, 1999.

scores and high school grades for (hypothetical) African American and white applicants. When applicants were strong on one dimension and weak on the other, raters tended to give the stronger dimension a greater weight for white applicants and the weaker one a greater weight for African American applicants.[36] In other words, they exercised their discretion in a way that ensured that whites would rank on top. The authors summarize their findings as follows:

> White college participants (whom, relative to the general population may be regarded as generally moderate to low prejudiced...), give White candidates the "benefit of the doubt," a benefit they do not extend to Blacks.[37]

24. In a study of gender bias with a similar experimental design, Eric Uhlmann and Geoffrey Cohen found that when given discretion on defining and weighing qualifications, evaluators redefined criteria of success so that men were assigned to stereotypically male jobs and females were assigned to stereotypically female jobs.[38] They concluded (p. 474) that "even without ambiguity in applicants' credentials, the criteria used to assess merit can be defined flexibly in a manner congenial to the idiosyncratic strengths of applicants who belong to desired groups." By acting in this

---

[36]G. Hodson, G., J. F. Dovidio and S. L. Gaertner, "Processes in Racial Discrimination: Differential Weighting of Conflicting Information," *Personality and Social Psychology Bulletin*, Vol. 28, 2002, p. 460-471.

[37]S. L. Gaertner, J. F. Dovidio, J. Nier, G. Hodson, and M. A. Houlette, "Aversive Racism: Bias Without Intention," p. 377-393 in *Handbook on Employment Discrimination Research: Rights and Realities*, edited by R. L. Nelson and L. B. Neilson, Kluwar Academic Press, 2005 (internal citation omitted, quotation on p. 384); G. Hodson, J. F. Dovidio, and S. L. Gaertner, "Processes in Racial Discrimination: Differential Weighting of Conflicting Information," *Personality and Social Psychology Bulletin*, Vol. 28, 2002, p. 460-471.

[38]E. L. Uhlmann and G. L. Cohen, "Constructed Criteria: Redefining Merit to Justify Discrimination," *Psychological Science*, Vol. 16, 2005, p. 474-480.

way, decision-makers can justify biased decisions by appealing to seemingly "objective"

criteria.  In their words (p. 479):

> Bias in the construction of job criteria allows evaluators both to discriminate and
> to maintain a personal illusion of objectivity.  Although gender stereotypes
> encourage discrimination, egalitarian norms compel making hiring decisions on
> the basis of applicants' merit rather than their group membership.  These
> conflicting pressures can be reconciled by defining and redefining merit in a
> manner that justifies discrimination.[39]

Although theirs is a study of gender bias, Uhlmann and Cohen conclude their study by

linking it to the research of Gaertner and Dovidio described above, noting (p. 479) that it

"dovetails with work on aversive racism in suggesting that prejudice often expresses itself

in rationalizable ways..."  In sum, this body of research demonstrates that discretion in the

definition and weighing of evaluative criteria, even with regard to ostensibly objective

criteria, contributes to bias, and it often does so in a way that allows decision-makers to

justify to themselves and to others that their actions are fair and nondiscriminatory.

    25.  Formal written policies alone, such as specific guidance on assessing and

weighing evaluative criteria, are not sufficient to minimize bias.  Passive organizational

approaches to the prevention of discrimination that take action only after an incident is

brought to the attention of management are often ineffective.  A written antidiscrimination

policy that is simply reactive, responding to complaints, and lacking effective

accountability, is often a symbolic exercise in "going through the motions," with little

substantive impact on creating organizational policy and practice that is free of bias.[40]

---

[39]Also see M. I. Norton, J. A. Vandello, and J. M. Darley, "Casuistry and Social Category Bias,"
*Journal of Personality and Social Psychology*, Vol. 87, 2004, p. 817-831.

[40]L. B. Edelman, "Legal Ambiguity and Symbolic Structures: Organizational Mediation of Civil
Rights Law," *American Journal of Sociology*, Vol. 97, 1992, p. 1531-1576; L. B. Edelman, S. Patterson, E.

Sociologist and legal scholar Lauren Edelman, the leading expert on this topic,

summarizes the findings of fifteen years of research on organizational responses to EEO

as follows:

> Because it is generally the form rather than the substance of compliance that
> attains an institutionalized status, there is variation in how enthusiastically
> management, as well as the personnel who staff compliance structures, embraces
> legal ideals.  In some cases, structures have both symbolic and substantive
> significance -- their form signals attention to legal ideals and they operate to
> enhance the workplace status and conditions of legally protected employees.  In
> other cases, however, the structures fit the law in form but lack substantive effect.
> Organizations may strategically seek to create compliance structures merely as
> symbolic gestures by "decoupling" those structures from core organizational
> activities.  Organizations may, for example, create affirmative action officer
> positions but give the officer little or no autonomy or authority or create grievance
> procedures that are hard to access and known to provide little relief.[41]

26.  The most effective approaches rely on proactive policies and practices,

including recurring and mandatory training of managers and supervisors, and systematic

and consistent monitoring of outcomes of personnel decisions.[42]

---

Chambliss, and H. S. Erlanger, "Legal Ambiguity and the Politics of Compliance:  Affirmative Action
Officers' Dilemma," *Law and Policy*, Vol. 13, 1991, p. 73-97; L. B. Edelman, H. S. Erlanger, and J. Lande,
"Employers' Handling of Discrimination Complaints: The Transformation of Rights in the Workplace," *Law
& Society Review*, Vol. 27, 1993, p. 497-534; L. B. Edelman, Lauren B. and S. Petterson, "Symbols and
Substance in Organizational Response to Civil Rights Law," in *Research in Social Stratification and
Mobility*, 1999; J. S. Leonard, "Women and Affirmative Action," *Journal of Economic Perspectives*, Vol. 3,
1989, p. 61-75.  Also see J. S. Leonard, *Use of Enforcement Techniques in Eliminating Glass Ceiling
Barriers*, Report prepared for the U. S. Department of Labor, Glass Ceiling Commission, April 1994.

[41]L. B. Edelman, "Law at Work:  The Endogenous Construction of Civil Rights," p. 337-352 in
*Handbook on Employment Discrimination Research:  Rights and Realities*, edited by R. L. Nelson and L.
B. Neilson, Kluwar Academic Press, 2005 (internal citation omitted, quotation on p. 345-346).  Also see K.
D. Krawiec, "Cosmetic Compliance and the Failure of Negotiated Governance," *Washington University
Law Quarterly*, Vol. 81, p. 487-544.  On the general issue of decoupling of organizational functions, see D.
J. Orton and K. E. Weick, "Loosely Coupled Systems: A Reconceptualization," *Academy of Management
Review*, Vol. 15, p. 203-223

[42]For a review of monitoring and accountability as strategies for ensuring equal employment
opportunity, see Bielby, 2000, *op cit.*; also see S. Sturm, "Second Generation Employment Discrimination:
A Structural Approach," *Columbia Law Review*, Vol. 101, 2001, p. 458-568; B. F. Reskin, "Including
Mechanisms in Our Models of Ascriptive Inequality," *American Sociological Review*, Vol. 68, 2003, p. 1-
21 (see, especially, p. 12-14); and A. Kalev, F. Dobbin, and E. Kelly, "Best Practices or Best Guesses?

27.  Effective accountability also requires explicit evaluation of managers and supervisors on their contributions to an organization's equal opportunity goals.  Nearly all medium- to large-scale organizations have a written antidiscrimination policy, and many have a written policy stating that implementing the objectives of the Affirmative Action Plan is the responsibility of every employee.  However, such policies are merely symbolic unless they also delineate explicit duties and responsibilities relating to equal opportunity in each manager's or supervisor's job description, which can then be related to specific evaluative dimensions in the performance reviews of those employees.  In short, in the area of EEO as well as other aspects of human resources, "what gets measured gets done."[43]

## DEFICIENCIES IN THE FEDEX PERSONNEL SYSTEM FOR MINIMIZING BIAS

28.  A number of FedEx's policies are based on sound principles of human resource management.  For example, it is the company's stated claim that selection criteria are to be limited to job-relevant factors, based on systematic job analyses with input from subject matter experts.[44]  It is company policy that any manager who conducts

---

Diversity Management and the Reduction of Inequality," Paper Presented at the Meeting on Social Scientific Perspectives on Employment Discrimination in Organizations," Center for Advanced Study in the Behavioral Sciences, Stanford, CA, November 2005.  For an example of policies and practices used by human resources professionals for establishing effective monitoring and accountability, see D. Kennedy, *Accountability: Establishing Shared Ownership*, Berrett-Koehler Communications, 2000.

[43]M. Giovannini, "What Gets Measured Gets Done:  Achieving Results Through Diversity and Inclusion," *Journal for Quality and Participation*, Vol. 27, 2004, p. 21-27; S. Kerr, "On the Folly of Rewarding A, While Hoping for B." *Academy of Management Journal*, Vol. 18, 1975, p. 769-783; Bielby, 2000, *op cit.*

[44]See, e.g. Hater depo., Vol. II, p. 169-170, 291-293; Brooks depo., p. 152-153.

interviews as part of the ASPIRE selection processes for promotion into management is to be trained in behavioral interview techniques (interviews are used in only a limited number of promotions into hourly positions).[45]  In addition, employee perceptions of managerial performance and workplace climate are assessed via the Survey Feedback Action (SFA) program, and that information is used in making selection decisions about promotions.[46]  The MGRAAP system provides a mechanism for underutilization information from the companies Affirmative Action Plans to be communicated to managers who are filling job openings.[47]

29.  However, the system has significant deficiencies as well.  Perhaps the most pervasive is the almost complete absence of any monitoring of racial disparities or disparate impact in personnel outcomes, apart from the utilization analyses provided by an outside vendor that supplies analyses for the Affirmative Action Plans.  Most importantly, there is no monitoring of racial disparities and adverse impact of performance reviews,[48] despite the large body of scientific and management studies demonstrating that this is an area of human resources systems that can be especially vulnerable to bias, and despite the fact that the data for conducting such an analysis is readily available to the human resources professionals responsible for the effectiveness of performance assessment.  Nor have those professionals at FedEx undertaken efforts to

[45]Speroff depo., Vol. I, p. 203-209, 233-234; Buchanan depo., p. 102-106, 112-115.

[46]Speroff depo., Vol. I, p. 193-194; Hayward depo., p. 60-61.

[47]Collins depo., p. 41-42; Buchanan depo., p. 97-98.

[48]Hayward depo., p. 50-51; also see Brooks depo., p. 25.

analyze how performance reviews affect other employment decisions such as promotion and compensation.[49]

30. While the company's human resources professionals devote considerable effort to assessing the "content validity" of selection criteria and performance dimensions, those exercises only address the relationship between job knowledge, skills, and aptitudes and the policies as they exist on paper. Very little effort is devoted to monitoring how performance assessment and selection tools are actually applied in practice. For example, Dr. Hayward testified that management has access to and monitors reports on whether performance reviews are being conducted according to the planned schedule of deadlines, but she was aware of no requirement that management monitor how reviews are conducted in practice. She testified that higher level managers have access to all completed reviews which they can use "to audit at any point they see fit," but as the person responsible for the effectiveness of performance reviews, she had never seen one done.[50]

31. While guidelines for ratings of performance dimensions appear on performance review forms, Dr. Hayward was not aware of any company policy or practice to ensure that they are in fact applied consistently. She testified: (1) that there is no specific policy outlining how to make a rating; (2) that judgments about the weights to be assigned to individual components of a performance dimension in order to obtain an

---

[49]Hayward depo., p. 92-93.

[50]Hayward depo., p. 144-146. Mr. Perry, a Senior Manager at the Oakland hub, testified that he does "random audits" of how his managers conduct performance reviews (Perry depo., p. 110-111). However, Mr. Perry, who testified that he personally refers to no written documents when he conducts a

overall rating for that dimension are left to the discretion of individual managers; and (3) that the company took no efforts to monitor whether managers were taking into consideration factors other than those specified in the written guidelines.[51]

32. Prior to the implementation of the online performance review process sometime between 2000 and 2002, managers were delegated discretion for determining weights assigned to each dimension of an overall performance rating for hourly employees in some if not all job classifications.[52] Similarly, in performance ratings for managerial employees, weighing of subcomponents of dimensions such as "judgment and decision making" is left to the discretion of the individual doing the assessment.[53]

33. Dr. Hayward, the professional responsible for the effectiveness of performance reviews, was aware of no company-mandated training on how to apply the written guidelines, although she had "anecdotal evidence" that some training was done on-the-job by peers.[54] Other testimony indicates that managers are exposed to some training about performance reviews, but that this occurs mainly when they first become managers and sporadically after that, and that it primarily involves an overview of how to fill out forms, and disseminating information about various resources related to conducting performance reviews.[55] In contrast, management scholars explain: (1) that

---

performance review, also testified that he was unaware of his manager (Managing Director Robin Van Galder) auditing any management performance reviews (Perry depo., p. 111, 171-172).

[51]Hayward depo., p. 181-183,203-207.

[52]Hayward depo., p. 154-161; Miller depo., p. 194-197.

[53]Deberry depo., p. 91-92; Perry depo., p. 127-131, 148-143.

[54]Hayward depo., p. 180-181

[55]Buchanan depo., p. 157-164; Perry depo., p. 142-143, 147-149, 156, 160-170, 175-176.

effective training on conducting fair and effective performance reviews requires hands-on rating exercises with instructor feedback, rather than overviews lasting no more than a few hours; (2) that training needs to be repeated at regular intervals, not just when a new system is introduced; and (3) that training needs to be tied to a policy of holding raters accountable for how they perform the task, with real consequences for inadequate performance.[56]

34. FedEx policy and practice regarding promotion, compensation, and discipline is similar to that regarding performance reviews: no analysis of racial disparities or disparate impact; and little monitoring of how policy is implemented. Danny Rhea, Managing Director for Global Compensation, testified that the company has not done any studies of compensation disparities by race.[57] Similarly, Managing Director Robert Speroff, designated by the company to testify about promotion policy and practice, was not aware of any studies done of promotion disparities by race.[58] Dr. David Brooks, who participated in the development and implementation of the ASPIRE process for promotion into management, testified that there have been no disparate impact studies of that process or of any of its components.[59] Shannon Brown, the Vice President for Human Resource Services and the company's top diversity officer, testified that during the past four years, he saw only one written document addressing the representation of

---

[56]M.A. Hauenstein, "Training Raters to Increase the Accuracy of Appraisals and the Usefulness of Feedback," pp. 404-442 in *Performance Appraisal: State of the Art in Practice*, edited by J. W. Sither, Jossey-Bass, 1998.

[57]Rhea depo., p. 69-70; also see Hayward depo., p. 83.

[58]Speroff depo., Vol. I, p. 49.

African Americans in management, and that was a one-page document prepared in early 2004.

35. In his role as Vice President of Human Resource Services and Chief Diversity Officer, Mr. Brown has never asked anyone to conduct an analysis of the representation of African Americans or Hispanics in management at FedEx.[60] Mr. Brown testified that he had never spoken to his supervisor, the Executive Vice President of Human Resources, about minority representation in management at Fed Ex, nor could he recall ever speaking the company's top executives (CEOs of FedEx Express and FedEx Corporation) about that topic.[61] In his role as Chief Diversity Officer, Mr. Brown had never set any diversity goals for the company, and he had never directed anyone to prepare an analysis of the effectiveness of the company's diversity programs.[62] Similarly, Senior Human Resources Representative Anita Collins, who assists in the preparation of the company's affirmative action plans, testified that she has never been asked to conduct and has never prepared

---

[59]Brooks depo., p. 107-108, 129-131. Nor has there been any study of the racial composition of the interview panels that make selection decisions (Brooks depo., p. 71-72).

[60]Brown depo., p. 50-57. Mr. Brown also testified (p. 27, 50-54) that the company's Officer Diversity Council, which is charged with taking "proactive efforts" in the area of diversity, conducts no studies our analyses of minority representation in management, apart from one requested by the FedEx legal department in early 2004. Mr. Brown could provide no reason for his failure to ask for any written analysis of this issue (Brown depo., p. 63-64). Ms. Anita Collins, the Senior Human Resources Representative responsible for Affirmative Action Plans (AAPs) in the Western and Southwestern regions, testified that apart from the studies down by the outside vendor for the AAPs, there are no annual analyses of minority representation in any job category at FedEx (Collins depo., p. 32-37, 69-70).

[61]Brown depo., p. 10, 57-59.

[62]Brown depo., p. 59, 70. Nor had Mr. Brown ever seen a written analysis of the effectiveness of the company's diversity programs (Brown depo., p. 70-71). Mr. Brown testified (p. 60-61) that the only written description of goals related to diversity is a one paragraph mission statement on diversity. Mr. Brown also testified (p. 16) that he had no job duties directly relating to affirmative action.

any written analysis of the effectiveness of the company's affirmative action plans.[63] Catherine Banks, the company's Manager of Human Resources Compliance, gave similar testimony.[64]

36. According to Mr. Brown, there is no written process for monitoring diversity at FedEx.[65] Compliance Manager Banks, the individual designated by the company to testify about EEO policies, stated that she was unaware of any proactive system in place at FedEx to ensure that the company was in compliance with its equal opportunity policy.[66] And while managers are provided with information on underutilization in making selection decisions (see above at paragraph 28), deposition testimony of managers who make those decisions is inconsistent regarding whether they actually do so in any consistent and significant manner.[67]

37. The company's Equal Employment Opportunity Policy States:

The FedEx Express Equal Employment Opportunity and Affirmative Action Programs (EEO/AAP) work in conjunction with each other to ensure compliance with government regulations with regard to both.[68]

---

[63]Collins depo., p. 43-45.

[64]Banks depo., p. 32-33.

[65]Brown depo., p. 71. Although the company has "Best Practices" manuals that are distributed throughout the company, there is no best practices document on the topic of diversity (Brown depo., p. 71-72).

[66]Banks depo., p. 35.

[67]See, for example, Six depo., p. 151-153; Presnoples depo., p. 110-120; W. Delgado depo., p. 155; Suazo depo., p. 155-163.

[68]2003 People Manual, Section 4-55, p. 227 (BATES PM1003P227).

When Human Resources Compliance Manager Banks, testifying on behalf of the company about its EEO policies, was asked how these two programs work in conjunction with each other to ensure compliance, Ms. Banks answered that she did not know.[69]

38.   Although promotions into hourly positions are normally supposed to be based on priority group status and CEV scores, company policy allows for departures from selections based on CEV rankings.[70]  Statistics compiled by Dr. Drogin indicate that promotion decisions that depart from rankings based on priority group and CEV scores are common, as many as 20,000 instances from January 1997 through January 2006 (Drogin 2006 Expert Report, paragraphs 50 and 51).  In addition, a manager can withhold approval for an employee who has applied to move to a position in a different job group if that employee has any "performance deficiencies that are related to the desired position."[71]  However, there are few guidelines for managers regarding what constitutes a job-related performance deficiency, and managers are not required to make a written record of whether they are withholding approval because of a performance deficiency or for some other reason.[72]

39.   Mr. Speroff testified that he was aware of no proactive monitoring of managers' compliance with promotion policies.  According to him, there is no direct assessment of managers' compliance with promotion policies as part of their regular

---

[69]Banks depo., p. 18-19.

[70] Speroff depo., Vol. I, p. 78-80; Perry depo., p. 96-97; Hesser depo., p. 60-62, 122-123; Williamson depo., p. 54-55; Buchanan depo., p. 131-132.

[71]2003 People Manual, Section 4-5, p. 181, Table 1 and Table 2 (BATES PM1003P181).

[72]Speroff depo., Vol. I, p. 70-71, 101-102; Vandeberg depo., p. 53-55.

performance reviews, and the *only* way departures from policy would be detected is if a promotion candidate filed a complaint under the company's Guaranteed Fair Treatment (GFT) dispute resolution process.[73]  Business Systems Analyst Vickie Williamson testified that the JCAT system is not structured to notify Human Resources or the selected candidate's current manager about selections for hourly promotions that depart from the CEV rankings.  She also testified that there is no tracking system of any sort in place to monitor or track the extent to which hiring managers are selecting candidates with the highest CEV.[74]  Senior Human Resources Representative Anita Collins testified that apart from impact ratio analyses required by government agencies, the company does no written analyses of racial disparities in promotion rates.[75]

40.  Mr. Speroff gave similar testimony regarding monitoring of the company's discipline policies.  According to him, the GFT process is the only mechanism for monitoring whether managers are complying with policy in their handling of disciplinary suspensions or suspensions with pay pending investigations.[76]

---

[73]Speroff depo., Vol. I, p.39-40, 47-49, 71-72, 101-102, 120-121, 134-137; Speroff depo., Vol. II, p. 46-47. Also see Hesser depo., p. 102-104. According to Shannon Brown, the GFT process is designed for complaints regarding selection, performance, and discipline and is not designed for resolving complaints about race discrimination. A separate internal EEO complaint process is used for complaints about racial discrimination (Brown depo., p. 101-104; Banks depo., p. 37-38).

[74]Williamson depo., p. 122-124.

[75]Collins depo., p. 38-41.

[76]Speroff depo., Vol. II, p. 164-165, 181-182.  In contrast, the policy regarding terminations is more proactive.  It is company policy that three notifications of a disciplinary deficiency (warning letter or performance reminder) "normally results in termination." However, the registration of the third deficiency automatically triggers a full review of the employee's entire work history at FedEx, and written policy specifies that "management is responsible for thoroughly reviewing an employee's disciplinary record with the Company and exercising judgment in determining appropriate action" (Policy 2-5, p. 54 of the October, 2003 People Manual; Speroff depo., Vol. II, p. 194-197).  That is, with three active disciplinary actions, Human Resources is required to approve a manager's decision not to terminate (Speroff depo., Vol. II, p. 197-198).  Mr. Speroff was asked: "Is there any reason that FedEx does not use this type of prompting or

41. Besides being a reactive form of accountability, FedEx's practice of relying on complaints as a monitoring mechanism is especially ineffective, since the company does not do any tabulations or analysis of outcomes of employee complaints and disparities by race.[77] It also provides no accountability for personnel actions involving casual employees, since they are not covered by the GFT process. Those employees are especially disadvantaged, since they do not receive performance reviews, they are ineligible for merit raises, they do not have access to the JCATS system, and there is no policy for considering their experience with the company as a factor in considering them for permanent hourly positions.[78] Nothing in FedEx policy prohibits managers for using a "tap on the shoulder" system for inviting casual employees to apply for open permanent hourly positions.[79]

42. In sum, in the area of equal employment opportunity at FedEx, the management principle of "what gets measured gets done" appears to have been replaced with one of "out of sight, out of mind," or, perhaps, "don't ask, don't tell." The company allows discretion to be exercised in key areas of personnel decision-making without monitoring the process or assessing its impact on equal employment opportunity. Top executives responsible equal employment opportunity, affirmative action, and diversity are uninformed about the impact of company policies in these areas. Those who oversee

---

alert mechanism to ensure compliance with FedEx's policies in cases where discipline is being issued and the employee is adversely impacted?" His response (p. 198) was: "I can't think of any."

[77]Brown depo., p. 88-90, 92-94; Rouzan depo., p. 15-16; Banks depo., p. 73-74; Dandridge depo., p. 25-26; Brooks depo., p. 23-24.

[78]Huffer depo., p. 11-12, 32-35, 53-56, 79-82; Presnoples depo., p. 124-131; Williamson depo., p. 12; Buchanan depo., p. 132-134.

[79]Presnoples depo., p. 130.

and implement policies and practices regarding performance assessment, promotion, compensation, and discipline eschew analysis of racial disparities.  Instead, it appears that they simply assume that the human resources system is free of bias, with no factual basis for that assumption.

## THE EXERCISE OF DISCRETION IN FEDEX'S HUMAN RESOURCE SYSTEM HAS AN ADVERSE IMPACT ON MINORITIES

43.  Above, I summarized research by social scientists and management professionals indicating that the exercise of discretion in a human resources system can have an adverse impact on minorities.  Data available from the FedEx personnel system allow for several tests of whether the exercise of discretion at the company works to the disadvantage of minority employees.  Plaintiffs' statistical expert, Dr. Richard Drogin, has performed several tests of this conjecture, and each supports the conclusion that discretionary aspects of the personnel system disadvantage minority employees relative to whites.

44.  In the first study, Dr. Drogin studied exceptions to the requirement that to be eligible to apply for an hourly position in the JCATS system, an employee:  (1) should not have a disciplinary deficiency (disciplinary warning within twelve months or disciplinary reminder within six months); (2) have met the minimum required time in job; and (3) have a performance rating of at least 5.0.  (Policy allows local managers, at their own discretion, to waive the disciplinary exclusion if they determine that the disciplinary

action is for infractions unrelated to the requirements of the posted job.[80]) Dr. Drogin

found that over two thirds of whites (68%) who sought to apply despite failing to meet at

least one of the requirements were indeed approved to apply for an open position,

compared to 61% for African Americans and 62% for Hispanics. Conversely, among

those seeking to apply who met all three requirements, 15% of whites were denied

approval, compared to 21% of African Americans and 19% of Hispanics.[81]

45. Second, Dr. Drogin analyzed the incidence of departure from policy requiring

that those in priority job group 1 be eligible for promotion into open positions ahead of

those in priority job group 2 and specifying that selections within job groups be made

according to CEV ranking. Dr. Drogin referred to an applicant as receiving a "passover" if

he or she is in job group 2 and is selected instead of an applicant in job group 1 or is

selected with a CEV score lower than a non-selected applicant in the same priority group.

Dr. Drogin's analysis shows that whites were significantly more likely to receive these

"passover" promotions than either African Americans or Hispanics.[82]

46. Finally, Dr. Drogin's analysis of racial disparities in performance ratings of

hourly employees shows that disparities tend to be greater for years 1997 through 2001

---

[80]Speroff depo., Vol. I, p. 125-127, 220-221; Fifer depo., p. 43-48; McDonald depo., p. 86-87. Managers also exercise some discretion in deciding whether to discipline employees over minor infractions of policies such as those pertaining to punctuality; see, e.g., McDonald depo., p. 101-105 and Rey depo., p. 178-186.

[81]2006 Drogin Report, paragraphs 47-49, Tables 17a and 17b. Dr. Drogin obtains similar results when he controls for having passed the Basic Skills Test (paragraph 55, Table 20).

[82]2006 Drogin Report, paragraphs 50-51, Table 18. Dr. Drogin obtains similar results when he controls for having passed the Basic Skills Test (paragraph 56, Table 21).

compared to more recent years.[83]  As noted above at paragraph 32, in the years prior to

the implementation of the online system, managers had discretion regarding the weighting

of performance dimensions.  The greater disparity in performance ratings during those

years is consistent with the hypothesis that discretion was exercised in a manner that was

disadvantageous to African American and Hispanic hourly employees.  However,

because the company has yet to produce accurate information on the timing of changes to

the performance rating system, a precise assessment of this hypothesis is not possible

with the available data.

47.  In short, social science research demonstrates that the exercise of discretion in

personnel systems in the absence of adequate monitoring is vulnerable to bias against

minorities, and Dr. Drogin's findings demonstrate that this phenomenon was indeed

present at FedEx.  It is reasonable to assume that other discretionary and unmonitored

aspects of the personnel system for which there is no quantitative data are similarly biased

against minority employees.


## NOT ALL RACIAL BIAS AT FEDEX IS SUBTLE

48.  There is testimony in the record that high-level FedEx managers have used

racial slurs in referring to African Americans and created a climate that has been hostile to

minorities.  Michael Snyder, who was Vice President for the United States Eastern

Region, testified that at the time Theodore "Ted" Weise was Vice President of Ground

Operations, Weise (who eventually became CEO of FedEx) used racial slurs on multiple

---

[83]2006 Drogin Report, Tables 30a and 30b.

occasions, and that Weise inappropriately instructed Snyder to tell "the fucking nigger with the beard" (an African American manager working for Snyder) to shave his beard. Snyder was warned by Michael Pigors, at the time Managing Director of Southern California (and who subsequently became Vice President of AGFS Western Region) not to challenge Weise on the matter and to carry out his directive.[84]  In placing the incident with Weise in context, David Rebholz, at the time a regional Vice President (and currently Executive Vice President, Operations and Systems Support), counseled Snyder that he needed to understand that the company had a "southern mentality" and that he would have to accept it or risk being an outsider.[85]  Snyder also testified that Rebholz chastised him for being a "nigger lover" as evidenced by Snyder's concern about racial issues.[86]

49.  Snyder testified that at the time he began his position as Managing Director at the Three Rivers District in Pennsylvania, David Rebholz, at the time Vice President of the Central Region, gave him an orientation about his peers and referred to one of the other Directors as a "a militant nigger with a chip on his shoulder."[87]  Snyder also testified about racial hostility and slurs expressed by Timothy Wertner, who at the time was a FedEx Operations Manager (and later became Managing Director of the Los Angeles Empire District).[88]

---

[84]Snyder depo., p. 20-28.

[85]Snyder depo., p. 47-48; Snyder *Pettaway-Vint v. FedEx* depo., p. 56.  Mr. Snyder recalled that these comments were made in 1992 or 1993 (Snyder *Pettaway-Vint v. FedEx* depo., p. 70-71)..

[86]Snyder depo., p. 47-48.

[87]Snyder depo., p. 39-42; Snyder *Pettaway-Vint v. FedEx* depo., p. 52-53.

[88]Snyder depo., p. 20-23, 26-31, 35-36, 50-51; Snyder *Pettaway-Vint v. FedEx* depo., p. 58-59, 72, 86.

50. Snyder left the company in 1998, but his testimony about the attitudes of top executives is relevant to the climate of FedEx during the years that followed. Social science research shows that organizational policies, practices, and the taken-for-granted understandings that are part of a company's culture, once in place, become institutionalized and rarely change in the absence of any substantial change in a firm's business, technical, or legal environment.[89] The climate described by Mr. Snyder also provides a context for the testimony of Janet Haynes, a former Operations Manager employed in Anchorage, Alaska. Haynes, who is African American, testified that she was often instructed to issue discipline to minority employees by white managers, who felt that doing so would reduce the credibility of any charges of racial discrimination.[90]

51. Most of the social science and management scholarship that I have relied upon and summarized above addresses subtle forms of discrimination, such as

---

[89]L. Stinchcombe, "Social Structure and Organizations," p. 142-93 in *Handbook of Organizations*, edited by J. G. March, Rand McNally, 1965; M. T. Hannan and J. H. Freeman, "Structural Inertia and Organizational Change," *American Sociological Review*, Vol. 43, 1984, p. 143-164; J. N. Baron, "Organizational Evidence of Ascription in Labor Markets," in *New Approaches to Economic and Social Analyses of Discrimination*, edited by R. Cornwall and P. Wunnava, Praeger, 1991. The concept of organizational inertia has been applied in scientific studies conducted in a wide range of industrial settings. For reviews, see S. Kaplan and R. Henderson, "Inertia and Incentives: Bridging Organizational Economics and Organizational Theory," *Organization Science: A Journal of the Institute of Management Sciences*, Vol. 16, 2005, p. 509-521; and C. Gresov, H. A. Haveman, and T. A. Oliva, "Organizational Design, Inertia, and the Dynamics of Competitive Response," *Organization Science: A Journal of the Institute of Management Sciences*, Vol. 4, 1993, p. 181-208. Also see, for example, J. Roggema and M. H. Smith, "Organizational Change in the Shipping Industry: Issues in the Transformation of Basic Assumptions," *Human Relations*, Vol. 36, 1983, p. 765-790; E. Abrahamson and C. J. Fombrun, "Macrocultures: Determinants and Consequences," *Academy of Management Review*, Vol. 19, 1994, p. 728-755; L. Gardenswartz and A. Rowe, "Diversity Management: Practical Application in a Health Care Organization," *Frontiers of Health Services Management*, Vol. 11, 1994, p. 36-40; G. T. Fairhurst, S. Green, and J. Courtright, "Inertial Forces and the Implementation of a Socio-technical Systems Approach: A Communication Study," *Organization Science*, Vol. 6, 1995, p. 168-185; C. Doucouliagos, "Conformity, Replication of Design and Business Niches," *Journal of Economic Behavior & Organization*, Vol. 30, 1996, p. 45-62; and M.. Ruef, "Assessing Organizational Fitness on a Dynamic Landscape: An Empirical Test of the Relative Inertia Thesis," *Strategic Management Journal*, Vol. 18, 1997, p. 837-853.

[90]Haynes depo., p. 151-153, 197-221.

stereotyping, a cognitive process that under certain circumstances can influence anyone's perceptions and decision-making, regardless of their personal prejudices towards minority groups. However, blatant racism has not disappeared, and Mr. Snyder's testimony suggests that it has been a reality in middle-level and high-level management ranks at FedEx. Overt prejudice among managers undermines equal opportunity by contributing to an environment that is hostile toward persons of color, and it signals a lack of management commitment to equal employment opportunity, and commitment is considered a key element of effective policies for minimizing bias.[91]

**CONCLUSION**

52. I have concluded that the personnel system at FedEx is uniform, centralized, and in any ways highly formalized and standardized. It also has discretionary features, and due to inadequate monitoring and accountability, these features are vulnerable to bias against African American and Hispanic employees. Statistical analyses of how discretion is exercised in the FedEx personnel system demonstrate that it has an adverse impact on minority employees, consistent with a large body of research by social scientists and management scholars on the sources of workplace racial bias. FedEx has taken a passive and reactive approach to equal employment opportunity, and its efforts at minimizing the potential for bias in decisions regarding performance assessment, pay, and promotion have been ineffective.

---

[91]Konrad and Linnehan, *op cit.*; Bielby, 2000, *op cit.*

Exhibit B

## EXPERT REBUTTAL REPORT OF WILLIAM T. BIELBY

*Derrick Satchell, et al. v. FedEx Express*

September 1, 2006

1.  My name is William T. Bielby. I am a Professor in the Department of
Sociology at the University of Pennsylvania. I have been retained by the law firm of
Lieff, Cabraser, Heimann & Bernstein, counsel for plaintiffs in *Derrick Satchell, et al. v.*
*FedEx Express*. I have previously authored two Reports concerning *Derrick Satchell, et*
*al. v. FedEx Express*, one in September 2004, submitted by plaintiffs in support of class
certification ("Bielby-1"), and another in June 2006 ("Bielby-2"). I have been asked by
plaintiffs' counsel to respond to the expert report of Dr. Philip Tetlock ("Tetlock Report")
submitted in June 2006 and to comment on aspects of the analysis in Dr. Mary Baker's
June 2006 expert report ("Baker Report" ) that relate to her characterization of certain
features of the FedEx personnel system as "objective" versus "subjective" and her
analysis of discipline. Dr. Tetlock and Dr. Baker are experts retained by the defendant.

2.  Since submitting Bielby-2 on June 30, 2006, I have been provided with the
deposition transcripts and documents listed in Appendix A. I have also received all of the
expert reports submitted by plaintiffs' and defendant's experts in June 2006.


## SUMMARY OF MY PRIOR REPORTS IN *SATCHELL, ET AL. V. FEDEX*

3.  In Bielby-1, I described the structure of the Western Region of FedEx Express
("FedEx") personnel system and features of the company's policies and practices for
making decisions about compensation, promotions, and performance assessment and for
addressing equal employment opportunity (EEO). I also summarized the substantial

forum and address them with empirical research. Tetlock's criticisms of the field have been aired in a scientific forum, the journal *Psychological Inquiry*, and the leading researchers in the field have provided detailed responses in the same issue of the journal.[11] When debate focuses on scientific issues it provides the impetus for further empirical research, which moves the field forward. In contrast, simply labeling research as "controversial" and making attributions about the personal values and political attitudes of those who contribute to it impedes rather than advances scientific research.

15. Interestingly, the specific scholarship Tetlock criticizes in *Psychological Inquiry*, the "implicit association test" developed by Anthony Greenwald of the University of Washington and Mahzarin Banaji of Harvard University, is not work I cite in my report, yet, Tetlock devotes ten paragraphs of his expert report to repeating the attack on this line of research.[12] In contrast to his critique published in *Psychological Inquiry*, in the context of this litigation Tetlock embellishes his criticisms with provocative labels and attacks on the alleged politics and motives of those with whom he disagrees.[13]

---

[11]H.R. Arkes and P. E. Tetlock, "Attributes of Implicit Prejudice, or 'Would Jesse Jackson 'Fail' the Implicit Association Test?," *Psychological Inquiry*, Vol. 15, 2004, p. 257-278; M. R Banaji, B. A. Nosek, and A. G. Greenwald, " No Place for Nostalgia in Science: A Response to Arkes and Tetlock," *Psychological Inquiry*, Vol. 15, 2004, p. 279-310. Regarding criticisms of the "response latency" methodology used in implicit bias research, social psychologist Eugene Borgida and colleagues wrote:
> However, given the firm grounding of methodologies in cognitive psychology as well as consistency of response patterns found across numerous studies, there is no serious question within the psychological community about whether response latency methodologies are a useful means of studying stereotyping.

J. S. Hunt, E. Borgida, K. M. Kelley, and D. Burgess, "Gender Stereotyping: Scientific Status," pp. 384-426 in *Modern Scientific Evidence: The Law and Science of Expert Testimony*, edited by D. Faigman, D. H. Kaye, M. J. Sacks, and J. Sanders, West Publishing Co., 2002, quotation from p. 390.

[12]Tetlock Report, p. 14-19, paragraph 24-33. Tetlock's attack on the scholarship based on the implicit association test is almost identical to the one that appears in his report submitted in *Nelson v. Wal-Mart*.

[13]Tetlock's attack on the research of Greenwald, Banaji, and their collaborators has also appeared on the opinion page of the *Wall Street Journal*. See A. Wax and P. E. Tetlock, "We're All Racists at Heart," *Wall Street Journal*, December 1, 2005, p. A16.

Exhibit C

VIDEOTAPED DEPOSITION OF WILLIAM T. BIELBY - VOL. I - 10/16/2006

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3                      --oOo--
 4
 5   DERRICK B. SATCHELL, KALINI
     BOYKIN, VALERIE BROWN, RICK
 6   GONZALES, CYNTHIA GUERRERO,
     RACHEL HUTCHINS, KELVIN SMITH,
 7   SR., and KEN STEVENSON, on
     behalf of themselves and all
 8   others similarly situated,
 9          Plaintiffs,
10   vs.              No. C 03-2659 SI;
                      C.03-2878 SI
11
     FEDEX EXPRESS, a Delaware
12   corporation
13          Defendant.
                                    /
14
15          DEPOSITION OF WILLIAM T. BIELBY
16            Volume I, Pages 1 - 268
17             Monday, October 16, 2006
18
19
20
21   REPORTED BY: CYNTHIA LEW, RPR, CSR No. 11999
22
23          TOOKER & ANTZ
        COURT REPORTING & VIDEO SERVICES
24       350 SANSOME STREET, SUITE 700
        SAN FRANCISCO, CALIFORNIA 94104
25             (415) 392-0650
```

**Page 3**

```
 1          BE IT REMEMBERED that, pursuant to Notice
 2   of Taking Deposition, on Monday, October 16, 2006,
 3   commencing at the hour of 8:55 o'clock a.m. thereof,
 4   at the Law Offices of Seyfarth Shaw, 560 Mission
 5   Street, Suite 3100, San Francisco, California 94105
 6   before me, CYNTHIA LEW, duly authorized to administer
 7   oaths pursuant to Section 2093(b) of the California
 8   Code of Civil Procedure, personally appeared
 9          WILLIAM T. BIELBY,
10   called as a witness on behalf of the Defendants, and
11   the said witness, having first been placed under
12   oath, was thereupon examined and testified as
13   hereinafter set forth.
14
15          APPEARANCES
16      The Law Offices of Schneider & Wallace, 180
17   Montgomery Street, Suite 2000, San Francisco,
18   California 94104, represented by GUY B. WALLACE,
19   Attorney at Law, appeared as counsel on behalf of the
20   Plaintiffs.
21          The Law Offices of Lieff, Cabraser, Heimann
22   & Bernstein, LLP, 275 Battery Street, 30th Floor, San
23   Francisco, California 94111-3339, represented by
24   JAMES M. FINBERG, Attorney at Law, appeared as
25   counsel on behalf of the Plaintiffs.
```

**Page 2**

```
 1             INDEX
 2
 3   DEPOSITION OF WILLIAM T. BIELBY
 4
 5   EXAMINATION BY:              PAGE
 6   MR. DIEKMANN                  6
 7
 8          --oOo--
 9
10          EXHIBITS
11   (For Defendants)
12   IDENTIFICATION    DESCRIPTION      PAGE
13     1   68-page "Expert Report of William T.   7
            Bielby, Ph.D.," dated June 30, 2006
14
15     2   26-page "Expert Rebuttal Report of     7
            William T. Bielby," dated September 1,
15          2006
16
17     3   31-page "Declaration of D. Jan Duffy,"  34
            dated November 3, 2004
17
18
19          --oOo--
20
21
22
23
24
25
```

**Page 4**

```
 1      The Law Offices of Seyfarth Shaw, 560
 2   Mission Street, Suite 3100, San Francisco, California
 3   94105, represented by GILMORE F. DIEKMANN, JR.,
 4   Attorney at Law, appeared as counsel on behalf of the
 5   Defendants.
 6          Also present: Philip Tetlock and Jake
 7   Krohn, videographer.
 8          --oOo--
 9
10
```

1  particularly in the 30(b)(6) depositions, and then
2  cross-check them against this list.
3      Q.  So basically, you reviewed the documents
4  that were attached as exhibits to the 30(b)(6)
5  depositions?
6      MR. WALLACE:  Misstates testimony.
7      THE WITNESS:  Correct.  Or if -- if
8  different depositions were constantly referencing a
9  certain section of the best practices or people
10  manual, I would just go to that PDF file, that hard
11  document.
12      MR. DIEKMANN:  Q.  You didn't review any
13  training documents or training materials?
14      A.  Not in detail, no.
15      Q.  I mean, I don't see any on here.
16      A.  Yeah.  Well, there are documents on here
17  that have the word "training" --
18      Q.  Hmm?
19      A.  There are documents on here that have the
20  word "training" in them.  But no, I did not do a
21  systematic analysis of training documents.
22      Q.  Okay.  And you didn't review any EEO
23  policies or training materials related to EEO?
24      A.  Or training materials related to EEO?
25  Apart from what's in the best practices manual and

1  reading the testimony.  The other half is devoted to
2  reading the documents, records and that testimony.
3      Q.  And you have no estimate of the total hours
4  spent in that process on depositions and documents?
5      A.  Well, again, I -- I'm saying that, in my
6  time records, where it says "Review Materials" -- I
7  would say, even where it says "Prepare Report," the
8  time I spent preparing reports, I would say
9  20 percent is actually writing a report, 40 percent
10  is reviewing testimony, and 40 percent is reviewing
11  document.  That's a rough breakdown.
12      Q.  Well, you did read the report of Jan Duffy?
13      A.  I did.  Yes.
14      Q.  You also read her deposition transcript?
15      A.  In a cursory matter, yes.
16      Q.  You know Ms. Duffy?
17      A.  I believe we met at a deposition once,
18  maybe twice.
19      Q.  Did you understand that she, as well as
20  you, frequently testifies for plaintiffs in
21  employment cases?
22      A.  Yes.
23      Q.  Have you ever been on the same case with
24  Ms. Duffy?
25      A.  I'm a consulting expert on a case that goes

1  the people manual, no.  And to the extent that they
2  were marked as exhibits to 30(b)(6) depositions.
3      Q.  How much time do you estimate you spent
4  reviewing documents all told, prior to this first
5  report?
6      A.  Including -- up to and including the 2004
7  report?
8      Q.  Yeah.  And from --
9      A.  Or from 2004 or 2006?
10      Q.  Well, I would say both, because you know,
11  the 2006 report is sort of a repetition and expansion
12  of the 2004 report.
13      A.  Right.
14      Q.  So necessarily, I'm asking -- in asking
15  about the 2006 report, I guess I necessarily am
16  asking about the time you spent reviewing materials
17  going into the 2004 report.
18      A.  Yes.  I would say that, if we were to go
19  through my time records in this case and looked at
20  time that I recorded as review materials, that
21  would -- that would mostly be reviewing deposition
22  testimony and then the documents that were referenced
23  in the deposition testimony as it came up.  Trying to
24  apportion that time, may be 50/50.  In other words,
25  half the time I'm -- half the time is devoted to

1  back -- my involvement on it goes back at least ten
2  years.  It's my understanding that the attorneys also
3  consult with her.  I don't know that she's ever been
4  made aware of that.  There might be one or two other
5  cases where we've been on the same side.  I don't
6  remember.
7      Q.  Is she, as far as you know, highly informed
8  on industry standards for personnel practices?
9      MR. WALLACE:  Vague.
10      THE WITNESS:  Yes, I believe so.
11      MR. DIEKMANN:  Q.  Highly regarded in that
12  field?
13      A.  Well, her field is different from mine.
14  She's sort of a diversity HR consultant.  But as far
15  as I can tell, yes.
16      Q.  Do you allege that you have any expertise
17  in the field of HR and diversity policies and
18  practices?
19      A.  Not as someone who goes in and sets up
20  programs for companies, which is what I understand
21  much of what she does.  That's something I don't do.
22      Q.  Do you write in that field at all?
23      A.  Well, I write for academics about those
24  issues.  I don't write for practitioner journals, for
25  example.

1   Q. Fair to say that Ms. Duffy has done more
2  work in designing and implementing state-of-the-art
3  personnel procedures than you have?
4   A. Well, I have no knowledge of -- well, I
5  have no knowledge of how much work she's done in that
6  area. But she does that; I don't. So I believe
7  that's safe to say.
8   Q. Okay.
9   A. I have not -- I have not looked at -- you
10  know, sometimes people who do what she does are
11  brought in and asked to do something very minor and
12  tinker around the edges. Sometimes they're asked to
13  write a state-of-the-art system. Sometimes they'd
14  like to do that, but they're not authorized to do
15  that. So it's a complicated business to be in.
16   Q. Would you say that she's at least equally
17  knowledgeable regarding the treatises and articles in
18  the field of employer policies and procedures with
19  respect to equal employment opportunity?
20   MR. WALLACE: Vague.
21   THE WITNESS: I would say, certainly in
22  terms of the practitioner literature for people who
23  design that stuff, yes.
24   MR. DIEKMANN: Q. Did you read her report,
25  actually read it, the report, as opposed to the

**Page 33**

1  deposition testimony?
2   A. Yes. Again, I think I testified I gave it
3  a cursory look. I did not look at it in detail.
4   MR. DIEKMANN: I'm going to show you a copy
5  of her report that bears the heading on the first
6  page, "Declaration of D. Jan Duffy."
7   We'll mark this Exhibit 3.
8     (Exhibit No. 3 was marked.)
9   MR. DIEKMANN: Q. Is Exhibit 3 the report
10  that you reviewed?
11   A. Yes, it is.
12   Q. Did you disagree with any of it?
13   MR. WALLACE: Overbroad.
14   THE WITNESS: I did not read it with the
15  intention of forming an opinion about it.
16   MR. DIEKMANN: Q. Do you notice in there
17  that she says that FedEx's personnel policies and
18  practices with respect to both training and EEO are
19  the gold standard in American industry?
20   A. I do remember reading that, yes.
21   Q. Did you disagree with that statement?
22   A. Let me say this. It seemed to me that what
23  Dr. Duffy examined and reported on was, for the most
24  part, dealing with written materials, written
25  policies, and not with -- and not implementation.

**Page 34**

1   I would take strong exception -- again, I
2  didn't write it as a rebuttal to her. But in the
3  latter section of my report where I address the way
4  the people charged with EEO -- Mr. Brown,
5  Ms. Collins, Ms. Banks and others -- the way their
6  operations are set up and the way they carried out
7  their duties, it would certainly not meet anyone's
8  gold standard for equal employment opportunity.
9   Q. Any other basis that you have for
10  disagreeing with her, her statement?
11   A. That's my main basis for disagreeing with
12  her.
13   Q. Any others?
14   A. No. As I said, I did not read her report
15  with a goal of forming an opinion one way or the
16  other.
17   Q. Do you know -- can you identify a single
18  company in American industry whom you believe has a
19  better policy and practice than Federal Express with
20  respect to promotions of hourly employees to
21  management -- within the hourly ranks or to
22  management?
23   A. I guess I want to respond to that in a
24  couple of ways. Just, you know, again, off the top
25  of my head, yeah. I think at Wal-Mart, the system

**Page 35**

1  for promotion within the hourly ranks, from hourly
2  employee to hourly supervisor, is better than --
3  better than FedEx.
4   Q. In what respect?
5   A. In that there's a clear posting procedure
6  that appears to be followed and monitored, and
7  there's no evidence that it has any adverse impact.
8   Q. Are you -- are you talking about promotion
9  from hourly to supervisor?
10   A. Hourly to hourly supervisor, within the
11  hourly ranks. I think you asked me both.
12   Q. Hourly supervisor as to an hourly position
13  at Wal-Mart?
14   A. That's my understanding, yes.
15   Q. Are you -- is it your belief that there is
16  such a position at FedEx?
17   A. No. But you asked about promotion among
18  hourly employees.
19   Q. Okay. So it's a posting system, and it has
20  no adverse impact. And that's why it's better?
21   A. And there were clear guidelines and so on.
22   Q. Clear guidelines for what?
23   A. For making decisions, for making selection
24  decisions.
25   Q. Like what?

**Page 36**

9 (Pages 33 to 36)

1     A. It's been several years since I've worked
2 on that case.
3     Q. Well, here we have a posting system;
4 correct? Correct, here?
5     A. Yes.
6     Q. And there are guidelines as to who's
7 selected; right?
8     A. Right.
9     Q. So what's the difference between this
10 system and Wal-Mart's system?
11     A. Well, you know, there's -- as I have tried
12 to say in my report, there are a lot of things -- he
13 doesn't like to hear me say these things. But there
14 are a lot things that FedEx does right. Having a
15 posting system with guidelines, those are good things
16 to have.
17     If it weren't for the discretionary aspects
18 that are not monitored that, in my opinion, have been
19 shown to be disadvantageous to employees of color, it
20 would be a good system.
21     Let me elaborate a little bit more, because
22 I think it's responsive to your question about how
23 good is FedEx or -- you know, this is -- FedEx
24 clearly has a sophisticated human resources
25 operation.

Page 37

1     Q. Ever seen one more sophisticated?
2     A. There are -- well, you know, there are -- I
3 don't want to get into cases where -- places where
4 I've been retained as a consultant and told attorneys
5 that, "I cannot express an opinion that's going to
6 support your litigation position."
7     Q. That's fine.
8     A. But I have seen -- I have -- let me just
9 finish my response. I have seen companies that are
10 much more careful in terms of monitoring and
11 oversight, monitoring of the -- two levels:
12 monitoring of the process and monitoring of
13 disparities.
14     I think where the sophistication is at
15 FedEx is sort of on the input side and not on the
16 monitoring-the-process and monitoring-of-outcome
17 side.
18     Q. What -- with respect to Wal-Mart -- let's
19 get back to the point. Does Wal-Mart have more
20 sophisticated monitoring systems of the discretion
21 that resides in its promotion to hourly supervisor
22 positions than is found at FedEx?
23     A. Certainly not in 2003, they didn't, no. In
24 general. And again --
25     Q. I'm still trying --

Page 38

1     A. I'm sorry. You're limiting it to within
2 hourly positions. And there, I can't make a
3 judgment. It's my recollection that, yes, it was.
4     Q. Their monitoring system was more advanced?
5     A. Well, perhaps the degree to which
6 exceptions were allowed and happened. I would really
7 have to go back. That was three years ago, four or
8 five years ago, when I actually studied that system
9 in any detail.
10     Q. Let's focus on -- anybody other than
11 Wal-Mart that you can identify that has a better
12 system of promotion -- not system. Better policies
13 and practices with respect to promotions than FedEx?
14     A. Again -- and I -- I cannot give you the
15 names of companies or, you know, even, I think, names
16 of attorneys. But I've been asked to review
17 materials for -- of companies. And I've looked at
18 them, and they seem -- seemed extraordinarily
19 well-designed and also incorporated sophisticated
20 monitoring and oversight in a way that I haven't seen
21 in FedEx.
22     But you know, in general, you know, I -- I
23 don't get access to a representative sample of
24 companies in order to make comparisons. The
25 companies that -- that you represent are usually --

Page 39

1 unless it's part of litigation, are usually pretty
2 careful about keeping that kind of information, you
3 know, proprietary.
4     So I really don't have a good basis for
5 saying -- you know, for making judgments on the
6 extent to which other companies that are as
7 labor-intensive as FedEx and as big as FedEx are or
8 are not more sophisticated in -- or, you know -- or
9 more sophisticated in their systems for specifying
10 the process and monitoring promotions within hourly
11 positions.
12     Q. Okay. Well, I didn't confine it to hourly
13 positions, but we'll move on from there. I just want
14 to give you a little guidance on this. I don't need
15 for you to tell me -- unless I start to ask, and in
16 which case, you can demur. But I don't mean -- in
17 asking you to identify companies, I'm not asking you
18 to tell me, "Oh, yes. There was a consulting
19 arrangement that I had, and I have studied this
20 company in the course of that because these people
21 were contemplating litigation and I gave them this
22 advice." I don't want to know that.
23     If it was Company XYZ Transportation, Inc.
24 that you were studying, all you've got to do is tell
25 me, "Yes, Company XYZ Transportation, Inc." And then

Page 40

10 (Pages 37 to 40)

VIDEOTAPED DEPOSITION OF WILLIAM T. BIELBY – VOL. I – 10/16/2006

1  maybe I can ask you some questions about what XYZ
2  Transportation Inc. does without your revealing that
3  you were a consultant or how you got that
4  information.  Okay?  So you don't need to tell me
5  confidential or privileged information in order to
6  answer most of these questions.
7       Now, can you identify any specific
8  companies that have better employee evaluation
9  procedures than FedEx?
10      A.  And there, I will say that, while I've -- I
11  think that people who design those things for a
12  living are better able to make that judgment than I
13  am.
14      Q.  Such as Ms. Duffy?
15      A.  Or Ms. French or Dr. Lundquist or -- yes.
16      Q.  But that's not my question.  I'm asking you
17  whether, in your opinion -- because you do express
18  some opinions with respect to the performance
19  evaluation system here -- can you identify any
20  company in American industry of which you are aware
21  that has a better employee performance evaluation
22  system than Federal Express?
23      A.  I have no basis for making -- expressing an
24  opinion on that, one way or the other.
25      Q.  Okay.

Page 41

1  as a manager.
2      A.  I think my answer is the same.  I have no
3  opinion in terms of what I see, doing the kind of
4  work I do.  You know, I've seen companies that seem
5  to have really sophisticated management training.
6  I've seen some that have hardly anything.  You know,
7  management training can be management training
8  specifically on how to conduct a performance review.
9  You know, I've certainly come across companies that
10  require it to be done periodically, not just when
11  people first become managers.
12      But I have no -- I have no opinion.
13      Q.  And what about in the area of EEO?  Can you
14  identify any company in America that has better EEO
15  policies?
16      A.  There, I think I can express an opinion,
17  yes.
18      Q.  Which ones?
19      A.  I would say there are many government
20  contractors that do more -- much more in the way of
21  monitoring disparity, analyzing utilization, doing so
22  in a way that's not just to fulfill the affirmative
23  action plan obligations that they have under
24  government regulations but also integrated with their
25  HR systems and don't have the deficiencies that FedEx

Page 43

1      A.  I have not -- no.  I have not done --
2  that's not what I do, is analyses of performance
3  evaluation systems.
4      Q.  Don't know?  Have no opinion?
5      A.  Have no opinion.
6      Q.  What about management training in the -- in
7  terms of conducting supervisory processes and EEO?
8  Do you know of a single company with better policies
9  and practices in the EEO and management-training
10  area?
11      A.  Um --
12      Q.  I'll break that down.  In thinking about
13  it, it seems to me to be combining possibly two
14  different things.
15      Do you have any opinions as to whether
16  there's any company in America that has better
17  management training processes and procedures than
18  Federal Express?
19      A.  Well, again, you know, management training
20  can -- there's management training to do your job.
21  There's training to become a manager or training to
22  move up in management.  Those are -- those are
23  related but different areas.
24      Q.  I'll break it down to management training
25  in how to do your job and your duties and obligations

Page 42

1  has in terms of sort of a disconnect between EEO and
2  everyday HR practice.
3      There's recent research on --
4      Q.  I haven't heard something named --
5      MR. WALLACE:  You have to let the witness
6  finish.
7      MR. DIEKMANN:  Q.  I asked can you identify
8  any specific company, and I asked you to name one.
9  Doesn't call for a dissertation.
10      A.  Okay.  Boeing, for one.
11      Q.  Any others?
12      A.  Well, I was about to say, there is recently
13  published research that I cited in my report and
14  published in the American Sociological Review that is
15  based on a probability sample of companies that file
16  EEO-1 reports across all industries, looking at those
17  companies from 1990, I think, roughly to the present.
18  Maybe it's even further back than that.
19      And they score companies on the kinds of
20  affirmative EEO structures that they have in place.
21  They chart those over time and look at the
22  consequences of those for the rate at which women and
23  minorities move into management.  And that line of
24  research gives a portrait of the proportion of
25  companies that have these -- I think they call them

Page 44

11 (Pages 41 to 44)

1  "responsibility structures" in place, which have an
2  effect -- which tend to make other forms of EEO
3  practice more effective versus those that don't.
4       Now, they don't name the companies, but --
5    Q.  So you can't tell me where FedEx ranked on
6  that, can you?
7    A.  I can't, no.
8    Q.  May have even ranked at the top.
9    A.  I don't know.
10   Q.  So other than Boeing -- let's get back to
11 the question. Other than Boeing, can you identify
12 any other companies that you think have better EEO
13 policies than FedEx?
14   A.  You know, it's hard to do that, sitting
15 here. First of all, my experience is primarily from
16 litigation. It's not a representative sample of
17 companies that get -- that end up being in class
18 action litigation. You know, I have turned down
19 a lot of expert-witness work because -- based on a
20 cursory review of things.
21   Q.  You've told me that three times, now.
22   A.  Well, you're asking me are there any, and
23 I'm saying yes.
24   Q.  You've named one, Boeing. Name another
25 one. And if you can't, say you can't.
                                          Page 45

1    A.  Sitting here today, I can't.
2    Q.  Okay. What is there about Boeing's EEO
3  policy that you think is better than FedEx's EEO
4  policy?
5    A.  At least in the piece of it that I looked
6  at -- I don't know. I might be testifying in
7  something here that I shouldn't be. But on the piece
8  of it that I looked at, there was a -- in my opinion,
9  a very careful and serious examination of disparities
10 by -- basically, utilization kind of analysis that
11 was -- again, this is my recollection based on
12 something that I looked at several years ago -- that
13 was directly linked back into its practice for
14 evaluating its procedures for making promotions and
15 for identifying potential vulnerabilities in the EEO
16 area.
17   Q.  What was the --
18   A.  There wasn't the kind of disconnect where
19 you have people whose -- at the vice president -- you
20 know, kind of disconnect that you see here, where
21 there are people at the vice president or senior vice
22 president level who are the people in charge with
23 issues relating to diversity and EEO who have never
24 asked for or ever seen an analysis of potential
25 discriminatory barriers or any sort of disparate
                                          Page 46

1  impact analysis.
2       So there's one example.
3    Q.  What was the linkage at Boeing between
4  utilization analyses and practice and procedure?
5    A.  You're asking me to recall materials that I
6  analyzed three, four years ago and that are no longer
7  available to me. It's not something I issued a
8  written report on. I'm telling you that, it's my
9  recollection, sitting here today, of the materials
10 that I looked at at that time, that it was much more
11 sophisticated than what I've seen here.
12   Q.  But you don't know how because you can't
13 identify what the linkage was?
14   MR. WALLACE:  Misstates testimony.
15   THE WITNESS:  Well, I had those materials
16 available to me at one time. I don't anymore.
17   MR. DIEKMANN:  Doctor, you can only tell me
18 what you know right now.
19   Q.  Can you, as you're sitting here right now,
20 tell me what the linkage was at Boeing between
21 utilization analyses and policy practice -- or
22 practice and procedure?
23   MR. WALLACE:  Asked and answered.
24   THE WITNESS:  I cannot give you any more
25 than I've already given you. I've given you my best
                                          Page 47

1  recollection, sitting here now.
2       MR. DIEKMANN:  Q.  Any other way in which
3  you believe Boeing EEO policies were better or are
4  better than FedEx's?
5    A.  Not that I can think of, sitting here
6  today.
7    Q.  All right. With respect to manager
8  accountability, can you identify any company in the
9  United States with better policies and practices with
10 respect to manager accountability than Federal
11 Express?
12   A.  I -- it's really difficult for me to answer
13 your questions when you're -- when you're asking for
14 the names of specific companies. I'm not a person
15 that goes out and does analyses of specific companies
16 apart from a litigation context.
17   Q.  So is your answer no?
18   A.  But I am aware that, for example, the
19 auditing of performance review processes is a
20 practice that's both a best practice recommended in
21 human resource literature and something that is
22 actually done out there in real world. I can't give
23 you, sitting here today, a list of such companies.
24 But my reading of the record here is that's something
25 that FedEx doesn't do.
                                          Page 48

12 (Pages 45 to 48)

1    So I would say, in my opinion, the
2  companies that do that have better -- have better
3  accountability for managers than FedEx does.
4    Q.  Can you identify any company that has more
5  of an auditing of personnel performance review
6  responsibilities, as you put it, than FedEx?
7    A.  Well, it's, again, my reading of the
8  evidentiary record here that -- that FedEx has hardly
9  anything along those lines, apart from what is
10  generated from specific complaints.
11    So -- and again, as I've just testified,
12  it's my understanding that this is a best practice
13  that's often recommended and is, indeed, adopted by
14  companies.  Companies that do that, in my opinion,
15  have a better system than FedEx does.
16    Q.  Doctor, I'm going to get an answer to the
17  question.  You're not going to be able to evade it.
18    Can you identify a specific company that
19  has more auditing of personnel performance review
20  responsibilities than Federal Express?
21    MR. WALLACE:  Argumentative.
22    THE WITNESS:  I'm saying that I'm aware
23  that there are companies that do what FedEx doesn't
24  do.  I'm not prepared to give you names today.  And
25  I'm also not prepared to name the names of companies

Page 49

1  specific companies that have best practices.  But I'm
2  not going to have the kind of detailed information
3  about that that I do about FedEx.
4    So it's -- you know, I wouldn't want to
5  rely just on that to say, "Here is the company that I
6  know does it better."  But there certainly is
7  literature out that there that represents companies
8  as having different kinds of systems that are more --
9  that are more effective than what FedEx has in place.
10    Q.  And presumably, Ms. Duffy is aware of that
11  literature; correct?
12    MR. WALLACE:  Calls for speculation.
13    THE WITNESS:  I would think so.
14    MR. DIEKMANN:  Q.  And you haven't done any
15  analysis or study on that issue?  That is, of whether
16  there is any company out there that has a better
17  system of manager accountability than FedEx?
18    A.  No.  No.
19    Q.  And you're not going to be prepared to give
20  any opinion that says that there are specific
21  companies out there that have better account--
22  measures of manager accountability than FedEx?
23    A.  No.
24    Q.  Do you know of a single company whose
25  evaluation, promotion, and discipline policies afford

Page 51

1  where I was retained as a consulting expert and
2  there's ongoing litigation and I've been asked by the
3  attorneys involved not to disclose anything I've
4  learned as a part of that litigation.
5    MR. DIEKMANN:  Q.  Did I ask you to do
6  that?
7    A.  Well --
8    Q.  I didn't hear myself asking you to do that.
9    A.  I know.  But it would otherwise be
10  responsive.  I could say Company XYZ, where I was
11  retained as an expert, and --
12    Q.  You don't have to tell me you were retained
13  as an expert, do you?
14    A.  But by my testifying here about a company
15  that's in litigation, I think -- you know, I think
16  that would compromise the agreement I have with the
17  attorneys involved.
18    Q.  Other than -- you can't identify one other
19  than any that you're consulting on right now?  Is
20  that a fair statement?
21    A.  Yes.  Um, yes.  As I sit here today, yes.
22  And let me elaborate on that a bit.  I could go to,
23  you know, the SHRM -- Society for Human Resource
24  Management -- Journal, HR magazine, or their Web site
25  and so on, where they give -- offer case studies of

Page 50

1  less discretion than Federal Express's do?
2    A.  I have not made a detailed analysis of
3  FedEx's discipline policy.  It's really not an area
4  that I work in.
5    Q.  Therefore, no opinion on that?
6    A.  And in other cases -- there have been very
7  few cases where I had available to me any sort of
8  detailed material on that and have been asked to
9  analyze that.  So I have no opinion on that.
10    Q.  Have you ever seen a company with more
11  policies and procedures in the personnel area than
12  FedEx?  And right now, I'm just talking about volume.
13    MR. WALLACE:  This is just private
14  entities, Gil?
15    THE WITNESS:  I was going to say, maybe the
16  federal government.  Maybe the University of
17  California.  I don't know.  I have no basis.  I have
18  no basis for expressing an opinion on that.
19    MR. DIEKMANN:  Q.  Have you ever seen a
20  company that provides more training to its managers
21  and employees on their HR and personnel
22  responsibilities?
23    A.  I think, then, we're back to the line of
24  questioning and answers I gave a few moments ago,
25  that, you know, I'm aware of literature for

Page 52

13 (Pages 49 to 52)

VIDEOTAPED DEPOSITION OF WILLIAM T. BIELBY - VOL. I - 10/16/2006

1 practitioners that holds out and describes companies
2 as having best practices. But I don't have the same
3 kind of access to that kind of information as I do in
4 a context like this. And even in this context, I
5 have not set out to do a detailed analysis of FedEx's
6 training procedures.
7 Q. So you're unable to answer that question?
8 A. Correct.
9 Q. The whole line of questions leads me to ask
10 this question. How is one to decide when there's too
11 much discretion in making personnel decisions?
12 A. I'm not sure that's the relevant question.
13 Q. But it's the question I asked.
14 A. Okay.
15 Q. Whether it's relevant or not, try it. Is
16 there any standard by which one may decide whether
17 there is too much discretion afforded by a company in
18 the making of personnel decisions?
19 A. Well, I think the task is to look at the
20 nature of policy and practice for making decisions,
21 say, about pay or performance evaluation or
22 promotion. Identify discretionary aspects, analyze
23 whether discretion is exercised in the way that at
24 least appears to have a disparate impact, and then
25 examine whether there are ways to reduce that

Page 53

1 And then, if you believe part of the response is
2 nonresponsive, move to strike. That's the proper way
3 to do it. Don't just start talking over the witness.
4 THE WITNESS: I believe the question is how
5 do we know when there's too much discretion, and I'm
6 trying to be responsive.
7 First point, discretion is not an attribute
8 of human resource systems. Discretion is something
9 that is part of elements of a human resource system
10 that can usually be clearly identified as it relates
11 to key parts, like the decision to set compensation,
12 the decision to make selections for promotion, and so
13 son.
14 Identifying those elements, monitoring how
15 that discretion is exercised, both in terms of the
16 guidelines in place for people to exercise discretion
17 and for its impact, and seeing whether providing more
18 guidance and substance to how that discretion is
19 exercised, reduces disparate impact, is a way of
20 gauging whether there was too much discretion or not
21 and for identifying where remedies are — are
22 warranted and are effective.
23 And again, I think a good example is the
24 natural experiment that occurred at FedEx when they
25 went to the on-line system in that it eliminated —

Page 55

1 discretion and to continue to monitor what the impact
2 is.
3 So for example, we have, again, sort of a
4 bit of a natural experiment in the FedEx case, where
5 they went from paper performance reviews to an
6 on-line system, which, by my understanding of the
7 record, reduced discretion — in some ways all but
8 eliminated discretion in the weighting of performance
9 dimensions in a way that the research would suggest
10 would reduce disparities. An analysis of that — you
11 know, this was done by experts, but I think it's the
12 kind of internal analysis the company could do —
13 Q. You know —
14 MR. WALLACE: Were you finished?
15 THE WITNESS: No, I wasn't.
16 MR. WALLACE: You can't interrupt the
17 witness. You have a habit of doing that,
18 Mr. Diekmann.
19 MR. DIEKMANN: Well, I would like the
20 witness to answer the questions, not go on and on and
21 on —
22 MR. WALLACE: Well, the thing to do is —
23 MR. DIEKMANN: — or we're going to be
24 here —
25 MR. WALLACE: — let the witness finish.

Page 54

1 or all but eliminated discretion in weighting. It
2 appears to have reduced disparate impact. There are
3 still discretionary — there's still discretionary
4 aspects of it in terms of exception ratings and so
5 on. Those, too, could be studied empirically and
6 both statistically and also in an auditing way.
7 And if they appear to be creating barriers
8 or having a disparate impact, appropriate safeguards
9 can be designed and maybe even implemented in a pilot
10 program to see whether they seem to work.
11 So regarding the question of too much —
12 too much — how do we know when there's too much
13 discretion, we analyze it.
14 MR. DIEKMANN: Q. Do I take it from that
15 probably two-page answer that the question of whether
16 it's too much depends upon the impact?
17 A. No. But the impact — the impact is a
18 diagnostic tool for deciding when a closer analysis
19 is warranted.
20 Q. If you don't see any — what you call
21 adverse impact, does one conclude that there is not
22 too much discretion?
23 A. Well, one concludes that there is likely —
24 discretion is likely not exercised in a way that
25 creates barriers to women and minorities. One might

Page 56

14 (Pages 53 to 56)

VIDEOTAPED DEPOSITION OF WILLIAM T. BIELBY – VOL. I – 10/16/2006

1 also discover, though, that company policy and
2 practice is carried out in a way that could be more
3 highly rationalized and more efficient.
4     So you know, in the course of auditing,
5 say, for example, performance reviews, you might find
6 that there are ways in which the performance review
7 process is implemented that aren't leading to.
8 Aren't leading to disparities but are leading to
9 unreliable ratings that are not good for the company,
10 and you would have a reason for improving the system.
11     So you know, I guess what I'm trying to say
12 is, there's -- based on both social science
13 literature and human resource literature, there's
14 good reason for auditing the exercise of discretion
15 in order to identify and remedy discriminatory
16 barriers. But there's also good reason to audit
17 discretion, just as a matter of a rationalizing human
18 resource systems.
19     Q.  Okay.  You audit it.  You find out that
20 sometimes it's effective, sometimes it's not.
21     How do you decide how much discretion is
22 too much and how much is too little?  Is there a
23 measure against which you can analyze that?
24     A.  And it's -- you know, again, you know, you
25 have people like Dr. French and Dr. Lundquist -- and

Page 57

1 maybe Dr. Duffy; I know less about her practice --
2 who go in and analyze that for you.
3     You might have that expertise in-house at a
4 company like FedEx, and you use the best available
5 tools that are at your disposal to -- to investigate
6 whether there are better or more disciplined ways of
7 doing this part of the human resource process.  And
8 then you monitor its effects, both in terms of its
9 impact on discriminatory barriers and its impact on
10 the efficiency of the HR system.
11     I think another example from a real company
12 is what happened in Home Depot regarding -- I suppose
13 actually responsive to an earlier question of
14 yours -- what happened in Home Depot in response to
15 concerns about women's opportunities to move from the
16 front-end to sales.  They had no system in place for
17 systematically registering availability and interest
18 in a promotion.
19     Highly discretionary.  Anybody looking at
20 that with expertise in the area would look at that
21 and say, "Here is a place where there appears to be
22 too much discretion.  We need" --
23     Q.  By what standard?
24     A.  By the standard of looking at how decisions
25 were made to bring people from front-end positions

Page 58

1 into sales.
2     Q.  What standard is that?
3     A.  Well, in that case, there were no
4 guidelines whatsoever.
5     Q.  No.  What standard are you measuring it
6 against that's decided it was too much?
7     A.  Okay.  Maybe it wasn't.  But here is what
8 happened.  The very knowledgeable people that Home
9 Depot relied upon --
10     Q.  You said it clearly was.
11     MR. WALLACE:  You can't interrupt the
12 witness.
13     MR. DIEKMANN:  He said it clearly was.
14 That assumes that there's some standard that tells
15 you that it clearly is far beyond that standard.
16     MR. WALLACE:  Are you finished with your
17 response?
18     THE WITNESS:  No.
19     MR. WALLACE:  Finish your response.
20     THE WITNESS:  Well, I don't want to
21 repeat -- I don't want to repeat the answer I already
22 gave.  But if I have to, I will.
23     And you'll say, "Asked and answered," and
24 we'll be here longer.
25     MR. DIEKMANN:  Q.  No, I won't.

Page 59

1     A.  Let me finish this answer.  Okay?  Example
2 at Home Depot, it started from a point of pretty much
3 complete discretion.  Then I'll contrast with FedEx.
4 Okay?
5     Q.  That's not my question.  It's not my
6 question.
7     MR. WALLACE:  You've interrupted the
8 witness again.
9     THE WITNESS:  Okay.  At Home Depot, they
10 did an analysis.  They decided they needed a
11 systematic way for people to express interest and
12 availability.  They implemented this Internet kiosk
13 system that systematically solicits information from
14 people, automatically puts them in the pool if they
15 meet the minimum qualifications and so on.  And it
16 led to both a lowering of the disparate impact by
17 gender and a more effective -- I think, by all
18 accounts, a more effective system for doing that.
19     Back to the FedEx thing.  No.  FedEx wasn't
20 starting -- isn't starting from the point that
21 FedEx -- that Home Depot started from.  FedEx is not
22 a totally discretionary system.  I've tried to make
23 that point again and again.
24     There are identifiable features that you
25 can look at that appear on the face of it to be

Page 60

15 (Pages 57 to 60)

1 discretionary. There are analyses that have been --
2 that could have been done in-house that have been
3 done by experts that show that they have a
4 discriminatory impact. The next step is to do -- I
5 don't know if I'm allowed to talk about this here.
6 But you know, I did see -- well -- I'll let you guys
7 decide this.
8      I saw the starting point for mediation
9 discussions. It seemed like a perfectly reasonable
10 way to proceed. You identify the discretionary
11 areas. You study their impact. You look at whether
12 there's a better way to do it that might -- that
13 perhaps is even more efficient than the current way
14 of doing things. And then you monitor it over time
15 to see whether it's having the intended effect, both
16 on company efficiency and on discriminatory barriers.
17      That's how you deal with the issue of how
18 much discretion is too much.
19      MR. DIEKMANN: Q. I still haven't heard an
20 answer.
21      A. Well, I've given you my best answer.
22      Q. You determine it based on whether there's
23 adverse impact.
24      A. That's not what I said.
25      Q. Do you have opinions --

Page 61

1      A. I can say it again.
2      Q. Do you have an opinion that there is too
3 much discretion afforded by Federal Express in the
4 making of its promotion, performance or discipline
5 decisions?
6      MR. WALLACE: Compound. Overbroad.
7      THE WITNESS: I -- I believe there are
8 discretionary aspects to its policies and practices
9 for doing those things. Those -- those raise a
10 potential. I believe that the statistics show that
11 that discretion is exercised in a way that it has a
12 disparate impact.
13      Only if there wasn't a disparate impact, I
14 do think you monitor how that -- how that discretion
15 is exercised. But particularly because there's a
16 disparate impact, you monitor that. And you put your
17 smart people to work on it and see is there a better
18 way to do this that might, again, make the system
19 more efficient and, at the same time, address a
20 potential discriminatory barrier.
21      Q. Doctor, some discretion is necessary in
22 virtually all -- in fact, in all personnel
23 decision-making processes, isn't there?
24      A. Absolutely.
25      Q. Well, just answer my question. Do you plan

Page 62

1 to testify that, in your opinion, there is too much
2 discretion afforded in Federal Express's
3 decision-making processes?
4      A. I will express the opinion that there is
5 discretion exercised in a way that appears to create
6 discriminatory barriers and that FedEx should look at
7 that and see if there's a different way of doing it.
8      Q. But you're not going to testify that, in
9 your opinion, there's too much discretion afforded in
10 the policies themselves?
11      MR. WALLACE: Misstates testimony.
12      THE WITNESS: Well, you know, I will
13 testify about what I've looked at and the specific
14 policies that are discretionary. And you know,
15 perhaps Dr. French or -- and Dr. Duffy will be there,
16 testifying about how it could -- how it could be done
17 differently or why it shouldn't be done differently.
18      MR. WALLACE: We've gone about an hour and
19 a half. Why don't we take a break.
20      MR. DIEKMANN: We're about to run out of
21 tape. Let me finish this.
22      Q. This is a standard that you personally
23 applied in deciding this, and Ms. Duffy, you expect,
24 is applying a different standard?
25      A. I don't understand the question.

Page 63

1      Q. Well, Ms. Duffy says, for example, "I find
2 that the discretion involved in these policies is
3 limited and appropriate for the processes and
4 procedures at issue," and you say that it's not. Who
5 is to -- how are we going to decide who is right and
6 who is wrong? How are we going to disprove either of
7 you?
8      A. Let's put Mr. Lundquist and Dr. French on
9 it and move forward.
10      Q. How are we going to decide whether you're
11 right or Ms. Duffy and others are right or wrong?
12      MR. WALLACE: Overbroad.
13      THE WITNESS: You know, I have given you a
14 methodology for doing that.
15      MR. DIEKMANN: Q. That's your own
16 standard, isn't it?
17      A. I didn't give you a standard. I gave you a
18 method.
19      Q. That's a method that you're suggesting
20 personally?
21      A. Yes.
22      Q. Ms. Duffy may came to a completely
23 different conclusion and say that's not necessary.
24      A. She might.
25      Q. All right. And one can't reasonably

Page 64

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

1 disprove either of your testimonies, can they?
2         MR. WALLACE: Argumentative.
3         THE WITNESS: You know, I don't know how to
4 answer that question. I'm not sure what that means.
5         MR. DIEKMANN: Q. It's not capable of
6 disproof, is it? I can't prove you wrong because you
7 say, "I believe I'm right, applying my standard for
8 what I think should have been done here," which
9 wasn't. I can't prove you wrong, can I?
10        A. I have not seen -- again, I didn't look
11 closely at Dr. Duffy. But I have not seen Dr. Duffy
12 opine on whether or not the exercise of discretion
13 that has the appearance of creating a disparate
14 impact was done -- is totally explained by
15 nondiscriminary [sic] practices.
16        Q. I didn't ask you about Ms. Duffy, Doctor.
17 I asked you about you. How do I disprove you?
18        MR. WALLACE: Argumentative.
19        THE WITNESS: I thought I just heard you
20 say how do we determine who's right.
21        MR. DIEKMANN: Q. How do I disprove you?
22 Is it even capable of disproof, that is, your
23 opinion?
24        A. Yes. You do the -- you apply the
25 methodology I just laid out for you. Perhaps in the

Page 65

1 course of that, you discover that the way discretion
2 was exercised was totally in line with reasonable
3 guidelines and that the only reason -- the only
4 reason that African Americans and Latinos are
5 getting -- are getting less stable outcomes is that
6 they're just not up to the job. That's possible.
7         I personally think it's highly unlikely. I
8 think that, if FedEx had appropriate policies and
9 procedures in the EEO area in place and did the kind
10 of things that people in Shannon Brown's position
11 normally do, they would have discovered that already
12 and done this exercise and learned the answer.
13        MR. DIEKMANN: Move to strike. Wholly
14 nonresponsive.
15        Go off the record.
16        THE VIDEOGRAPHER: This is the end of Tape
17 1, Volume 1, for the deposition of Dr. William
18 Bielby. Off the record at 10:26.
19        (A recess was taken.)
20        THE VIDEOGRAPHER: This is the start of
21 Tape 2, Volume 1, for the deposition of Dr. William
22 Bielby. On the record at 10:33.
23        MR. DIEKMANN: With respect to your -- I
24 guess I still don't have an answer to the question.
25        Q. Are you going to testify that, in your

Page 66

1 opinion, there's too much subjectivity -- I mean too
2 much discretion afforded by Federal Express in its
3 policies and practices with respect to promotion,
4 discipline and performance evaluation?
5         A. I can't say that I'll use the word "too
6 much." I will say that there is evidence of
7 discretion that is exercised in a way that has a
8 discriminatory impact or could have a discriminatory
9 impact and that --
10        Q. Actually, you're going to testify that it
11 could; right? Could have? You're not going to
12 testify it did?
13        A. Well, it has a disparate impact.
14        Q. That's based on other people's analyses;
15 correct?
16        MR. WALLACE: Are you finished with your
17 answer?
18        THE WITNESS: Well --
19        MR. DIEKMANN: Q. Did you conduct any
20 disparate-impact analyses?
21        A. No. I'm relying on Dr. Drogin's analysis.
22        Q. Go back to your answer. I'm sorry for
23 interrupting. I just wanted to clarify.
24        A. I'm going to testify that there are
25 discretionary elements of the FedEx personnel system,

Page 67

1 some of which can be shown to have an impact that's
2 disadvantageous to employees of color, that there's
3 also evidence that, when aspects of discretion has
4 been -- have been eliminated, that disparity goes
5 away, which leads to a plausible inference that this
6 discretion is having a discriminatory or a biased
7 outcome, just as the researched literature on
8 discretion and decision-making is -- suggests.
9         Whether that's too much discretion or not
10 enough discretion in terms of business necessity or
11 efficient business practice is something for the
12 company to determine. And I will testify that I feel
13 the company has not conducted itself in a way that
14 eliminates the way discretion creates bias. I
15 will -- I don't think I used the word "too much" or
16 "too little" in that response.
17        So to answer your question, no. I'm not
18 going to testify that FedEx has too much discretion.
19 I'm not going to testify that FedEx has too little
20 discretion.
21        Q. And you have no opinions on that specific
22 subject?
23        A. Too much, too little?
24        Q. Yes.
25        A. I have no opinion. I have no absolute

Page 68

17 (Pages 65 to 68)

VIDEOTAPED DEPOSITION OF WILLIAM T. BIELBY - VOL. I - 10/16/2006

1  metric of discretion that one can look at and say,
2  "Oh, when it's up here, you have discrimination, and
3  when it's down here, you don't."
4      I do have an opinion from researched
5  literature that the exercise of discretion can
6  have -- can allow bias to affect decisions, and
7  that's why you need to look at it.
8      Q.  Same question with respect to subjectivity.
9  Are you going to testify that there's too much
10 subjectivity in any of Federal Express's
11 decision-making processes?
12     A.  No.
13     Q.  Are you going to testify that any
14 subjectivity in the processes has led to any kind of
15 adverse impact?
16     A.  No. I don't think -- I don't think it's in
17 my report.
18     Q.  I don't think so. So subjectivity is not
19 something that you're going to be testifying about?
20     A.  Not subjectivity per se, meaning exercise
21 of judgment. You know, subjective things can be
22 assessed in a way that has sufficient safeguards so
23 that it's not discriminatory or doesn't have adverse
24 impact. It always depends on the context.
25     Q.  Your focus is on the discretion afforded in
Page 69

1  are. That's where I -- that's where I apparently
2  disagree most fundamentally with Dr. Duffy, if she
3  has, indeed, expressed opinion about monitoring
4  disparities and EEO audits.
5      Q.  What to you is in absence -- what to you is
6  in absence to others appears to be a presence. How
7  do we decide whether, independent of the -- just
8  listening to people and picking one over the other,
9  whose opinion or conclusion is correct?
10     A.  Part of that is a matter of the -- the
11 factual matter is for the fact-finder. You know, I
12 read the testimony as the EEO people don't audit
13 what's going on. I don't -- I haven't read
14 Dr. Duffy's deposition, but I don't know that she
15 disputed that testimony, the testimony from Brown and
16 Banks and Collins and so on.
17     There's apparently a difference of opinion
18 that -- that I have no strong opinions on -- or
19 independent opinions on about the simple monitoring
20 of the process of the performance review system. And
21 that's more in Dr. French's -- Dr. French's area than
22 in mine. I've chosen not to do a careful analysis of
23 that. I understand that Dr. French has expressed
24 opinions on that. I've read her report on that. I
25 do recall Dr. Duffy has a different opinion.
Page 71

1  the process of making decisions?
2      A.  Correct. I have -- Dr. French might have
3  opinions on how teamwork was assessed and so on. I
4  don't.
5      Q.  What about -- do you have an opinion that
6  you plan to express that there is too little
7  monitoring of the exercises of discretion at FedEx?
8      A.  Yes.
9      Q.  How does one -- well, is there a
10 standard -- let me withdraw that.
11     To the extent that you say there's too
12 little monitoring and Ms. Duffy says that there's
13 enough or Dr. Campion says that there's enough and
14 Ms. French says that there isn't enough -- she says
15 that -- is there a measure other than the respective
16 person's opinions against which those -- that
17 conclusion can be tested?
18     A.  Well, we're sort of in the same realm
19 there.
20     Q.  You're right. I think it is the same
21 realm.
22     A.  But I think where the record is the
23 clearest is the virtual absence of monitoring of
24 disparities and the absence of auditing as part of
25 the EEO function. So that's where my strong opinions
Page 70

1      But I haven't done my own analysis of that.
2  So --
3      MR. DIEKMANN: Doctor, my questions really
4  don't call for the monologues. You're fully entitled
5  to answer any question you want for as long as you
6  want, but it's just really a lot easier if you focus
7  on the questions.
8      Ms. Duffy does say -- I'll quote.
9  "Although monitoring is but a tool and not a
10 requirement for achieving equal opportunity and
11 nondiscrimination efforts, FedEx monitors its effort
12 to meet its EEO objectives through a variety of
13 progressive and usually effective means." And then
14 she goes on. So there is a difference between you
15 and Dr. Duffy on this issue of monitoring.
16     Q.  And my question is this. She says one
17 thing; you say another. Is there any objective
18 scientific standard by which one can decide who is
19 correct, other than your own opinions?
20     A.  Well, I should actually -- I guess I should
21 read her report more carefully, and we can go through
22 it point by point.
23     Q.  I just want you to answer my question.
24     A.  Well, you know --
25     MR. WALLACE: If you want to review what
Page 72

18 (Pages 69 to 72)

TOOKER & ANTZ COURT REPORTING AND VIDEO SERVICES
TEL: 415-392-0650 FAX: 415-392-3897

VIDEOTAPED DEPOSITION OF WILLIAM T. BIELBY - VOL. I - 10/16/2006

1  Ms. Duffy says in her declaration, you should do so.
2       THE WITNESS: Okay. There is a -- okay.
3  There is a literature. I started to talk about it
4  earlier, and the conversation got -- the conversation
5  got side-tracked.
6       There is this literature most recently
7  published in American Sociological Review about the
8  kinds of responsibility structures that appear
9  effective in contributing to EEO effectiveness and
10  goals as opposed to what's not.
11       My reading of the testimony -- and I -- you
12  know, I would be surprised if Dr. Duffy would say
13  that testimony isn't what it is -- is that FedEx
14  doesn't have that kind -- those kinds of structures
15  in place in the EEO level, in the EEO area, and
16  again, in terms of what Mr. Brown's office and
17  Ms. Collins's office and so on do.
18       So there's -- I will point to that
19  literature as supporting the inferences I've drawn
20  from this record.
21       MR. DIEKMANN: Q. And you --
22       A. Maybe she disagrees with that literature;
23  maybe she doesn't. I don't know.
24       Q. Doctor, I'm asking you to tell me whether
25  there is any standard for a level of monitoring that

Page 73

1  the basis for my conclusion is -- I think it's on
2  Paragraph 35 -- starts at Paragraph 35 or so. I
3  believe that that provides a basis for deciding
4  whether she is right or I am right on the issue of
5  effective EEO monitoring at the level of the
6  organization.
7       And again, in terms of the level of
8  monitoring and auditing the daily administration of
9  performance reviews, I have no strong opinion on
10  that. But once again, there's a literature that I
11  know that Dr. French will be relying upon, and I
12  agree that the experts on either side have different
13  opinions.
14       Q. These are areas where there is no
15  scientific consensus?
16       MR. WALLACE: Misstates testimony.
17       THE WITNESS: No. I think there's a
18  scientific -- there's a scientific consensus in
19  Footnotes 40 through 42. There's not the metric you
20  asked for. I think that's different.
21       MR. DIEKMANN: Q. How is it, then, that
22  you and Ms. Duffy can come to opposite conclusions on
23  that subject?
24       A. Maybe she's not familiar with the
25  literature that I've cited in Paragraphs 40 through

Page 75

1  is sufficient or is not against which one can measure
2  your opinion and Ms. Duffy's opinion and
3  Dr. Campion's opinion or Ms. -- Dr. French's opinion
4  on the subjects of monitoring.
5       MR. WALLACE: Asked and answered.
6       MR. DIEKMANN: I know you told me there are
7  articles that have been written on that. Articles
8  don't necessarily establish standards. Article just
9  say, "I think this is a good idea" or "I think this
10  is going to be particularly effective" or "I believe
11  that this is not an effective policy."
12       Q. The question is, is there an agreed-upon
13  standard against which a person's opinion can be
14  measured in the area of what is sufficient and what
15  is not sufficient monitoring?
16       A. Once again, I don't think that there is a
17  metric where you can point to here is where it's
18  effective and here is where it's not. But there's a
19  large literature, which I cite roughly in Footnotes
20  40 to 42 of my report of June 30th, on the ways in
21  which EEO structures become decoupled or closely
22  coupled with actual HR practice.
23       In my opinion, based on my reading the
24  evidence, regardless of what metric there is, FedEx
25  is very much towards the uncoupled end. And my --

Page 74

1  42 [sic], which is literature by social scientists
2  and not HR practitioners. In fact, it's literature
3  by social scientists about HR practitioners.
4       Q. Exhibit D to Exhibit 3, list of
5  depositions, there's two different lists.
6       With respect to the first list, the
7  30(b)(6) depositions, which ones of those did you
8  review? Let me put it this way. Are there any of
9  them that you didn't review?
10       A. There are -- there are many that I did not
11  read from beginning to end. At one level or another,
12  I reviewed every one that addressed topics relevant
13  to my report. And I used a method to ensure that
14  that was the case.
15       Q. How would you know that one's testimony
16  wasn't relevant to your report unless you read the
17  whole deposition?
18       A. Okay. I read the depositions that were
19  most relevant to the topics. For other depositions,
20  what I did was I had them all in the same subfolder
21  of my computer, and I would do text searches on
22  relevant terms, like weight, monitor, process,
23  performance, punctuality, attendance, EEO and so on.
24       And I would get a report on the frequency
25  with which those various words would come up in a

Page 76

19 (Pages 73 to 76)

VIDEOTAPED DEPOSITION OF WILLIAM T. BIELBY - VOL. I - 10/16/2006

1  deposition, and it will give me the adjacent
2  language. And I would make a determination as to
3  whether that person, if it was not one that I read
4  from beginning to end, was testifying on that topic.
5  And I would then read the relevant passages of that
6  deposition and go backwards and forward to get the
7  rest of the context as necessary.
8      Q. So you triggered into the depositions
9  through a keyword search?
10     A. Yes.
11     Q. And if the keyword didn't come up in some
12  later part of the deposition in which the subject was
13  discussed, you might have missed that?
14     A. Correct. And there are some I read from
15  beginning to end.
16     Q. Which ones did you read from beginning to
17  end?
18     A. Let's see. I believe I read McQueen from
19  beginning to end; Van Galder; Speroff, definitely. I
20  think Rhea, Brown, Collins. I don't remember about
21  Banks and Dandridge. I believe Hesser and Huffer. I
22  don't believe Williamson. I believe DeBarry. I
23  believe Hater. I know Hayward. I believe Pfeiffer.
24      I believe those are the ones I had read
25  beginning to end.

Page 77

1      Q. What about the second list? Did you read
2  any of those?
3      A. I don't believe I read any of those from
4  beginning to end. No. No. Probably not.
5      Q. And how would you decide which portion of
6  those to read? First of all, let me ask you the
7  percentages of them that you read any part of.
8      A. I would say through the -- through the
9  process that I've just described, I would say maybe
10  70 percent of them would come up through that
11  process. And I would at least look closely enough to
12  see whether, say, the word "exception" came up,
13  because they used the word "exceptional" nine times
14  versus they were talking about exceptions in the
15  posting policy or exceptions in performance
16  evaluation.
17     Q. And that was -- you identified that was
18  through the key-word process we discussed previously?
19     A. Correct.
20     Q. In preparing your report, did you talk to
21  any FedEx employees?
22     A. Only to ship things.
23     Q. Only to what?
24     A. Ship things.
25     Q. About the case?

Page 78

1      A. No.
2      Q. Talk to any of the plaintiffs?
3      A. No.
4      Q. Talk to any FedEx managers?
5      A. No.
6      Q. Visit any FedEx sites, other than to maybe
7  get a package to somebody?
8      A. No.
9      Q. Did you make any effort to learn how
10  FedEx's operations worked in a typical day?
11     A. Only through deposition testimony.
12     Q. Were any of the keywords keywords that tied
13  you into FedEx's operations and how they functioned?
14     A. Some of the first 30(b)(6) depositions, the
15  organization structure one and some of the senior VP
16  ones, talked a lot about the daily operations. I
17  learned a lot about that. Very interesting.
18     Q. Did you analyze the work environment at any
19  FedEx location?
20     A. No.
21     Q. Did you analyze the contents of any FedEx
22  training programs?
23     A. No. Not systematically, no.
24     Q. Did you have any conversations with anyone
25  about the level of oversight that they exercised,

Page 79

1  "they" being -- let me withdraw that.
2      Did you have any conversations with any
3  managers about the level of oversight they exercised
4  in connection with promotions, evaluations, and
5  discipline decisions?
6      A. No.
7      Q. Did you read any depositions on that
8  subject or those subjects? I guess "that subject,"
9  that is the subject being -- the oversight a specific
10  manager exercised in connection with promotions,
11  evaluations and discipline decisions.
12     A. Yes, through that same process.
13     Q. Who?
14     A. As I recall, some of the people that were
15  deposed were deposed because they were
16  decision-makers for named plaintiffs. And there was
17  testimony about why a specific person got an
18  exception on a performance review or why attendance
19  was or was not -- you know, an absence was or was not
20  taken into account.
21     Q. I'm talking about the level of oversight
22  that was exercised over that process.
23     A. The -- over the person testifying.
24     Q. Yeah. The level of oversight that a
25  manager exercised over decisions that were made in

Page 80

20 (Pages 77 to 80)

VIDEOTAPED DEPOSITION OF WILLIAM T. BIELBY - VOL. I - 10/16/2006

**Page 165**

1  last 10 years, 20 years, of explicit measures of
2  racism have shown that anti-black attitudes within
3  the general population have declined dramatically?
4     A.  Absolutely.
5     Q.  And in a general overall sense, would you
6  expect the same level of stereotyping and prejudice
7  against existing employees as — as fellow employees
8  as you would with respect to total strangers?
9     A.  You've conflated stereotyping and prejudice
10  again.
11     Q.  Okay.  I won't do that.  Would you expect
12  the same level of stereotyping against or with
13  respect to fellow employees as you would with respect
14  to total strangers?
15     A.  The stereotypes can — are always there.
16  But I — it's reasonable to conclude that they are
17  less consequential in dealing with people who you
18  interact with regularly as opposed to total
19  strangers.
20       I need to qualify that to a certain extent
21  because it does depend on the nature of the
22  interaction and so on.  There's a literature on how
23  people acquire and retain information that's
24  consistent with stereotypes and ignore that which is
25  inconsistent with it.

**Page 166**

1     Q.  In a team-based setting, that is, where the
2  success of members of the team — I mean individual
3  members of the team, including the team leader, are
4  based on the overall achievements of the team, would
5  you expect to see a lot less decision-making based on
6  stereotypes and prejudice than in the situations
7  where these team goals and team achievements aren't
8  predominant?
9     A.  Among decision-makers in the team or —
10     Q.  Yes.
11     A.  — or the decision-makers who make
12  decisions about who are on the team?
13     Q.  Decision-makers within the team.
14     A.  I would expect there to be less.
15     Q.  Why?
16     A.  Because having shared goals is one way to
17  reduce the impact of stereotyping.
18     Q.  I mean, if my success as a manager depends
19  on the performance of my team, I want people running
20  that team under me, possibly, who are the best
21  qualified and can get the best performance out of
22  that team.
23       Right?
24     A.  That could be true, and it could still be
25  influenced by stereotypes.  But I do think that being

**Page 167**

1  interdependent does reduce the impact of stereotypes.
2     Q.  Makes one look far more rigorously at who
3  is going to do the best job?
4     A.  Roughly, yes.
5     Q.  And I assume you answered this, but I need
6  to cover it.
7       Did you test any employees at FedEx for
8  implicit or explicit anti-black stereotypes?
9     A.  No, I did not.
10     Q.  Moving on to Paragraph 22 of your report.
11  You say, quote, "If decision-makers" — I don't know
12  if this is an exact quote.  But you say something to
13  the effect of, "If decision-makers know they will be
14  accountable for making fair and unbiased decisions,
15  bias in the process will be minimized."
16       Correct?
17     A.  Let me read it, and we'll —
18     Q.  Maybe you don't say that.
19     A.  That's part of the statement I make there.
20  And for the consequences their actions have for
21  employment opportunity, yes.
22     Q.  So if decision-makers know they're going to
23  be accountable for making fair and unbiased
24  decisions, bias in the process of making those
25  decisions is going to be minimized.  Correct?

**Page 168**

1     A.  It can be, yes.  Well, you know, I list a
2  series of things that are not —
3     Q.  Yeah.
4     A.  It's an "and," not an "or."
5     Q.  Let's go to the studies you cite.  And I
6  hate to do this, but I think I need to.
7       These are the studies you cite in Footnote
8  35.  There are several.  But I would like you to go
9  through each one and tell me what the accountability
10  measures were in each of those studies, if you can.
11     A.  Boy.  Some of these are review articles.
12  In the Nelson, Acker and Manis one — actually, the
13  bottom line of that study was how difficult it is to
14  overcome the impact of stereotypes.  But there were
15  several conditions where — several factors that were
16  manipulated.  One had to do with giving people
17  explicit information about the fact that, whatever
18  stereotypes they might hold, those did not apply to
19  the group being assessed here.  And they were also
20  told that they would need to describe the rationale
21  for their decision publicly after they made it.  I
22  believe I remember that correctly.
23     Q.  So this was a lab study?
24     A.  That was a lab study, yes.
25     Q.  With students as the —

42 (Pages 165 to 168)

1    A.  I believe so.
2    Q.  -- the guinea pigs, I guess?  Okay.
3    A.  We call them "subjects."
4    Q.  And the accountability measure was that
5  they were going to have to explain themselves
6  later -- or that they might?
7    A.  I believe so, yes.
8    Q.  Were they given an admonition not to
9  discriminate or not to engage in stereotypical
10 behavior?
11   A.  I believe so.  And again, the main finding
12 of that study was, even with those two kinds of
13 manipulations, people -- and particularly the
14 knowledge that the stereotype did not apply, they
15 stereotyped anyway.
16     Eberhardt and Fiske is a review article.
17 Conrad and Linnehan.
18   Q.  When you say it's a review article, are you
19 indicating there that that wasn't a study?
20   A.  That wasn't a study.  It was summarized in
21 a series of studies.
22   Q.  Okay.
23   A.  And part of that is about how power
24 differences affect the extent to which people
25 stereotype.

Page 169

1  organization had in place proactive versus reactive.
2    Q.  Policies?
3    A.  Policies.  Correct.
4    Q.  There was a study of actual organizations?
5    A.  Yes.
6    Q.  What organizations?  Companies?
7    A.  Yes.  It was a sample of companies.  I
8  forget the details of it.
9    Q.  What about Pettigrew and Martin?
10   A.  Pettigrew and Martin is a review article of
11 a series of studies.
12     Salancik and Pfeffer is similar to the
13 Nelson, Acker and Manus.  It has to do with whether
14 people were told that they were going to have to
15 publicly justify their decision-making afterwards.
16   Q.  They were going to have to or --
17   A.  Yes.
18   Q.  -- that they might have to?
19   A.  Well, they manipulated that.  Those are the
20 two -- no.  That they were.
21   Q.  Okay.  What about Schreiber?
22   A.  That is more of an applied piece of
23 interpreting best practices for human resource
24 professionals, so I think that's not relevant to --
25 to your question.

Page 171

1    Q.  Let's go back.  You say Fiske and Lin,
2  L-i-n, was not a study?
3    A.  It's a review study.  A review of other
4  studies.
5    Q.  The Nelson, Acker was a study?
6    A.  Yes.
7    Q.  We just talked about that.
8    A.  Right.
9    Q.  And was the MacRae and Stangor -- that was
10 not a study.  Correct?
11   A.  That's the book it was in.  Eberhardt and
12 Fiske is the chapter.
13   Q.  All right.
14   A.  And --
15   Q.  You type things too small for my aged eyes.
16   A.  And that was a review article.  Conrad and
17 Linnehan is a field study based on a survey of
18 organizations.  And they're looking at the presence
19 or absence of basically proactive -- proactive
20 monitoring that requires explicit attention to race
21 and gender versus sort of neutral accountability that
22 just says -- that just involves oversight.
23   Q.  What were the accountability measures in
24 that study, if any?
25   A.  Again, that was the extent to which an

Page 170

1     Dr. Tetlock's article -- I think the first
2  one is a review article.  And I think he described
3  what the accountability was there in his report.  I
4  don't recall the details, sitting here right now.
5    Q.  Was that a field study or a lab study?
6    A.  Well, again, I think -- I think "The
7  Neglected Social Context" is a review article.
8  Tetlock and Kim was a study.  The one after that I
9  think is another review article.  And in the Tetlock
10 and Kim one, I think it was along the lines of the
11 Nelson, Acker and Mannis, having to do with being
12 required to explain the decision-making process
13 afterwards.
14   Q.  So none of these were field studies?
15   A.  None of the Tetlock ones were.
16   Q.  Well, none of the articles you cite were
17 field studies, were they?
18   A.  Oh, yes.
19   Q.  Salancik and Pfeffer?
20   A.  No.  The Conrad and Linnehan.
21   Q.  Okay.  Yeah.  Right.  Sorry.
22   A.  And I think we covered it.
23   Q.  Okay.  Yes, we have.
24     Safe to say that the accountability
25 measures in these particular studies were not as

Page 172

43  (Pages 169 to 172)

VIDEOTAPED DEPOSITION OF WILLIAM T. BIELBY - VOL. I - 10/16/2006

1 strong as the accountability measures used at FedEx;
2 right?
3    A.  In the laboratory studies, they weren't.
4 In the field studies, some were; some weren't. It
5 varied. That was the point of that study.
6    Q.  The only field study was Conrad and
7 Linnehan; right?
8    A.  Right.
9    Q.  Are there any disincentives in any of these
10 studies for getting things wrong?
11    A.  I don't remember. I'm not sure.
12    Q.  What, in your opinion, is the worst thing
13 that can happen to a subject in a lab study, a lab
14 study of accountability, who fails to behave in the
15 way that those monitoring the subject deem
16 acceptable?
17    A.  You're generally not allowed to have
18 anything too bad happen to them, or we'd be in big
19 trouble with the university.
20    Q.  And what's the best thing that can happen
21 to them if they get it right?
22    A.  If they get it — I need to hear the first
23 question to answer the second one.
24    Q.  What is the best thing that can happen to
25 an individual in a lab study who does — who behaves
Page 173

1 whatever.
2    Q.  Okay.
3    A.  Self-concept, preservation issues, a
4 variety of things that could be invoked there.
5    Q.  I'm going to ask you a series of questions
6 here. I'll begin with the introductory phrase, can
7 you identify any studies that show that unconscious
8 stereotypes bias hiring decisions or promotion
9 decisions when any of the following conditions
10 existed?
11    You've got five different conditions. But
12 you got the general question? Any studies that show
13 that unconscious stereotypes bias hiring or promotion
14 decisions when the condition exists. Okay? Are
15 there any studies showing this?
16    Are there any studies that show that
17 unconscious stereotypes bias hire decisions when the
18 people making the hiring recommendations and
19 judgments were required to pass a computer-based
20 learning program on diversity awareness? That's —
21 well, diversity awareness that stresses both basics
22 of nondiscrimination and equal opportunity and the
23 value of demographic diversity to the long-term
24 success of the company.
25    A.  Well, there — there are not — there are
Page 175

1 in a way that the lab study was instructing him to
2 behave?
3    A.  Well, you're not instructing them to
4 behave. I think I understand what you're saying.
5    Q.  In other words, what — what's the best
6 thing that can happen if somebody follows the rule of
7 the study?
8    A.  I think what you're saying is, if you're in
9 the accountability condition, what are the
10 consequences for actually attending to the
11 accountability.
12    Q.  Precisely.
13    A.  And if you're not in the accountability
14 condition, what are the consequences for actually —
15 well, usually, you don't know there's an
16 accountability. So usually there are not any
17 consequences that last beyond the duration of the
18 experiment.
19    Q.  What are the consequences within the
20 duration of the experiment?
21    A.  Well, that can vary. Again, sometimes
22 deception is used to lead people to believe that
23 they're going to — afterwards, in front of a group
24 of peers, have to explain what they just did. And
25 that can be peer pressure or embarrassment as to
Page 174

1 no studies that I'm aware of that apply these
2 experimental paradigms, experimental designs designed
3 to get at unconscious bias and their consequences for
4 behavior outside of laboratory settings.
5    So my answer to that one, and probably for
6 the questions to follow, is that I'm not aware of
7 studies in one way or showing things one direction or
8 the other.
9    Q.  Can you identify any studies that show that
10 unconscious stereotypes bias hiring or promotion
11 decisions when people making the recommendations made
12 those decisions in a group setting in which two of
13 the four members were required to be minorities?
14    A.  I have not seen studies that are relevant
15 to that and show an impact in one direction or the
16 other.
17    Q.  Can you identify any studies that show
18 unconscious stereotypes bias hiring decisions when
19 the people making the hiring recommendations and
20 judgments were required to do their initial screening
21 guided by well-defined minimum qualification
22 guidelines?
23    A.  No.
24    Q.  Can you identify any studies that show
25 unconscious stereotypes bias hiring decisions when
Page 176

44 (Pages 173 to 176)

1  the people making the recommendations were required
2  to conduct the initial interviews in accord with
3  structural behavior interview techniques?
4      A.  Again, I'm not aware of studies that are
5  relevant one way or the other.
6      Q.  Can you identify any studies that show
7  unconscious stereotypes bias hiring decisions when
8  the people making the recommendations have no doubt
9  that the managers who oversaw their work disapproved
10  of discrimination and scrutinized the criteria that
11  the screening committees were employing?
12      A.  I'm not aware of studies one way or the
13  other.
14      Q.  Do you believe that having to explain a
15  decision to the employee counts as a form of
16  accountability?
17      A.  It contributes to accountability, yes.
18      Q.  Do you believe that having to defend a
19  decision to coworkers or friends of the employee
20  count as a form of accountability?
21      A.  Defend it to friends and coworkers. I
22  could see that creating all sorts of mischief. I
23  don't know about the form of accountability.
24      Q.  By that, I don't mean coworkers and friends
25  of the decision-maker but coworkers and friends of

Page 177

1  of diversity practices, one of them being the
2  establishment of, basically, authority structures
3  charged with responsibility for diversity issues.
4      And they developed a scale of -- a scale of
5  such structures or practices which shows that, first,
6  those kinds of structures and accountability --
7  accountability structures -- the accountability
8  structures impacted EEO outcomes significantly,
9  whereas other kinds of diversity practices that
10  relied just on training. So a more reactive and a
11  less empowered form of intervention had no impact,
12  nor did mentoring programs and the kinds of things
13  that are designed to reduce the social isolation of
14  members of protected groups, and that it was only in
15  the presence of those specific EEO structures that
16  those other kinds of factors did have positive EEO
17  outcomes.
18      So that's the best research I've seen to
19  date that shows that there's, indeed, variation
20  across organizations and the extent to which they
21  implement EEO oversight. And the greater the EEO
22  oversight, the more measurable the impact is on equal
23  employment opportunity.
24      Q.  If one were to opine that FedEx's
25  accountability measures were "the gold standard,"

Page 179

1  the impacted employees.
2      A.  That -- that -- that could work in either
3  direction, I think, depending on the culture among
4  those coworkers. I could see sort of a group think
5  going on there that would make it worse rather than
6  better.
7      Q.  Do we have a discussion of the existence of
8  measures by which to determine whether accountability
9  levels are adequate or not?
10      A.  A very long one.
11      Q.  Well, I know we did it with discretion; I
12  know we did it with subjectivity; and I know we did
13  it with respect to monitoring. I'm not sure we did
14  it with respect to accountability. So let's try it,
15  just to be sure. To call it a discussion, I think,
16  is a little bit of an overstatement. But in any
17  event, we'll go ahead. Ignore my comments, my
18  out-of-line comments.
19      Are there any standards that you're aware
20  of for determining whether given levels of
21  accountability are adequate?
22      A.  I'm going to reference, again, the recent
23  article by Kalev, Dobbin -- K-a-l-e-v, D-o-b-b-i-n --
24  and Kelly, published in the August issue of the
25  American Sociological Review that looked at a variety

Page 178

1  and, in another, that they were insufficient, how
2  would one approve the accuracy or fallacy of each
3  assertion?
4      A.  I would go through the -- I would go
5  through and enumerate whether it is, indeed, the
6  fact, the case, that -- say, for example, the top
7  executives charged with diversity do or do not issue,
8  commission or review reports regarding EEO matters;
9  they do or do not monitor disparities and so on.
10      And first see whether the person alleging
11  the gold standard and the person alleging
12  deficiencies agree or disagree on whether those
13  things are there or not.
14      Q.  Let's assume they agree -- disagree. How
15  does one -- is there any objective standards against
16  which to measure their opinions? Or do we just
17  simply say, "Well, their opinion is based on this,
18  this other person's opinion is based on this, and
19  they disagree"?
20      A.  Okay. I'm trying to disentangle that.
21  There's whether the two people agree or disagree
22  about what's in place, and then there's whether they
23  agree or disagree about whether it was necessary.
24      Q.  Well, let's just assume -- I'm not sure the
25  experts even agree as to what is in place. But let's

Page 180

45 (Pages 177 to 180)

1  assume they agree as to what is in place, because
2  that's really not a subject of significant dispute.
3  So let's assume that they agree as to what is in
4  place, what the company is doing on a regular basis.
5      How does one decide, if one can, which
6  person is accurate in saying that, either on the one
7  hand, this is the gold standard, or on the other
8  hand, this is completely deficient?
9      A.  All I can say is that the conclusions that
10  I draw regarding whether these things are or are not
11  necessary is based on my reading of peer-reviewed and
12  widely accepted social science research.
13      Perhaps I've mischaracterized — the person
14  I disagree with may either feel that I've
15  mischaracterized that research.  And I was talking
16  about specifically, for example, the things like the
17  Kalev article or the Conrad and Linnehan article.
18  The person might feel that I have mischaracterized
19  that research, the research is wrong, or the research
20  doesn't apply here.  And we could have a discussion
21  about that.
22      But I do — I do think that the opinions
23  expressed on these matters are not just made up.
24  They're based on a social — a body of social science
25  research that supports the inferences that have been

Page 181

1  drawn here.
2      Q.  Would you concede that one person with
3  knowledge of how companies in American industry
4  operate and what they do, what they don't do, could
5  come to one conclusion, and another person looking at
6  the same facts could come to a different conclusion?
7      A.  Well, of course, that could happen.  Yes.
8      Q.  Well — and is there some specific
9  identifiable standard that exists to determine which
10  one's opinion is valid or not, or do we just simply
11  conclude that this is a subject on which reasonable
12  people can reasonably differ?
13      A.  No, I think we can go beyond that.  What I
14  would want to ask Ms. Duffy, for example, is does she
15  agree that EEO and diversity efforts differ across
16  companies in how tightly or loosely coupled they are
17  with actual HR practice.  Do companies differ
18  among — among themselves in whether or not they
19  monitor disparities, whether they monitor how
20  discretion is exercised and so on.  And then I would
21  add — and maybe we would find out that she has a
22  different view of that than I do.  And then I would
23  want to ask her about where FedEx stands on those
24  same things.  You know, perhaps she has a basis for
25  her conclusion.

Page 182

1      But anyway, those are the kinds of things I
2  would want to know in trying to figure out why she
3  has come to a different conclusion than I have.
4      Q.  There's no standard out there that says, if
5  you do A, B, C, and D, you are fully compliant in the
6  field of accountability with personnel practices.
7  Right?
8      A.  Well, there are —
9      Q.  "Compliance" is a bad word, I guess,
10  because I'm in compliance with what.  So let me
11  withdraw it and give you a better question to the
12  same end.
13      There is no set of specific elements of
14  accountability that you can tick off and say, if you
15  have each of these elements of accountability, you
16  are accountable to the state of the art?
17      A.  No.  But again, I think the research
18  literature in this area sort of addresses that.
19  Because simply saying we have this, we have a bunch
20  of things we can check off, doesn't get at how they
21  are, in fact, implemented.  I mean, I suppose we
22  could make a sufficiently elaborate issues that got
23  at those issues and not just whether there's an equal
24  opportunity policy, whether there's an affirmative
25  action plan, and that sort of thing.

Page 183

1      Because much of the most interesting
2  research in this area is about how these things play
3  out.  To what extent do they actually have a
4  substantive impact?  To what extent is it just going
5  through the motions because the government wants you
6  to produce an affirmative action plan every year and
7  so on.
8      Q.  There's a sidelight on the level of
9  accountability.  Let me withdraw that.
10      Do you — shifting subjects, so don't
11  assume that this is related to the subject I intended
12  to let you think it was, because it's not.
13      Do you agree with Professor Fiske, who has
14  recently stated that "Stereotypes and beliefs have
15  been studied extensively.  But the extent to which
16  they predict discrimination remains in question"?
17  I'm referring you to the Telaska and Fiske
18  meta-analysis.
19      A.  Well, two things.  I would say, certainly,
20  there has not been a lot of research about the extent
21  to which they predict discriminatory behaviors done
22  in field settings.
23      Q.  There's a — you've cited Professor
24  Faigman, F-a-i-g-m-a-n, on occasion in your papers —
25  or not?  I think you have.

Page 184

46 (Pages 181 to 184)

1    Q.   Anything else? These three monitoring
2  deficiencies and, as you put it, a decoupling of EEO
3  and other systems?
4    A.   Without taking time to go through each
5  paragraph in detail to make sure that it's subsumed
6  in this one paragraph summary, I'll just -- I'll say,
7  you know, this is a summary. What comes next goes
8  into detail. Some things that come next might not
9  easily be subsumed in that summary.
10   Q.   The subsequent paragraphs are designed to
11 explain the three disparities -- not disparities --
12 deficiencies that you identified in Paragraph 29.
13       Correct?
14   A.   For the most part, yes.
15   Q.   Okay. So we got monitoring generally -- or
16 absence of monitoring of personnel outcomes and a
17 decoupling of EEO and other company processes.
18       Those are your basic criticisms?
19   A.   Well, as long as that is understood to also
20 subsume a monitoring of the exercise of discretion
21 and how that might impact minorities.
22   Q.   In those areas that you identified in
23 Paragraph 29?
24   A.   Correct.
25   Q.   Okay.

Page 241

1    Q.   In terms of analyzing or in terms of
2  setting up a monitoring system of performance
3  evaluations, what would be the appropriate level of
4  analysis. I.e., by decision-maker? by work unit? by
5  department? by facility? by division? by region?
6  companywide?
7    A.   And I'll answer yes.
8    Q.   All of the above?
9    A.   Well, you know, yeah. I think you can set
10 up a pretty sophisticated corporatewide system that
11 gets down to all those levels. You could
12 certainly -- you could certainly analyze in a -- set
13 up an automated system that collects data on
14 performance reviews that gets down to the level of
15 specific job unit, specific locations, specific
16 employees, and specific -- specific raters that would
17 allow you to disaggregate any analysis to that level,
18 to look at outliers at that level and anomalies at
19 that level.
20   Q.   On performance evaluations, specifically
21 companywide or regionwide, aggregations aren't very
22 helpful in identifying decision-maker bias, are they?
23       MR. WALLACE: Asked and answered.
24       THE WITNESS: You know, other than a
25 snapshot, an overall snapshot, I'm not saying that

Page 243

1    A.   I just want to make sure. I don't want to
2  be in court and start to testify about something.
3    Q.   I don't want to be in that circumstance
4  either.
5    A.   And you say, "But you testified this was
6  all you were going to criticize us on."
7    Q.   I mean, inherent in all of these three is
8  exercise of discretion; right?
9    A.   I'll accept that characterization, yes.
10   Q.   All right. Anything else? Monitoring
11 deficiencies, as explained in 29 and further
12 explained in the subsequent paragraphs, and
13 decoupling?
14   A.   Yes.
15   Q.   Now we come to the part of my paper where I
16 ask detailed questions about monitoring, and I'm
17 going to have to make sure we don't repeat ourselves.
18 But the first question I know I haven't asked.
19       Did you ever design a performance
20 evaluation monitoring system yourself?
21   A.   No. That's not what I do.
22   Q.   Have you ever analyzed the effectiveness of
23 a specific company's performance evaluation
24 monitoring system?
25   A.   No.

Page 242

1  aggregate statistics are going to be of much use
2  diagnostically, although I'm not going to imagine if
3  all of a sudden you see 95 percent of the people
4  getting ratings of 6 and above, all of a sudden,
5  there'll be some concern across the company.
6       But if you collect -- collect and analyze
7  information as part of a companywide system that
8  allows you to have diagnostics that look at variation
9  across units, you have much more diagnostic power
10 than if you have 100 separate assessments going on
11 because you've delegated to local decision-makers the
12 responsibility for monitoring their operations.
13       MR. DIEKMANN: Q. Well, I'm not sure what
14 you just told me because it's getting late. But do
15 we agree that companywide or regionwide data are not
16 helpful in identifying decision-maker bias?
17       MR. WALLACE: Asked and answered.
18       THE WITNESS: I believe collecting it
19 companywide with the capacity to disaggregate down to
20 the level of decision-makers gives you all the
21 inform- -- well, I wouldn't say all the information
22 you need but gives you much of the information you
23 need to do effective analysis.
24       MR. DIEKMANN: Q. To identify
25 decision-maker bias, you would have to disaggregate

Page 244

61 (Pages 241 to 244)

**Page 269**

```
 1          UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3                  --oOo--
 4
 5   DERRICK B. SATCHELL, KALINI
     BOYKIN, VALERIE BROWN, RICK
 6   GONZALES, CYNTHIA GUERRERO,
     RACHEL HUTCHINS, KELVIN SMITH,
 7   SR., and KEN STEVENSON, on
     behalf of themselves and all
 8   others similarly situated,
 9          Plaintiffs,
10   vs.              No. C 03-2659 SI;
                      C 03-2878 SI
11
     FEDEX EXPRESS, a Delaware
12   corporation
13          Defendant.
     _____/
14
15       DEPOSITION OF WILLIAM T. BIELBY
16          Volume II, Pages 269 - 476
17          Monday, November 13, 2006
18
19
20
21   REPORTED BY: CYNTHIA LEW, RPR, CSR No. 11999
22
23          TOOKER & ANTZ
     COURT REPORTING & VIDEO SERVICES
24      350 SANSOME STREET, SUITE 700
        SAN FRANCISCO, CALIFORNIA 94104
25          (415) 392-0650
```

**Page 270**

```
 1              I N D E X
 2
 3   DEPOSITION OF WILLIAM T. BIELBY
 4
 5   EXAMINATION BY:              PAGE
 6     MR. DIEKMANN (Resumed)      273
 7
 8          --oOo--
 9
10         E X H I B I T S
11   (For Defendants)
12   IDENTIFICATION   DESCRIPTION    PAGE
13     4   11-page "Order re Motions to Strike   425
           Expert Testimony," re: Gosho v. U.S.
14         Bancorp, Dated October 1, 2002
15     5   18-page "Opinion & Order" re: EEOC v.  430
           Morgan Stanley, dated July 2, 2004
16
17          --oOo--
18
19
20
21
22
23
24
25
```

**Page 271**

```
 1          BE IT REMEMBERED that, pursuant to Notice
 2   of Taking Deposition, on Monday, November 13, 2006,
 3   commencing at the hour of 8:58 o'clock a.m. thereof,
 4   at the Law Offices of Seyfarth Shaw, 560 Mission
 5   Street, Suite 3100, San Francisco, California 94105
 6   before me, CYNTHIA LEW, duly authorized to administer
 7   oaths pursuant to Section 2093(b) of the California
 8   Code of Civil Procedure, personally appeared for the
 9   continuation of his deposition
10          WILLIAM T. BIELBY,
11   called as a witness on behalf of the Defendants, and
12   the said witness, having previously been placed under
13   oath, was thereupon examined and testified further as
14   hereinafter set forth.
15
16          A P P E A R A N C E S
17      The Law Offices of Schneider & Wallace, 180
18   Montgomery Street, Suite 2000, San Francisco,
19   California 94104, represented by GUY B. WALLACE and
20   NANCY PARK, Attorneys at Law, appeared as counsel on
21   behalf of the Plaintiffs.
22          The Law Offices of Seyfarth Shaw, 560
23   Mission Street, Suite 3100, San Francisco, California
24   94105, represented by GILMORE F. DIEKMANN, JR.,
25   Attorney at Law, appeared as counsel on behalf of the
```

**Page 272**

```
 1   Defendants.
 2          Also present: Philip Tetlock and Jake
 3   Krohn, videographer.
 4          --oOo--
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 269 to 272)

1 higher-level management. Whether people are inclined
2 to use those to make discrimination complaints and
3 that becomes a significant way of monitoring the
4 overall system for deficiencies in the area of the
5 EEO, I think it — it has, I guess, again, a positive
6 effect but not a substantial one.
7     And there's one other thing you asked me
8 about. Oh, yes. The guaranteed-fair-treatment
9 system with regard to — again, I'm interpreting your
10 question as regarding discriminatory bias in the
11 performance-evaluation system.
12     I'd say, again, it's going to be a factor
13 that could reduce bias. But I don't think — I don't
14 think it's going to have a very significant effect,
15 again, for the same reasons.
16     Q.  So there are some measures that FedEx has
17 adopted that, in your opinion, would tend to minimize
18 bias, but you, I take it, in a general sense, feel
19 that there aren't enough. Correct?
20     A.  And I think, as I stated in my report, and
21 perhaps I can state it more clearly here, what all
22 those things do is place the responsibility of the
23 monitoring of these processes regarding the EEO
24 effectiveness of the promotion and performance review
25 systems on the employees as opposed to the company.

Page 285

1 So to the extent that there's a — you know, maybe a
2 complacency that sets in or a belief by the people in
3 HR that "This is all we need in order to make sure
4 that the promotion system or the performance-review
5 system is implemented as designed and in a way that
6 assures equal employment opportunity," I think these
7 kinds of features that we've been talking about could
8 lead to less discriminatory barriers than there would
9 be in their absence.
10     But at the same time, they are a factor
11 that contributes to sustaining a different kind of
12 barrier that comes from the absence of the overall
13 organizational-level monitoring of those processes
14 regarding promotion and performance review.
15     Q.  Well, is there any algorithm by which one
16 can determine when a company has done enough to
17 minimize vulnerability to stereotypes or actual bias?
18     A.  I'm not sure what you mean by "algorithm,"
19 although there's been enough discussion in this room
20 about metrics and that — accountability metrics and
21 so on that I think I understand what you're getting
22 at.
23     And what I would say is that there is a
24 body of social science in management literature that
25 is relied upon by people who study these things, like

Page 286

1 myself, and there are some general results about the
2 relative impact of different kinds of accountability,
3 like reactive and proactive, and the kind of things
4 we've just been talking about. Complaint procedures
5 are reactive in the sense that someone has to
6 recognize something that they think is unfair, bring
7 to it the attention of the company, and then the
8 company has to respond.
9     Those kinds of things are less effective in
10 promoting equal employment opportunity than proactive
11 or tap-down monitoring of process and outcome.
12     I know this is a long answer, but I'm
13 really trying to be responsive because I've given
14 a lot of thought to this.
15     Q.  I hope you get to the question.
16     A.  The question is whether there's an
17 algorithm.
18     Q.  Yes.
19     A.  The answer is no, and I'll explain why.
20 I'm explaining why.
21     So I think there's a knowledge base. It's
22 not the knowledge base that results in formulas. You
23 know, we're not doing high-energy particle physics
24 here. We're doing social science. And there's a
25 basic knowledge — base of — there's a body of

Page 287

1 knowledge that we rely upon in these things. The
2 other body of knowledge — the other body of research
3 that I've relied upon is the stuff about the degree
4 of coupling versus decoupling of EEO from other areas
5 of HR.
6     Ultimately, figuring out how it all works
7 requires a case study, requires understanding how it
8 operates in the given organizational circumstance.
9 So that's why I'm saying, no, there's not a
10 mathematical algorithm that you plug the numbers in,
11 or you do the counts on this practice is here and
12 this practice is not there. There is a case study
13 using the various kinds of information available to
14 the organization, if you're talking about what the
15 organization is doing, or the experts and we are
16 talking about a litigation context that allows us to
17 draw some reasonable inferences.
18     But no, it doesn't — it's not the kind of
19 task where one can simply do a count of policies and
20 plug them into an algorithm. There's inferences that
21 need to be made by just looking in detail at the
22 circumstances of the case.
23     Q.  A related question. Is this — having
24 determined that a system is "vulnerable" to bias, is
25 there any measure that one can come up with in your

Page 288

5  (Pages 285 to 288)

VIDEOTAPED DEPOSITION OF WILLIAM BIELBY - VOL. II - 11/13/2006

1  social framework analysis that tells us how probable
2  discrimination is? In other words, for example, what
3  percent of employment decisions are likely to be
4  affected by bias.
5      A.  No, there isn't.
6      Q.  Is it your -- we're going to go back to
7  accountability before we just move on.
8          Is it your contention that the level of
9  accountability in FedEx's performance-review and
10  promotion processes are less than the levels of
11  accountability found in experimental simulations of
12  accountability?
13     MR. WALLACE:  Vague.  Which simulations?
14     THE WITNESS:  That really is, to some
15  extent, an apples-and-oranges comparison.  What is
16  done in experimental studies is in a controlled
17  environment, to try to isolate specific mechanisms,
18  not to try to mimic what happens in the real world.
19  So it's hard to put them on the same scale.
20         You know, there's a large tradition of
21  research on experiments.  Not experiments but
22  research on experiments, on the degree to which
23  subjects of experiments feel compelled to follow
24  directions of the experimenter.  There's a large
25  research on how people in experiments try to
                                          Page 289

1  anticipate what the experimenter wants and,
2  therefore, behave in a certain way.  That's why you,
3  know, it's important to have double-blind experiments
4  and so on.
5          So there is research that suggests that
6  accountability and conformity pressures can be really
7  strong in experimental settings.  But it's -- again,
8  that's in the context of an experiment, which is, in
9  many ways, nothing like the "real world."  And that's
10  by design, because you want to control the
11  environment and isolate the specific mechanisms in an
12  experiment.
13         So the bottom-line answer is I don't think
14  it's possible to make a direct comparison between one
15  and the other.
16     MR. DIEKMANN:  Q.  Well, then, is it safe
17  to say that you do not believe that the measures of
18  accountability in experimental situations are greater
19  than the measures of accountability that exist at
20  Federal Express?
21     MR. WALLACE:  Vague.  Overbroad.
22     THE WITNESS:  I'm unable to make a -- make
23  a comparison one way or the other.  I can't say that
24  they're greater than or less than.  They're just
25  different in most kinds of experiments -- or in many
                                          Page 290

1  kinds of experiments.
2      MR. DIEKMANN:  Q.  I don't take it, then,
3  that you have any opinions on that question, one way
4  or the other?
5      A.  The question being whether they are --
6      Q.  Whether the levels of accountability at
7  Federal Express are greater or less than the levels
8  of accountability one finds in the lab experiments.
9      A.  No.
10     Q.  Now, we're going to go back to your report,
11  so why don't you get that in front of you, just for
12  your reference, if you'd like.  I think Mr. Wallace
13  has it right here.
14         While you're doing that, if you'd like to
15  get in front of you Page 22 of your report,
16  Paragraph 30.  And again, remember, the process --
17  we're going to go through the same way we were doing
18  before, which is just to give you some context for
19  some of the questions.  Out of fairness, I'm going to
20  tell you where I'm drawing the questions from.  But
21  again, listen to the questions.  And you don't need
22  to tell me what's in your report; I know what's
23  there.
24         Okay.  Paragraph 30, you're talking about
25  Dr. Hayward and her awareness or lack of awareness of
                                          Page 291

1  whether managers were auditing the performance
2  evaluations of operations managers.  And you seem to
3  be -- seem to regard as relevant the fact that
4  Dr. Hayward was unaware whether there was monitoring
5  of how reviews were conducted in practice.
6          I'm just wondering this:  Do you understand
7  that Dr. Hayward probably wouldn't know whether
8  higher-level managers were auditing the performance
9  evaluations of their operations managers?
10     A.  You mean there was no way she could know or
11  would know?
12     Q.  Well, it's just not -- do you have any
13  understanding that that's within her job description,
14  for example?  Doctor -- well, I'll just ask you that.
15     A.  Okay.  My understanding is that she is
16  responsible for developing performance reviews,
17  making changes to performance reviews, and so on.
18     Q.  Well, the first two are right.  I don't
19  know what the "so on" is.
20     A.  Okay.
21     Q.  But she does develop them.  She does modify
22  them.  She updates them.
23     A.  Yes.
24     Q.  But in terms of actual practice, it's not
25  her job to go out and make sure that people's actual
                                          Page 292

6 (Pages 289 to 292)

1 are warranted or can, you know, go back and do a
2 similar analysis themselves from the same materials
3 or incorporate those into their own research as they
4 move beyond what you're doing in a scientific study.
5     Q.  Do you believe that a scientific analysis
6 in the social sciences should distinguish between
7 conclusions based on facts and conclusions based on
8 values?
9     A.  Yes.
10     Q.  I'm going to go to Paragraph 9 of your
11 report for the next series of questions.
12     Are the various theories about implicit
13 racial bias the foundation of your opinions and
14 conclusions regarding unmonitored discretion being
15 the source of discriminatory decision-making?
16     A.  Can I hear that again.
17     MR. DIEKMANN:  Can you read it back.
18     (Record read.)
19     MR. WALLACE:  Vague.
20     THE WITNESS:  I don't — I don't think so,
21 as that was worded.  As I testified a few moment ago,
22 I'm relying on some basic insights about social
23 cognition.  Those basic insights have been refined
24 and extended somewhat through the implicit-bias
25 framework and related frameworks.

Page 373

1 My insights have certainly been informed by
2 them.  But in terms of the foundation for my
3 conclusion, no.  I would have come to much the same
4 conclusion 15 years ago, 10 years ago, before actual
5 implicit-association test and that sort of thing
6 existed.  The ideas — the basic ideas of social
7 cognition have been around in various forms for 40,
8 50 years.  But certainly in terms of the way I'm
9 using them, for at least 20 years.
10     MR. DIEKMANN:  Q.  Would it be safe to say
11 that you would come to the same conclusions in this
12 case, even absent any statistical disparities being
13 presented with respect to the results of FedEx's
14 processes?
15     A.  No.
16     Q.  Are you saying, then, that, if there were
17 no — if there was no evidence of statistical
18 disparities that you could observe, you would not
19 opine that FedEx's processes are vulnerable to bias?
20     A.  I think absent — absent any statistical
21 results, including the results about the exercise of
22 discretion, I obviously could have written a report
23 that's descriptive of the FedEx personnel system — I
24 mean, I could write this report taking out anything
25 that had anything to do with statistical analysis.

Page 374

1     Q.  That's my point.
2     A.  But I think my bottom-line conclusion would
3 have simply been that here is what the system looks
4 like.  There are features here that are consistent
5 with what the research shows.  But I would not have a
6 stronger conclusion of vulnerability to bias absent
7 statistical evidence.
8     Q.  So what level of statistical evidence do
9 you need to see in order for you to come to a
10 conclusion that an employer's systems are vulnerable
11 to bias?  Is there any metric or algorithm that we
12 can apply to that question?
13     A.  You know, it's not a metric or algorithm
14 issue but — you know, as a case-specific issue.  But
15 for example — for example, in this case, it seemed
16 consistent to me that, for example, given that the
17 compensation system seemed more or less formulaic,
18 highly formulaic, that once performance ratings are
19 controlled for, there's little, if any, disparity.
20     Q.  Where did you see that?
21     A.  I think that goes back to Dr. Baker's first
22 report.
23     Q.  Well, she controlled for performance
24 evaluation of a lot of variables; right?
25     A.  Right.  But I don't want to forget this

Page 375

1 question.
2     Q.  Well, we went through that before.  Yeah.
3     A.  But you know, second, it's not an absent —
4 absent a disparity, absent any showing one way or the
5 other, I think there's a difference between —
6 there's a difference between doing an analysis where
7 there's no statistical showing at all.  I think
8 that's what you asked me about.
9     Q.  Actually, I think we're getting astray
10 here.  I don't want to cut you off.  But my question
11 is, simply, if — I'm taking your answer that your
12 opinions and conclusions wouldn't be the same if
13 there were no evidence which you've seen of
14 disparities of results and then following it up with,
15 so, when is it that you or how is it that you
16 determine when there is sufficient evidence of
17 disparities for you to express the opinion such as
18 you've expressed here, that the system is vulnerable
19 to bias?
20     A.  That's sort of where I was going.  That's
21 case-specific.  And in this case — let's assume I'm
22 right in my characterization for the moment, that the
23 compensation disparities seem largely driven by
24 performance-rating disparities, which is
25 consistent — which, to me, is consistent with where

Page 376

27 (Pages 373 to 376)

1 are warranted or can, you know, go back and do a
2 similar analysis themselves from the same materials
3 or incorporate those into their own research as they
4 move beyond what you're doing in a scientific study.
5      Q. Do you believe that a scientific analysis
6 in the social sciences should distinguish between
7 conclusions based on facts and conclusions based on
8 values?
9      A. Yes.
10      Q. I'm going to go to Paragraph 9 of your
11 report for the next series of questions.
12      Are the various theories about implicit
13 racial bias the foundation of your opinions and
14 conclusions regarding unmonitored discretion being
15 the source of discriminatory decision-making?
16      A. Can I hear that again.
17      MR. DIEKMANN: Can you read it back.
18      (Record read.)
19      MR. WALLACE: Vague.
20      THE WITNESS: I don't — I don't think so,
21 as that was worded. As I testified a few moment ago,
22 I'm relying on some basic insights about social
23 cognition. Those basic insights have been refined
24 and extended somewhat through the implicit-bias
25 framework and related frameworks.

Page 373

1      Q. That's my point.
2      A. But I think my bottom-line conclusion would
3 have simply been that here is what the system looks
4 like. There are features here that are consistent
5 with what the research shows. But I would not have a
6 stronger conclusion of vulnerability to bias absent
7 statistical evidence.
8      Q. So what level of statistical evidence do
9 you need to see in order for you to come to a
10 conclusion that an employer's systems are vulnerable
11 to bias? Is there any metric or algorithm that we
12 can apply to that question?
13      A. You know, it's not a metric or algorithm
14 issue but — you know, as a case-specific issue. But
15 for example — for example, in this case, it seemed
16 consistent to me that, for example, given that the
17 compensation system seemed more or less formulaic,
18 highly formulaic, that once performance ratings are
19 controlled for, there's little, if any, disparity.
20      Q. Where did you see that?
21      A. I think that goes back to Dr. Baker's first
22 report.
23      Q. Well, she controlled for performance
24 evaluation of a lot of variables; right?
25      A. Right. But I don't want to forget this

Page 375

1      My insights have certainly been informed by
2 them. But in terms of the foundation for my
3 conclusion, no. I would have come to much the same
4 conclusion 15 years ago, 10 years ago, before actual
5 implicit-association test and that sort of thing
6 existed. The ideas — the basic ideas of social
7 cognition have been around in various forms for 40,
8 50 years. But certainly in terms of the way I'm
9 using them, for at least 20 years.
10      MR. DIEKMANN: Q. Would it be safe to say
11 that you would come to the same conclusions in this
12 case, even absent any statistical disparities being
13 presented with respect to the results of FedEx's
14 processes?
15      A. No.
16      Q. Are you saying, then, that, if there were
17 no — if there was no evidence of statistical
18 disparities that you could observe, you would not
19 opine that FedEx's processes are vulnerable to bias?
20      A. I think absent — absent any statistical
21 results, including the results about the exercise of
22 discretion, I obviously could have written a report
23 that's descriptive of the FedEx personnel system — I
24 mean, I could write this report taking out anything
25 that had anything to do with statistical analysis.

Page 374

1 question.
2      Q. Well, we went through that before. Yeah.
3      A. But you know, second, it's not an absent —
4 absent a disparity, absent any showing one way or the
5 other, I think there's a difference between —
6 there's a difference between doing an analysis where
7 there's no statistical showing at all. I think
8 that's what you asked me about.
9      Q. Actually, I think we're getting astray
10 here. I don't want to cut you off. But my question
11 is, simply, if — I'm taking your answer that your
12 opinions and conclusions wouldn't be the same if
13 there were no evidence which you've seen of
14 disparities of results and then following it up with,
15 so, when is it that you or how is it that you
16 determine when there is sufficient evidence of
17 disparities for you to express the opinion such as
18 you've expressed here, that the system is vulnerable
19 to bias?
20      A. That's sort of where I was going. That's
21 case-specific. And in this case — let's assume I'm
22 right in my characterization for the moment, that the
23 compensation disparities seem largely driven by
24 performance-rating disparities, which is
25 consistent — which, to me, is consistent with where

Page 376

27  (Pages 373 to 376)

**Page 377**

1 the discretion is. Plus, the three statistical
2 analyses that indicate to me that the exercise of the
3 discretion, when it can be measured, has an adverse
4 impact on minorities gives me confidence in my
5 conclusion that there's not just the potential for
6 vulnerability to bias, but there's vulnerability to
7 bias in FedEx.
8     And I would say -- I would say that, if
9 either side had retained me or it was outside of
10 litigation and provided all the same materials to me
11 but everybody's computers are broken and so what can
12 you tell us about -- is there a vulnerability to bias
13 there, I would say -- again, absent the discretion
14 analysis, I would say that, you know, given
15 specifically identifiable aspects and what I've seen
16 as evidence of a disconnect between the EEO side and
17 other parts of the HR side, that this is a system
18 that is vulnerable to bias. And if you now go and do
19 your statistical analysis and find significant
20 disparities that are there year after year and so on,
21 this is where I would start looking for the
22 mechanisms.
23     Q. Okay. So you would have come to the same
24 conclusion, but you would be looking for some
25 statistical analysis to support it?

**Page 378**

1     A. Yes.
2     MR. WALLACE: Misstates.
3     MR. DIEKMANN: Q. Then the question -- but
4 I assume that, if you saw no statistical analysis
5 that supported your conclusion, you would rethink it.
6 Is that what you're saying?
7     A. Absent any statistics at all, I think I
8 would still say this system has these features.
9     Q. Right.
10     A. And if you find disparities, here is where
11 I would focus for the relevant mechanisms.
12     Q. So is there any level of statistical
13 differences that you think are necessary in order for
14 you to come to any confirmation of your belief that
15 the system is vulnerable to bias?
16     A. I don't think that there's a formula,
17 algorithm, metric that says differences of four
18 tenths of a standard deviation means there's bias;
19 differences of two tenths of a standard deviation
20 means there's not. It's a more inferential exercise
21 that's looking at different pieces of information.
22     Q. Sounds like you know it when you see it.
23     A. No. That is not what I said.
24     Q. I know that's not what you said, but that's
25 sort of what it sounds like to me.

**Page 379**

1     A. Okay.
2     Q. But that's not what you're saying?
3     A. That's not what I'm saying. I'm saying it
4 is -- it is case-specific. It's -- yeah. It's
5 case- -- it's case-specific.
6     Q. So how would one --
7     A. Surely, if I had seen disparities favoring
8 whites one year and favoring people of color the next
9 and things -- you know, that sort of thing,
10 idiosyncratic patterns, that would lead me to suggest
11 that it's not -- that would lead me to conclude that
12 it's not enduring systematic features of the
13 organization that are driving those disparities.
14     Q. What kind of idiosyncrasies would you be
15 looking for to come to that conclusion?
16     A. As I said, disparities that -- that --
17 assuming that there's a large enough number of
18 observations to get precise estimates, disparities
19 that move around from one direction to the other from
20 year to year or across major divisions in the company
21 and so on.
22     Q. How about significant disparities of
23 outcome in various large facilities?
24     A. I'd really want to look closely at the
25 analysis that purports to show that. That's what I'm

**Page 380**

1 talking about tomorrow at his school (indicating).
2     Q. Well, what are you going to say? Actually,
3 why don't you tell me what your view of that is,
4 regardless of what you're going to say tomorrow.
5     A. My view of that is that -- this is going to
6 get beside the point, but I'll give you my views. My
7 view of that is that the kinds of statistical
8 analyses that are often offered to show that can be
9 highly misleading and unreliable, that -- and that
10 there are statistical approaches that are -- that, in
11 some circumstances, are much more probative but are
12 really used in litigation for a number of reasons.
13     But the bottom line is that there's good
14 reason to be highly suspicious of statistical
15 analyses that seem to show variation across
16 facilities.
17     Q. Okay. And I understand that that's a point
18 of debate in the Wal-Mart case, and I don't want to
19 get into the Wal-Mart case. But -- and I assume your
20 basic criticism is that, if you go facility by
21 facility, you sometimes don't have enough
22 transactions to have any kind of statistical power or
23 meaning.
24     Right?
25     A. Right.

Exhibit D

EXPERT REPORT OF ANTHONY G. GREENWALD

Derrick Satchell et al. v. FedEx Express

Anthony G. Greenwald, Ph.D.

*a. G. Greenwald*

September 3, 2006

against typically produce undesirable consequences for the complainer. This fact must be well known intuitively to almost all potential complainers, and it is rather surprising that this did not occur also to Professor Tetlock. Perhaps the 202 recorded cases were well-documented with guilt-confirming evidence and perhaps they occurred publicly enough so that several witnesses were prepared to step forward and confirm acts of blatant discrimination. However, because many forms of damaging discrimination occur without leaving public evidence trails, this confluence of circumstances must occur rarely. As an estimate of the likelihood that complaints of discrimination will succeed, Reskin (2002b) reported that fewer than 3% of discrimination complaints processed by the EEOC concluded with an outcome favorable to the complainant. The odds are therefore strongly stacked against the success of any official complaint about discrimination.

25. Adding to this intuitive basis for rejecting Professor Tetlock's calculation of expected rates of discrimination complaints is empirical evidence showing that people who complain about discrimination receive negative evaluations as the reward for their complaint (e.g., Kaiser & Miller, 2001). Kaiser and Miller concluded from their research that "The social costs of making attributions to [i.e., complaining about] discrimination may prevent stigmatized people from confronting the discrimination they face in their daily lives" (p. 254). As a consequence of these several relevant considerations, it is most sensible to treat Professor Tetlock's analysis of complaint rates at FedEx as simply irrelevant to appraising the presence or absence of discrimination at FedEx.


## II. Tetlock attacks arguments not made by Bielby

To justify his class-wide claim, Bielby must turn to controversial new work on implicit (or unconscious) prejudice. Bielby cites some of this work in a block of footnotes (Bielby Rep. footnotes 30 and 31), but he does so cryptically, leaving the incorrect impression that "stereotyping" has the same meaning for social scientists as for the general public and that there is scientific consensus on the validity of this new work on implicit prejudice [Tetlock report, p. 14, ¶ 25].

26. This just-quoted assertion by Professor Tetlock — asserting that Professor Bielby's argument is based on appeal to concepts of implicit bias — is inaccurate, as indicated most directly by the dates on the 18 citations in Footnotes 33 and 34 in the relevant passage of Bielby's June 2006 report. (These footnotes correspond to the two in Bielby's 2004 report to which Professor Tetlock directly referred.) The dates of 11 of these 18 citations precede the recent 10-year period during which virtually *all* work dealing with the concept of implicit bias has been published. Even the post-1996 publications cited in Professor Bielby's Footnotes 33 and 34 are ones describing work that treats concepts of bias, racism, prejudice, or stereotype in a *comprehensive* fashion, including the full breadth of contemporary scholarly work. Thus, Professor Bielby's analysis is broadly based on existing literature on bias, racism, and prejudice, rather than being based selectively on the portion of that literature that deals with implicit bias. The works cited by Professor Bielby include material on the explicit, or "old-fashioned" form of bias, which Professor Tetlock believes should be the exclusive focus of analysis for the suit against FedEx.

27. ¶¶ 35–51 (on pp. 19–26) of Professor Tetlock's report appear under the heading, "Bielby's Inaccurate Portrayal of the Power of Stereotypes". The bulk of the content of these seven pages is, like the preceding five pages of Professor Tetlock's report, directed against an argument that Professor Bielby made neither in 2004 nor in 2006. The only place in these seven pages in which Professor Tetlock refers specifically to any statement contained in Professor Bielby's report is in ¶ 38 on p. 20. There, Professor Tetlock characterizes Professor Bielby (without quotation) as asserting the "view that racial bias can only be overcome when managers are under constant scrutiny to apply fixed rules and satisfy de facto quotas".

28. Professor Tetlock cites ¶¶ 21–24 and ¶¶ 28–30 of Professor Bielby's 2004 report as the relevant location to find the material that reveals "Bielby's Inaccurate Portrayal . . .". Similar material starts at ¶ 22 of Professor Bielby's 2006 report. In these paragraphs, Professor Bielby makes almost precisely two points that Professor Tetlock also made — specifically, that (a) accountability is a successful means of reducing bias

his description of implicit bias to characterizing it as "unconscious" (p. 15 of his report).
To understand the concept of implicit bias and its relevance to this case therefore
requires some explanation both of the concept itself and of its role in contemporary
understanding of prejudice and stereotyping.

32. *Implicit biases* are defined as forms of social knowledge that operate largely (but
not exclusively or necessarily) outside of conscious awareness, yet are significant in
determining judgment and behavior in relation to stigmatized and disadvantaged
groups. Professor Tetlock inaccurately supposes that theory and research on implicit
bias is the work of a fringe group of "activist psychologists" (report, p. 18, ¶ 31). Rather,
the work on implicit bias has been published in most of the leading, mainstream
international journals of psychology and its subdisciplines, including social psychology,
clinical psychology, cognitive psychology, and developmental psychology, as well as in
cognitive neuroscience. Whatever the political leanings of the social scientists
associated with this view, they clearly comprise a mainstream group rather than a
deviant fringe. The basic concepts of implicit social cognition, the theoretical area within
which work on implicit bias resides and also the one that is my primary area of
specialization within social psychology, have been embraced broadly not only by
psychologists but by a large and growing collection of social scientists in disciplines
other than psychology.

33. Research on phenomena of implicit bias has accelerated greatly in the past 10
years because of the development of a research method that was first published in
1998, the Implicit Association Test (IAT; Greenwald, McGhee, & Schwartz, 1998; a very
recent review is given by Nosek, Greenwald, & Banaji, 2006). Prior research on bias
was obliged to rely mainly on survey (question-asking) methods, which have the two
disadvantages of (a) allowing people the option to select answers that disguise their
actual beliefs and (b) not allowing opportunity to observe relevant beliefs that escape
conscious awareness. (Professor Tetlock properly identifies these two limitations of
survey methods for research on prejudice on p. 15, ¶ 26 of his Report.) By contrast, the
IAT assesses implicit bias without asking questions. It relies instead on speeded